# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## CASE NO.: 21-13755-BB

_____

IBRAHIM ALMAGARBY and MICROCAP EQUITY GROUP, LLC,

Appellants,

v.

SECURITIES AND EXCHANGE COMMISSION,

Appellee.

_____

## INITIAL BRIEF OF APPELLANTS, IBRAHIM ALMAGARBY AND MICROCAP EQUITY GROUP, LLC,

Sallah Astarita & Cox, LLC
Counsel for Appellants
3010 N. Military Trail, Suite 210
Boca Raton, FL 33431
Tel: 561-989-9080
_____/s/ Joshua A. Katz_____
James D. Sallah, Esq. (Fla. Bar No.: 92584)
Joshua A. Katz, Esq. (Fla. Bar. No.: 848301)
Jeffrey L. Cox, Esq. (Fla. Bar. No.: 173479)


Hunter Taubman Fischer & Li LLC
2 Alhambra Plaza, Suite 650
Coral Gables, Florida 33134
Tel: 305-629-1180
_____/s/ Mark David Hunter_____
Mark David Hunter, Esq. (Fla. Bar No. 12995)
Jenny Johnson-Sardella, Esq. (Fla. Bar No. 67372)
Sharifa G. Hunter, Esq. (Fla. Bar No. 97961)

Neil Rose, Esq.
4000 Hollywood Blvd.,
Suite 610 North
Hollywood, Florida 33021
Tel: (305) 439-5108
Email: neil@myappeal.com

By: _____/s/ Neil Rose_____
    Florida Bar No.: 378755

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT OF APPELLANTS,
## IBRAHIM ALMAGARBY AND MICROCAP EQUITY GROUP, LLC

Appellants, Ibrahim Almagarby and Microcap Equity Group, LLC, by counsel and pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, hereby certify that the following persons and entities have an interest in the outcome of this appeal:

1. Almagarby, Ibrahim, *Defendant/Appellant*

2. Cooke, Hon. Marcia G., *U.S. District Court Judge*

3. Cox, Jeffrey, L., Esq., *Attorney for Defendants/Appellants*

4. Gordon, Robert K., Esq., *Attorney for Plaintiff/Appellee*

5. Harris, Robert Charles, Esq., *Attorney for Defendants/Appellants*

6. Hicks, William P., Esq., *Attorney for Plaintiff/Appellee*

7. Hunter, Mark David, Esq., *Attorney for Defendants/Appellants*

8. Hunter, Sharifa, Esq., *Attorney for Defendants/Appellants*

9. Hunter Taubman Fischer & Li, LLC, *Attorneys for Defendants/Appellants*

10. Johnson-Sardella, Jenny Daphne, Esq., *Attorney for Defendants/Appellants*

11. Katz, Joshua A., Esq., *Attorney for Defendants/Appellants*

12. Microcap Equity Group, LLC, *Defendant/Appellant*

13. Rose, Neil, Esq., *Attorney for Defendants/Appellants*

14. Sallah, James D., Esq., *Attorney for Defendants/Appellants*

## CORPORATE DISCLOSURE STATEMENT

Appellant, Microcap Equity Group, LLC is a privately owned corporation, with no parent corporation, and no publicly held corporation owns 10 percent or more of it.

By:      /s/ Joshua Katz
Joshua Katz
Sallah Astarita & Cox, LLC
Florida Bar No: 848301

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument in this matter. This appeal involves important issues of first impression for this court regarding the "dealer/trader" distinction in the context of the Exchange Act. The primary issue concerns whether an investor is a dealer required to register under Section 15(a) of the Exchange Act, 15 U.S.C. Section 77o(a), or whether he falls into the trader exemption (and is thus not required to register), when he buys and sells securities only for his own account, but not part of a "regular business."

This is a critical issue affecting large numbers of investors, ranging from countless day-traders to large institutions (both individuals and businesses across the country). The lack of clarity on the proper application of this statutory section creates massive confusion, places innocent individuals and businesses in peril, and may deprive investors of their substantive due process rights to be informed about what the law requires. Oral argument would be useful for the Court to understand the nuances of these legal arguments and others presented in this appeal.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS

AND CORPORATE DISCLOSURE STATEMENT ...........................................C 1

STATEMENT REGARDING ORAL ARGUMENT .................................................i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ................................................................. viii

STATEMENT OF JURISDICTION........................................................ 1

STATEMENT OF THE ISSUES........................................................ 2

STATEMENT OF THE CASE................................................................ 4

STATEMENT OF THE FACTS ............................................................8

SUMMARY OF ARGUMENT ...............................................................14

## ARGUMENT I

**WHERE AN INVESTOR BUYS AND SELLS SECURITIES ONLY FOR HIS OWN ACCOUNT, BUT NOT AS PART OF A REGULAR BUSINESS, HE IS A PRIVATE INVESTOR OR TRADER, RATHER THAN A DEALER, AND THE DISTRICT COURT COMMITTED LEGAL ERROR IN DETERMINING THAT SUCH AN INDIVIDUAL OR HIS COMPANY WAS A DEALER REQUIRED TO REGISTER UNDER SECTION 15(a) OF THE EXCHANGE ACT, 15 U.S.C. SECTION 77o(a).**.....................16

Standard of Review.........................................................................16

Introduction of Argument...............................................................16

Argument .......................................................................................16

The District Court's Reliance on *Big Apple* is Misplaced............18

The Exchange Act...........................................................................18

The Securities Act...........................................................................19

The Dealer Analysis in *Big Apple* was Not under the Exchange Act ..........19

Exchange Act..................................................................................21

The District Court Never Decided Whether Almagarby

and MEG were Engaged in a Regular Business.............................21

The District Court Avoided the Factors the SEC Itself has Identified as

Indicating Dealer Activities............................................................21

The District Court's Interpretation of the Scope of Dealer was

Overly Broad ..................................................................................25

The District Court's Conclusion is Contradicted by the Meaning of the Term

Dealer as Used when the Exchange Act was Passed.....................27

The Facts Cited by the District Court to Support a Finding of "Dealer" Status

are Misplaced..................................................................................28

The Volume of Transactions and Sum of Profits is Irrelevant......29

Recent Case Law Undermines the District Court's Decision .......30

The Record Does Not Support a Finding of Undisputed Facts that Appellants Acted as Dealers ............................................................31

The District Court Mistakenly Applied Disputed Facts to Support its Conclusion that Appellants were Dealers.......................................32

## ARGUMENT II

**WHERE SEC GUIDANCE FOR DECADES FAILED TO PROVIDE SUFFICIENT NOTICE THAT INVESTORS' CONDUCT WOULD MAKE INVESTORS A "DEALER" REQUIRED TO REGISTER UNDER SECTION 15(a), RATHER THAN A "TRADER" WHO WAS EXEMPT FROM THE REGISTRATION REQUIREMENT, THE DISTRICT COURT COMMITTED LEGAL ERROR IN FAILING TO FIND THAT THE SEC VIOLATED INVESTORS' SUBSTANTIVE DUE PROCESS RIGHTS.** ...................................................35

Standard of Review........................................................35

Argument ..................................................................35

## ARGUMENT III

**WHERE MORE THAN FIVE YEARS PASSED FROM THE TIME THE INVESTORS FAILED TO REGISTER BEFORE ENGAGING IN BUYING OR SELLING SECURITIES FOR**

**THEIR OWN ACCOUNT, AND THE CONTINUING VIOLATION DOCTRINE DID NOT APPLY, THE EXPIRED STATUTE OF LIMITATIONS PRECLUDED THE SEC FROM SEEKING DISGORGEMENT.** ...................................................39

Standard of Review.........................................................................39

Argument .......................................................................................39

## ARGUMENT IV

**WHERE THE DISTRICT COURT FAILED TO MAKE A FINDING THAT THE REMEDY OF DISGORGEMENT WAS APPROPRIATE OR NECESSARY FOR THE BENEFIT OF ANY INVESTORS (AND INSTEAD IMPROPERLY MEASURED DISGORGEMENT BY DEFENDANTS' PROFITS AND NOT INVESTOR LOSSES), THE DISTRICT COURT COMMITTED LEGAL ERROR IN ORDERING DISGORGEMENT.** ........................44

Standard of Review.........................................................................44

Argument .......................................................................................44

The Supreme Court Decision in *Liu v. SEC* .................................45

The Disgorgement Award Failed to Find it was Appropriate or Necessary for the Benefit of Investors.........................................................................46

The District Court's Invitation to the SEC to Find Victims Post-Judgment Does Not Satisfy Section 21(d)(5)..................................................46

Recent Cases Have Required Victim Identification......................................48

## ARGUMENT V

**WHERE THERE WAS NO CAUSAL LINK BETWEEN ANY MERE FAILURE OF INVESTORS TO REGISTER WITH THE SEC AND ANY ILL-GOTTEN PROFITS, THE DISGORGEMENT AWARD WAS CONTRAY TO LAW.** ...................49

Standard of Review........................................................................49

Argument ........................................................................................49

## ARGUMENT VI

**EVEN IF INVESTORS WERE LIABLE SOLELY FOR A NON-SCIENTER-BASED, DEALER REGISTRATION VIOLATION, THE DISTRICT COURT COMMITTED LEGAL ERROR IN BASING INJUNCTIVE RELIEF, INCLUDING A PENNY STOCK BAR, ON THE INVESTOR'S YOUTH, THE MAINTENANCE OF TWO ACTIVE COMPANIES, GENERATION OF $2,600,000, IN MULTIPLE TRANSACTIONS OVER THREE YEARS, WHERE THERE**

**WAS NO SHOWING THAT THERE WAS A REASONABLE**

**LIKELIHOOD THAT THE WRONG WOULD BE REPEATED**........52

Standard of Review..........................................................................52

Argument ........................................................................................52

The *Calvo* Factors............................................................................54

The District Court Improperly Determined that Appellants' Conduct was

Egregious ........................................................................................54

Investors' Violation was Isolated, with No Prior Violations ........................56

It is Undisputed that Investors Never Acted with Scienter ...........................57

Defendants Ceased Engaging in the Conduct at Issue in 2016 .....................58

Investors Recognize the SEC's View of Their Conduct and the Gravity of the

Enforcement Action and Have Not Engaged, and Will Not Engage, in Such

Activity in the Future........................................................................59

Almagarby's Occupation Does Not Afford Him with an Opportunity to

Engage in the Violations Charged .................................................................60

CONCLUSION ....................................................................................61

CERTIFICATE OF SERVICE .................................................................62

CERTIFICATE OF COMPLIANCE.........................................................65

# TABLE OF AUTHORITIES

CASES

*3M Co. v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994) .................................................41

*Aaron v. SEC*, 446 U.S. 680 (1980) ...........................................................52, 57, 58

*Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*,

    548 F.3d 986 (11th Cir. 2008) .......................................................................16

*Birkelbach v. SEC*, 751 F.3d 472 (7th Cir. 2014) .....................................................41

*CFTC v. Southern Trust Metals*, 894 F.3d 1313

    (11th Cir. 2018) ...............................................................................................49

*CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir. 1999) .....................................................49

*CFTC v. Investors Freedom Club, Inc.*, 2005 WL 940897 (M.D. Fla. Apr. 4, 2005)

    ...........................................................................................................................55

*CFTC v. Wilshire Inv. Management Corp.*,

    531 F.3d 1339 (11th Cir. 2008) .....................................................................55

*Chapel Investments, Inc. v. Cherubim Interest, Inc.*,

    177 F. Supp. 3d 981 (N.D. Tex. 2016) .......................................22, 23, 26, 27

*Discover Growth Fund v. Beyond Commerce,* 561 F. Supp. 3d 1035

    561 F. Supp. 3d 1035 (D. Nev. 2021) .....................................................31, 33

*Donander Co. v. C.I.R.*, 29 B.T.A. 312 (U.S. Bd. Tax Appeals,

    Nov. 8, 1933) ...................................................................................................27

*FCC v. Fox Television Stations, Inc*., 567 U.S. 239 (2012) .............................35, 37

*Gabelli v. SEC*, 133 S. Ct. 1216 (2013) ...................................................41

*Howmet Corp. v. EPA*, 614 F.3d 544 (D.C. Cir. 2010) ...........................36

*Hyman v. Nationwide Mutual Fire Insurance Co.*,  304 F.3d 1179

(11th Cir. 2002) ..........................................................................16

*In re David B. Havanich, Jr*., SEC Release No. 935, 2016 WL 25786

(Jan. 4, 2016) ..............................................................................57

*In re Immune Pharms.,* No. 19-13273 (VFP),

 2021 WL 5989337 (Bank. D.N.J. Dec. 8, 2021)..................................30, 33*

*In re Scripts America*,  634 B.R. 863 (Bank. D. Del 2021)................... 22, 31, 33-34

*Kokesh v. SEC*, 581 U.S. ___, 137 S. Ct. 1635, 198 L. Ed. 2d 86 (2017)..............39

*Liu v. SEC*, 140 S. Ct. 1936, 1940, 207 L. Ed. 2d 401 (2020) ...........44, 45, 46, 47*

*Oceana Capitol Grp., Ltd. v. Red Giant Entm't, Inc.*, 150 F. Supp. 3d

1219 (D. Nev. 2015) ....................................................................23

*PHH Corp. v. CFPB*, 839 F.3d 1, 49 (D.C. Cir. 2016)...........................35

*Proffit v. FDIC*, 200 F.3d 855 (D.C. Cir. 2000) ......................................59

*Quantum Capital, LLC v. Banco de los Trabajadores*, 2016 WL 10536988

(S.D. Fla. Sept. 8, 2016) ..............................................................25

*Satellite Broadcasting Co. v. FCC*, 824 F.2d 1 (D.C. Cir. 1987)............................35

*SEC v. Adler*, 137 F.3d 1325 (11th Cir. 1998).........................................57

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786

    (11th Cir. 2015) ........................................................ 18, 19, 20, 21, 25, 32, 33

*SEC v. Blackburn*, 15 F.4th d 676 (5th Cir. 2021)....................................................48

*SEC v. Bevil*,2020 WL 7048263 (D. Nev. Nov. 30, 2020)......................................48

*SEC v. Brennan*, 2013 WL 12091655 (S.D. Fla. Dec. 9, 2013)..............................55

*SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004)...................................52, 53, 54, 58*

*SEC v. Carriba Air*, 681 F.2d 1318 (11th Cir. 1982) ..............................................54

*SEC v. Federated Alliance Group*, 1996 WL 484036

    (W.D.N.Y., Aug. 21, 1996) ...........................................................22, 23, 25*

*SEC v. First City Financial Corp., Ltd.*,

    890 F.2d 1215, 1228 (D.C. Cir. 1989)...........................................................55

*SEC v. Friendly Power Company LLC*, 49 F. Supp. 2d 1363 (S.D. Fla. 1999) ......55

*SEC v. Gane*, 2005 WL 90154 (S.D. Fla. Jan. 4, 2005) ..............................49, 50, 51

*SEC v. Gentile* 939 F. 3d, 549 (3d Cir. 2019)..........................................................58

*SEC v. Gunn*, 2010 WL 3359465 (N.D. Tex. Aug. 25, 2010)................................55

*SEC v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004) ..................................................53

*SEC v. Greene*, 2014 WL 11706448 (S.D. Fla. Jan. 27, 2014) ...............................55

*SEC v. Grossman*, 1997 WL 231167 (S.D.N.Y. May 6, 1997)...............................60

*SEC v. Hall*, 759 F. Appx. 877 (11th Cir. 2019) .....................................................55

*SEC v. Huff*, 758 F. Supp. 2d 1288, 1340 (S.D. Fla. 2010)....................................40

*SEC v. Janus Spectrum LLC*, 811 Fed. App'x. 432 (9th Cir. 2020).........................48

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) ...............................................59

*SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020)................................56

*SEC v. Perez*, 2011 WL 5597331 (S.D. Fla. Nov. 17, 2011) ......................56, 59, 60

*SEC v. Ridenour*, 913 F.2d 515 (8th Cir. 1990)......................................................29

*SEC v. U.S. Pension Trust Corp.*, 2010 WL 3894082

    (S.D. Fla. Sept. 10, 2010) ...............................................................................44

*SEC v. Voey*, 2013 WL 3805127 (D.N.H. July 22, 2013) .......................................58

*SEC v. Weintraub*, 2012 WL 13012751 (S.D. Fla. Jan. 10, 2012) .........................55

*SEC v. Wyly*, 56 F. Supp. 3d 260 (S.D.N.Y. 2014) .................................................50

*Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666 (10th Cir. 2016) ..................42

*Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979)................................52, 53, 56, 58*

*Steadman v. SEC*, 967 F.2d 636 (D.C. Cir. 1992) ............................................53, 56

*Toussie v. U.S.*, 90 S. Ct. 858 (1970).....................................................................41

*Wisc. Res. Protection Council v. Flambeau Min. Co.*, 727 F.3d 700

    (7th Cir. 2013) ...............................................................................................36

*XY Plan Network, LLC v. SEC*, 963 F.3d 244 (2d Cir. 2020).................................26

*Unexcelled Chemical Corp. v. U.S.*, 73 S.Ct. 580 (1953) ......................................41

*United States v. Harra*, 985 F.3d 196 (3rd Cir. 2021).............................................38

*Upton v. SEC*, 75 F.3d 92, 98 (2nd Cir. 1996) ..................................................35, 38

*U.S. v. Spectrum Brands, Inc.*, 924 F.3d 337 (7th Cir. 2019)...............40, 41, 42, 48

*U.S. v. Midwest Generation, LLC*, 720 F.3d 647 (7th Cir. 2013)..........................42

*U.S. v. W.T. Grant Co*., 345 U.S. 629 (1953) ........................................................53

OTHER

*Adoption of Rule 15Ba2-1*, 1975 WL 163406 (Oct. 15, 1975)..............16, 24, 29, 36

*Acqua Wellington North American Equities Fund, Ltd.*, 2001

WL 1230266 (Oct. 11, 2001).......................................................17, 22, 23, 24

*Burton Sec.*, 1977 WL 10680 (SEC No-Action Letter

Dec. 5, 1977)...........................................................................16, 23, 24, 26, 36

*Citicorp Homeowner, Inc., SEC No-Action Letter*, Fed. Sec. L. Rep.

(CCH) (Oct. 7, 1987) ....................................................................................23

Compliance Guide to Banks on Dealer Statutory Exceptions and Rules (2007),

https://www.sec.gov/divisions/marketreg/bankdealerguide.htm ............17, 36

*Continental Grain Co.*, 1987 WL 108902 (SEC No Action Letter

Nov. 6, 1987) .........................................................................................16, 36

*Davenport Mgmt., Inc.*, 1993 WL 120436 (SEC No-Action Letter

Apr. 13, 1993)...............................................................................17, 24, 36

Definition of Terms, 67 FR 67,496 (Nov. 5, 2002) ................................................17

Definition of Terms, 68 FR 8686 (Feb. 24, 2003)..................................................17

"Enhancing Our Equity Market Structure," (June 5, 2014), https://www.sec.gov/news/speech/2014-spch060514mjw ...........................29

Guide to Broker-Dealer Registration (2008), https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html ...................................17, 37

https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html .........................................19

*Fairfield Trading Corporation*, SEC No-Action Letter, 1988 WL 233618 (Jan. 10, 1988) ............................................................................................24

*In the Matter of Gordon Wesley Sodorff*, 50 SEC 1249, 1992 WL 224082 (1992) .............................................................17, 26, 36*

J. Coffee and H. Sale, Securities Regulation (12th ed. 2012)...................................24

*Louis Dreyfus Corp.*, 1987 WL 108160 ..........................................................17, 36

*Nat'l Council of Savings Institutions*, 1986 WL 67129 (SEC No-Action Letter July 27, 1986) ...................................................................16, 22, 23, 36

OTC Derivatives Dealers, 63 FR 59,362 (Nov. 3, 1998) ..................................17, 36

## STATEMENT OF JURISDICTION

This Court has "jurisdiction of appeals from all final decisions of the district courts."  28 U.S.C. Sec. 1291.

<u>STATEMENT OF THE ISSUES</u>

1. Did the District Court err in determining that an investor was a dealer required to register under Section 15(a) of the Exchange Act, 15 U.S.C. Section 77o(a), rather than a private investor or trader (who was not required to register), where he bought and sold securities only for his own account, but not part of a regular business?

2. Did the District Court err in failing to find that the SEC violated Investors' due process rights when the SEC guidance for decades failed to provide sufficient notice that the Investors' conduct would make one a "dealer" required to register under Section 15(a), rather than a "trader" who was exempt from the registration requirement?

3. Did the expiration of the statute of limitations preclude the SEC from bringing the claim for disgorgement, where more than five years passed from the time the Investors failed to register before engaging in the business of buying or selling securities for their own account, and the continuing violation doctrine did not apply?

4. Was disgorgement proper where the District Court failed to make a finding that the remedy of disgorgement was appropriate or necessary for the

benefit of any investors (and instead improperly measured disgorgement by defendants' profits and not investor losses)?

5.  Was disgorgement proper when there was no causal link between any mere failure of Investors to register with the SEC and any ill-gotten profits?

6.  Was injunctive relief proper for a non-scienter-based dealer registration violation, where there was no showing that there was a reasonable likelihood that the wrong would be repeated?

STATEMENT OF THE CASE

Introduction

Ibrahim Almagarby ("Almagarby") and his company, Microcap Equity Group, LLC ("MEG") (referred to as "Investor" or "Investors," as "Defendants" or by name) appeal from District Court rulings and a final judgment that imposed substantial punitive restrictions and financial penalties as a result of an enforcement action brought by the Securities and Exchange Commission ("SEC"). SEC brought an enforcement action against Investors for operating as dealers, without first registering as dealers, which according to the SEC was required by Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78o(a)(1), under the circumstances of this case.

The Pleadings

In the November 17, 2017 Complaint, SEC sued both Almagarby and MEG for violation of Section 15(a)(1) of the Exchange Act), 15 U.S.C. § 78o(a)(1) and Almagarby solely as a control person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). [DE 1].

Investors filed their answer and affirmative defenses, taking the primary position that they were "**traders**" who are excluded from the definition of "**dealers**" because they bought and sold securities ***but not as a part of a regular business***. [DE 42 at 7-8]. For their second affirmative defense, Investors maintained the position

4

that the SEC's enforcement of the dealer registration provisions of the Exchange Act violated their right to due process. [DE 42 at 8]. For their fourth affirmative defense, Investors claimed SEC's disgorgement and penalty claims were barred by the statute of limitations. [*Id.* at 9]. For their fifth affirmative defense, Investors maintained that injunctive relief was improper. [DE 42 at 9-10.] For their eighth affirmative defense, Investors stated that a penny stock bar was unwarranted. [DE 42 at 10-11].

SEC filed a motion for summary judgment against Investors [DE 73], along with a statement of material facts. [DE 73-1]. Investors filed their opposing memorandum of law [DE 82] and statement of disputed facts and statement of undisputed facts in support of response [DE 83]. SEC filed its reply in support of motion for summary judgment. [DE 88].

Investors filed their own motion for summary judgment [DE 74] and a statement of undisputed facts [DE 75] (hereinafter "DSMF ¶ __"). SEC filed its opposing memorandum of law [DE 79] and statement of disputed facts [DE 80]. Investors filed their reply to support their motion. [DE 86].

The District Court granted SEC's motion for summary judgment and denied Investors' motion for summary judgment. [DE 112]. The District Court's reasoning for these orders will be discussed in the argument sections.

As required by order [DE 117], the parties' filed a joint report delineating remaining issues, agreeing there were still issues about the propriety of: (1) civil

penalties; (2) disgorgement; (3) prejudgment interest on disgorgement; (4) a penny stock bar; and (5) MEG's surrender for cancelation of its remaining shares of stock and conversion rights of certain issuers. [DE 118 at 1-3]. The parties disagreed about whether the District Court had addressed and ruled upon a sixth issue: whether to impose permanent injunctive relief against Investors. [DE 118 at 3]. The District Court ordered a briefing schedule for the first five issues, but not for the sixth. [DE 119].

SEC filed its motion for remedies and supporting memorandum of law against Investors. [DE 120]. Investors filed their opposition memorandum. [DE 125].

The District Court referred the motion for remedies [DE 120] to the magistrate judge for a report and recommendation. [DE 135]. The magistrate judge issued his report and recommendation, to which Investors objected, and SEC responded. [DE 138; 142; 143].

On September 29, 2021, the District Court issued its order adopting the magistrate judge's report and recommendation. [DE 144]. On October 14, 2021, SEC moved for an amendment of the order adopting the magistrate judge's report and recommendation to clarify and supplement the relief ordered. [DE 145]. Investors opposed this motion [DE 148]. On October 28, 2021, Investors filed a notice of appeal. [DE 146.] On February 15, 2022, the District Court granted SEC's motion to amend the order adopting the magistrate judge's report and

recommendation.  [DE 150].  On the same day, the District Court entered an amended order adopting the magistrate judge's report and recommendation and entered a final judgment as to Investors.  [DE 151].

<u>STATEMENT OF THE FACTS</u>

In the order granting summary judgment in favor of the SEC and denying summary judgment for Almagarby and MEG, the District Court accepted as undisputed,

> Mr. Almagarby formed MEG, a Florida limited liability company, in January 2013. From January 2013 through July 2016 (hereinafter, "the relevant period"), Almagarby was the sole owner, officer, employee, and controlling person of MEG. Mr. Almagarby was a 29-year-old college student at Palm Beach State College during the relevant period. Mr. Almagarby operated MEG out of his home. During the relevant period, Mr. Almagarby had no employment outside of MEG and his sole means of support was his profits from MEG's securities transactions.

> MEG was a commercial enterprise carried on for profit or gain, and its business model was predicated on obtaining shares from the microcap companies (hereinafter, "Issuers") at a discount and selling the shares in the market at a profit. MEG obtained shares by purchasing "aged debt"[1] from the Issuers' debtholders and entering into certain agreements granting MEG the right to convert the debt into common stock of the Issuers at a significant discount—most often 50 percent—to then-prevailing market prices. MEG specifically purchased aged debt, which allowed MEG to obtain shares that upon conversion of the debt were unrestricted—such shares were exempt from the registration requirements of the Securities Act under SEC Rule 144 when sold into the market. MEG simultaneously obtained convertible debentures or convertible notes ("convertible debentures") from the Issuers whose debt MEG had agreed to purchase, which gave MEG the right to convert the convertible debentures, or any portion of them, into discounted shares of the Issuer. Almagarby, on behalf of MEG, subsequently converted the convertible debentures into shares of the Issuers.

---

[1] "Aged debt," was debt that was either six months or one year old, depending on the particular exemption sought from the registration provisions of the Securities Act of 1933.

Defendants did not have any employees, nor did they advertise or otherwise hold themselves out publicly to buy or sell securities. . .

Upon receipt of a conversion notice, the Issuers would arrange for their transfer agents to deposit the requested shares into one of MEG's brokerage accounts. . . . Following the deposit of the shares into MEG's brokerage accounts, MEG brokers sold the shares into the market pursuant to Almagarby's instructions.

Defendants typically sold the shares they acquired very quickly. Almagarby converted most of the convertible debentures that MEG received during the relevant period into shares within ten trading days of receiving the convertible debenture from the Issuer. Further, MEG, more often than not, sold all the shares in a given deposit within 7 to 14 days from receipt. Almagarby did not conduct research on the companies whose shares he acquired because his stated goal was to "turn [his] money around as fast as possible."

During the relevant period, Defendants engaged in at least 57 purchases of aged debt from the debtholders of at least 38 different Issuers. MEG received deposits of shares into its brokerage accounts on no fewer than 167 occasions as a result of issuing conversion or reset notices. MEG completed no fewer than 962 sales of shares. MEG received approximately 8.5 billion shares, and the total number of shares MEG sold during this period exceeded 7.6 billion. MEG purchased no less than approximately $1,115,000 of outstanding debt from the Issuers and obtained more than $2.8 million in proceeds from selling shares obtained pursuant to the convertible debentures and related documents. MEG used the proceeds from the sales of the shares to fund additional purchases of aged debt.

[DE 112 at 1-3].

While the District Court accepted as undisputed the statement that "MEG purchased no less than approximately $1,115,000 of outstanding debt from the Issuers . . . ," based on DSMF ¶ 22, Almagarby and MEG **never agreed** it was

9

undisputed.  In PSMF ¶ 22, the SEC asserted as an undisputed fact that ". . . MEG purchased not less than approximately $1,115,000 of outstanding debt from the debtholders of issuers . . . ."  Almagarby and MEG accepted the statement as undisputed, other than the amount claimed by the SEC  [DE 83 at 7.]  Investors' facts also showed: "There is no dispute that Defendants never acquired any securities by purchasing securities from any of the Issuers, since the transaction, as alleged by Plaintiff, consisted of exchanging aged debt from debtholders for shares of common stock."  [DE 83 ¶ 84.]

The parties also **agreed** [DE 75, 80, 83, 87] to the following facts contained in Investors' statement of material facts:

Almagarby formed Microcap Equity Group LLC, a Florida limited liability company, with the assistance of counsel, and is its president.    DSMF ¶ 3.  MEG operates out of Almagarby's house.  DSMF ¶ 4.  Almagarby owns 100% of the membership interest.  DSMF ¶ 5.

MEG would purchase the Debt directly from third party creditors of issuers.  DSMF ¶ 8.  Investors would ask the sellers for supporting documentation for proof of payment, the note itself and any agreement between the seller and the issuer.  DSMF ¶ 11.  Investors bought two types of debt instruments:  promissory notes and convertible notes.  DSMF ¶ 12.  If buying a promissory note without conversion feature, Investors would negotiate an exchange agreement with the Issuer to allow

10

Defendants to convert the note into a convertible note. DSMF ¶ 13. Investors negotiated the exchange rate for the number of shares into which the debt would convert. DSMF ¶ 14. Investors negotiated "reset" provisions for some notes, which would reset the conversion rate in the event that the price of the Issuer's stock price dropped. DSMF ¶ 15.

No Issuer ever offered to pay the note in full. DSMF ¶ 18. Finders (the "Finders") would locate companies that had Debt on their books with Debtholders who were willing to sell their Debt. DSMF ¶ 19. Finders looked for notes or opportunities in which Investors could invest. DSMF ¶ 20. If Finders located Issuers that had Debtholders with Aged Debt, Finders would give the information to Investors. DSMF ¶ 21. All of the deals were referred by Finders. DSMF ¶ 22.

Investors paid Finders a percentage of the acquisition cost of the Debt. DSMF ¶ 25. Finders were never employees of Investors. DSMF ¶ 59. Investors never directed Finders how to find deals. DSMF ¶ 60. There was no guarantee Finders would locate deals. DSMF ¶ 61.

Investors did not pay Finders any percentage made on the proceeds of the sale of stock once the note had been converted. DSMF ¶ 26. While Investors did pay Finders a percentage of the total purchase price of the acquisition of the Debt, Investors did not share the proceeds of the sale of stock once the note had been converted. DSMF ¶ 62. Depending on the liquidity of the market, Investors

11

exercised the conversion of the Debt, or a portion of the Debt, for shares of common stock. DSMF ¶ 27. Investors deposited the common stock in accounts in MEG's name held at one or more registered broker-dealers and sold the shares though registered broker-dealers. DSMF ¶ 28.

Investors never purchased the stock of their own clients (or even had clients); engaged in a business that was, due to their efforts, a "pump and dump." DSMF ¶ 64. Defendants had no website. DSMF ¶ 31. Investors never attended conferences or meetings where individuals from Issuers were present. DSMF ¶ 32. Investors never provided investment advice, DSMF ¶ 36, or extended or arranged credit in connection with securities transactions. DSMF ¶ 37. Investors never ran a book of repurchase or reverse repurchase agreements, DSMF ¶ 39, or used an interdealer broker for securities transactions. DSMF ¶ 40. Investors never loaned securities to customers, DSMF ¶ 41, or issued or originated securities. DSMF ¶ 42. Investors never guaranteed contract performance or indemnified the parties for any loss or liability from the failure of any transaction to be successfully consummated. DSMF ¶ 43. Investors never promoted the stock of any of the issuers or paid to do so. DSMF ¶ 45. Investors never delivered subscription agreements to investors of the Issuers for their review and signature. DSMF ¶ 46. Investors never solicited investors to invest in securities issued by the Issuers. DSMF ¶ 47. Investors never handled money or securities on behalf of any Issuers or note sellers. DSMF ¶ 48.

By at least September 2012, through a related entity, Almagarby International, LLC, Almagarby began purchasing Aged Debt from unaffiliated third-party creditors of Issuers, converting the Debt to common stock and selling the stock into the market.  DSMF ¶ 56.  Investors were never registered with SEC as dealers. DSMF ¶ 57.  Investors have not purchased Aged Debt for purposes of converting the Debt into shares of common stock since 2016.  DSMF ¶ 57.

SUMMARY OF ARGUMENT

Almagarby and MEG bought and sold securities only for their own account, but not as part of a "regular business".  Investors were not required to register as "dealers," under Section 15(a) of the Exchange Act, 15 U.S.C. Section 77o(a). Instead, they were "traders" who were not required to register.

The District Court committed legal error in entering summary judgment for the SEC on this issue, applying the legal standards incorrectly, conflating the Securities Act with the Exchange Act, ignoring the history of the Act, and ruling contrary to decades of guidance given by the SEC itself.  Investors were traders, buying and selling for their own profit (investing their own money in their own investment decisions) and not on behalf of any customers or issuers; they did not act for customers or make markets as professionals or provide dealer services to the public, like dealers would do.

Moreover, the SEC provided guidance for decades regarding the type of investor conduct that would make one a "dealer," who was required to register under the Exchange Act, rather than a trader who was exempt from registration.  But this guidance failed to provide sufficient notice to Investors that *their* conduct was the type of conduct for which registration was required.  As such, the SEC violated Investors' substantive due process rights.

14

Next, the disgorgement claim was time barred. The failure of Investors to register before initiating buying and selling securities for their own account occurred more than five years prior to the time the SEC filed this action. And the continuing violation doctrine did not apply in this case. Consequently, the statute of limitations expired, thus precluding the claim for disgorgement and penalties.

The disgorgement order was also unlawful. The District Court failed to make a finding that disgorgement was appropriate or necessary *for the benefit of investors*. The District Court never identified the investors who were purportedly harmed or how they were harmed. Instead, the District Court improperly measured disgorgement by Investors' profits and not investor losses. The disgorgement award was also contrary to law because there was no causal link or connection between Investors' failure to register with the SEC and any net profits or ill-gotten gains.

Finally, injunctive relief was improper because there was no showing that there was a reasonable likelihood that the wrong would be repeated. Even if Investors were liable solely for a non-scienter-based, dealer registration violation, there was no evidence of egregious, flagrant or deliberate conduct; fraud or scheme; repeated misdeeds or crimes; or breach of fiduciary duty that would justify an injunction as a result of a mere technical violation, especially where Investors ceased the questionable conduct in 2016.

15

## **ARGUMENT I**

**WHERE AN INVESTOR BUYS AND SELLS SECURITIES ONLY FOR HIS OWN ACCOUNT, BUT NOT AS PART OF A REGULAR BUSINESS, HE IS A PRIVATE INVESTOR OR TRADER, RATHER THAN A DEALER, AND THE DISTRICT COURT COMMITTED LEGAL ERROR IN DETERMINING THAT SUCH AN INDIVIDUAL OR HIS COMPANY WAS A DEALER REQUIRED TO REGISTER UNDER SECTION 15(a) OF THE EXCHANGE ACT, 15 U.S.C. SECTION 77o(a).**

Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court. *Hyman v. Nationwide Mutual Fire Insurance Co.*, 304 F.3d 1179, 1185 (11th Cir. 2002). This Court reviews the district court's interpretation of a federal statute under a *de novo* standard. *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 548 F.3d 986, 989 (11th Cir. 2008).

Introduction to Argument

For years, the SEC has provided guidance, through Releases and No-Action Letters, detailing those activities that tend to show a person is acting as a dealer, who must register, or trader, who is excluded from the definition of dealer and has no obligation to register. *See, e.g.*, *Adoption of Rule 15Ba2-1*, 1975 WL 163406, at *3 (Oct. 15, 1975); *Burton Sec.*, 1977 WL 10680, at *1 (SEC No-Action Letter Dec. 5, 1977); *Continental Grain Co.*, 1987 WL 108902, at *2 (SEC No Action Letter Nov. 6, 1987); *Nat'l Council of Savings Institutions*, 1986 WL 67129, at *2 (SEC No-

16

Action Letter July 27, 1986); *Louis Dreyfus Corp.*, 1987 WL 108160, at *2; *Gordan*

*In the Matter of Gordon Wesley Sodorff*, 50 SEC 1249, 1992 WL 224082 (1992) at

*5 & n.27; *Davenport Mgmt., Inc.*, 1993 WL 120436, at *12 (SEC No-Action Letter

Apr. 13, 1993); OTC Derivatives Dealers, 63 FR 59,362, 59,370 n.61 (Nov. 3, 1998)

("Release No. 34-40594"); *Acqua Wellington North American Equities Fund, Ltd.*,

2001 WL 1230266 (Oct. 11, 2001); Definition of Terms, 67 FR 67,496, 67,499 &

n.31 (Nov. 5, 2002) ( "Release No. 34-46745"); Definition of Terms, 68 FR 8686,

8688 & n.22 (Feb. 24, 2003); Compliance Guide to Banks on Dealer Statutory

Exceptions              and              Rules              (2007),

https://www.sec.gov/divisions/marketreg/bankdealerguide.htm; Guide to Broker-

Dealer       Registration       (2008),       https://www.sec.gov/reportspubs/investor-

publications/divisionsmarketregbdguidehtm.html

Both dealers and traders buy and sell securities for their own accounts, but

they are distinct animals. 15 U.S.C. § 78c(a)(5)(A) and (B). Dealers engage in this

business while acting for their customers or making markets as professionals; traders

buy and sell for their own profit and not on behalf of any customers or issuers. *See*

*Acqua*, 2001 WL 1230266 at *3-4. The overwhelming, indisputable evidence

demonstrated that Investors acted as traders, **not** dealers, because their business was

never geared towards providing dealer services to the public. *See id*. Summary

judgment should have been entered in favor of Investors. However, even if the

District Court could not conclude *as a matter of law* that Investors were traders, there was at least disputed evidence supporting the conclusion that Investors were traders, and such evidence precluded finding as a matter of law that Investors were **dealers**.

<u>Argument</u>

## **The District Court's Reliance on *Big Apple* is Misplaced**

The District Court concluded that Investors were dealers based on this Court's analysis of the definition of dealer under the **Securities** Act in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015). [DE 112 at 7]. Despite the District Court's mistaken statement that *Big Apple* was "based in part on the definition of dealer under the **Exchange** Act" [*id.*], *Big Apple* analyzed the definition of "dealer" under Section 2(a)(12) of the **Securities** Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(12), and **not** under the Exchange Act, 15 U.S.C. § 78c(5). Because the definitions are distinct and concern separate regulatory requirements, the District Court's reliance on *Big Apple* was erroneous.

- **The Exchange Act**

The Exchange Act defines dealer as "any person engaged in the business of buying and selling securities … for such person's own account …." 15 U.S.C. § 77c(a)(5)(A). The Exchange Act, however, provides an "[e]xception for person not engaged in the business of dealing.—The term 'dealer' does not include a person that buys or sells securities … for such person's own account … but not as a part of

18

a regular business." 15 U.S.C. § 78c(a)(5)(B).  SEC has referred to persons excluded from the definition of dealer under Subsection (B) as "traders."  *See* https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html.

- **The Securities Act**

The Securities Act, on the other hand, defines "dealer" as "any person who engages, either for all or part of his time, directly or indirectly, … in the business of … offering, buying, selling or otherwise dealing or trading in securities issued by another person." 15 U.S.C. § 77b(a)(11).  **The Securities Act definition is broader than the Exchange Act because it contains no trader exception.**  A trader who buys and sells securities, but not as part of a regular business, would be excluded from the **Exchange** Act definition of dealer, but would be **included** in the **Securities** Act definition because that trader would be engaged, for part time, in the business of trading securities.  Thus a finding that a person is a dealer under the Securities Act definition would *not* mean that person is required to register as a under the Exchange Act.

- **The Dealer Analysis in *Big Apple* was Not under the Exchange Act**

*Big Apple* was not an Exchange Act decision involving the dealer-trader distinction, but instead dealt with the applicability of an exemption from Section 5 of the **Securities** Act, which prohibits "the 'sale' and 'offer for sale' of any securities

19

unless a registration statement is in effect or there is an applicable exemption from registration." *Big Apple*, 783 F.3d at 806. Among others, Section 4(1) of the Securities Act exempts "from the registration requirements of § 5 . . . 'transactions by any person *other than* an issuer, underwriter, or dealer.'" *Id.* at 807 (quoting Section 4(1), 15 U.S.C. § 77d(1) (emphasis in *Big Apple*). The Eleventh Circuit stated that the district court and the parties analyzed the applicability of the Section 4(1) exemption under the Exchange Act definition, not the Securities Act. This Court explained that "[b]ecause the definition of dealers in 15 U.S.C. §77b(a)(12) and 15 U.S.C. § 78c(a)(5)(A) are very similar, the district court's analysis was sound." *Id.* n.11.

Neither *Big Apple*, nor the District Court, explained the differences between the definitions. A finding that a person was a dealer under the Exchange Act would be "sound" for concluding that person was a dealer under the Securities Act. However, there was no discussion about the converse: whether a person defined as a Securities Act dealer is always within the scope of a dealer under the Exchange Act and, accordingly, required to register. *Big Apple* interpreted the definition of dealer under a statute **without** a trader exemption, because the dealer-trader distinction was irrelevant under the Securities Act.

By following guidance from *Big Apple*, which dealt with the **Securities Act (rather than the Exchange Act)**, the District Court committed legal error by

20

concluding Investors were dealers, without any finding that they were engaged in the business of buying and selling securities as part of a regular business. For example, the District Court stated that "[t]his case turns on whether Defendants engaged in the 'business of' buying and selling securities for its own account" **without** any reference to whether that business was a regular business or what a regular business would mean. [DE 112 at 7.] The District Court concluded that "it is indisputable that Defendants were 'in the business of … buying [and] selling securities …" and, therefore, they do not meet the § 4(1) exemption to the registration requirement." *Id.* The *Big Apple* Court reached the same conclusion. *Big Apple*, 783 F.3d at 809. However, the Section 4(1) exemption only applies to the registration requirement under Section 5 of the **Securities** Act, not to the **Exchange** Act.

### The District Court Never Decided Whether Almagarby and MEG were Engaged in a Regular Business

- **The District Court Avoided the Factors the SEC Itself has Identified as Indicating Dealer Activities**

The **Exchange** Act **excludes** a person who "buys or sells securities … for such person's own account … but not as a part of a regular business," and the District Court stated that "those who buy and sell securities as part of a 'regular business' must register …." [DE 112 at 6.] But the District Court did not consider whether Investors were engaged in the business of buying and selling securities *as part of a*

*regular business* and did not explain what distinguishes a business from a "regular business". Since the District Court erroneously concluded that Investors were liable *only* for having been in the business of buying and selling securities, it never considered any published guidance from the SEC **itself** on the dealer-trader distinction.

The Exchange Act provides no definition of what constitutes a regular business, and Black's Law Dictionary has no entry for "regular" or "regular business." The case law concerning the trader-dealer distinction is scant, at best. *SEC v. Federated Alliance Group*, 1996 WL 484036, at *4 (W.D.N.Y., Aug. 21, 1996). One court has found that "[t]he term 'regular business' as used in Section 5(B) means 'the regular business of providing dealer services to others …, such as soliciting investor clients, handling investor clients' money and securities, [and] rendering investment advice to investors.'" *In re Scripts America, Inc.*, 643 B.R. 863, 872 (Bank. D. Del. 2021) (quoting *Chapel Investments, Inc. v. Cherubim Interest, Inc.*, 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016)). It is these services that "distinguish the activities of a dealer from those of a private investor or trader." *Id.* (quoting *Sodorff*, 1992 WL 224082, at *5 n.27).

Over time, "[i]n various contexts, the Commission and its Staff have articulated a variety of factors that should be considered in distinguishing a person acting as an investor or a trader from a dealer." *Acqua*, 2001 WL 1230266 at *3-4

(citing No-Action Letters). *See* Release No. 34-46745; Release No. 34-40594; *Nat'l Council of Savings Institutions*, 1986 WL 67129, at *4. The few courts that have considered the dealer-trader distinction have utilized the SEC's No-Action Letters as a basis for presenting those factors that would require a person to register as a dealer. *See Chapel Investments*, 177 F. Supp. 3d at 990 (citing *Acqua* 2001 WL 1230266, at *5; *Burton Sec.*, 1977 WL 10680, at *1; *Federated Alliance*, 1996 WL 484036 at *4 n.40 (quoting *Citicorp Homeowner, Inc., SEC No-Action Letter*, Fed. Sec. L. Rep. (CCH) ¶ 78,513, at 77,653 (Oct. 7, 1987); *Oceana Capitol Grp., Ltd. v. Red Giant Entm't, Inc.*, 150 F. Supp. 3d 1219 (D. Nev. 2015) (citing *Acqua*, 2001 WL 1219 at *5; *Burton Secs.*, 1977 WL 10680, at *1; *Nat'l Council of Savings Institutions*, 1986 WL 67129, at *2)). These various factors include analyzing whether the persons:

1) Advertise or otherwise hold themselves out publicly as willing to buy or sell securities from its own account on a continuing basis;

2) Purchase or sell securities as principal from or to customers;

3) Carry a dealer inventory in securities;

4) Quote a market in securities;

5) Provide investment advice;

6) Extend or arrange for the extension of credit in connection with securities transactions;

7) Run a book of repurchase and reverse repurchase agreements;

8) Use an interdealer broker for securities transactions;

9) Lend securities to customers;

10)  Issue or originate securities;

11)  Guarantee contract performance or indemnify the parties for any loss or liability from the failure of the transaction to be successfully consummated; and

12)  Participate in a selling group or act as an underwriter.

*Acqua*, 2001 WL 1230266, at \*3-4; *see also Davenport Management, Inc.*, 1993 WL 120436, at \*5; *Fairfield Trading Corporation*, SEC No-Action Letter, 1988 WL 233618 (Jan. 10, 1988); *Burton Securities*, 1977 WL 10680, at \*1. Being engaged in a "regular business" involves more than forming a company, buying and selling securities and generating a profit; rather, **the phrase "regular business" "is intended to distinguish professionals who act for others or make markets as a profession from very active personal investors."** *See* J. Coffee and H. Sale, Securities Regulation (12th ed. 2012), at 630 (emphasis added).

The reason for establishing these factors was to clarify that "it was not the intent of Congress that every [firm] engaged in" the activity of buying and selling securities "solely for its own account … even though such purchases and sales are made with some frequency" register as a dealer. *Adoption of Rule 15Ba2-1*, 1975 WL 163406, at \*3. Despite the consistency in the SEC's statements about the dealer-

24

trader distinction, the District Court did not even consider these factors which *the SEC has claimed* show a person is acting as a dealer, stating these factors were "merely examples of activity or actions that might render one a dealer" and were neither an exclusive nor exhaustive checklist as a burden of proof for the SEC.  [DE 112 at 8.]  *See Federated*, 1996 WL 484036, at *5.

It was improper not to at least review *all the relevant facts and circumstances* to determine whether a person meets the definition of a dealer.  *See* Release No. 34-46745; *Quantum Capital, LLC v. Banco de los Trabajadores*, Case No. 1:14-cv-23193-UU, 2016 WL 10536988, *6 (S.D. Fla. Sept. 8, 2016) ("Because the Exchange Act [does not define] 'engag[ing] in the business,' an array of factors determines whether a person qualifies as a dealer").  Instead, the District Court erroneously relied on *Big Apple*, concluding Investors were dealers by buying and selling securities for their own accounts through a business, **without** considering these factors to determine whether the business was a *regular* business.

- **The District Court's Interpretation of the Scope of Dealer was Overly Broad**

One of the only federal cases dealing with the dealer-trader distinction under the Exchange Act is *SEC v. Federated Alliance Group*, 1996 WL 484036 (W.D.N.Y., Aug. 21, 1996).  The SEC argued that defendants violated Section 15(a) of the Exchange Act because they "made money by purchasing government securities and distributing them to individuals across the country. . ." without

registering as dealers (similar to what our District Court found).  *Id*. at *5.  *Federated* rejected this argument, concluding that it would "excessively broad[en]" the definition" of "dealer" beyond that contemplated by the guidance provided in SEC No-Action Letters.  *Id*.  According to *Federated*, **the SEC's position "would embrace every securities trader who makes money through buying and selling securities**." *Id*.  (Emphasis added).

*Federated's* reasoning is sound:  persons engaged in the business of buying and selling securities as part of a regular business means those market participants who act as market makers, simultaneously quoting buy and sell prices to customers, and otherwise providing services to customers who seek to trade.  *See Chapel Inv.*, 177 F. Supp. 3d at 990; *XY Plan Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020) (noting that brokers and dealers "effect securities transactions for customers, for which they typically charge a commission or other transaction-based fee").

The distinctions are explained in *Sodorff*:

> The definition of dealer contains an exclusion for activity that is not part of "a regular business."  **The purpose of this phrase is to "exclude from the definition of 'dealer' members of the public who buy and sell securities for their own account as ordinary traders," even though their trading may involve more than isolated transactions**.

50 SEC 1249 at *5 (emphasis added).  In reference to these activities, the SEC stated:

"[t]hese factors distinguish the activities of a dealer from those of a private investor

or trader." *Id.*, n.27; *see also* Burton Securities, SEC No-Action Letter, 1977 WL 10680, at *1.

- **The District Court's Conclusion is Contradicted by the Meaning of the Term Dealer as Used when the Exchange Act was Passed**

SEC guidance established that the business of securities dealing was well-understood to mean the business of providing financial services to customers and facilitating customer trading, and not to mean persons investing their own money in their own investment decisions. *See* SEC Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker at xiv (1936); *Donander Co. v. C.I.R.*, 29 B.T.A. 312, 314-15 (U.S. Bd. Tax Appeals, Nov. 8, 1933) (a person who "carries on an investment business for [his] own profit … is not a dealer in securities … regardless of the number of purchases and sales." Instead, "[t]he term [dealer] rather has application to a merchant who holds himself out to customers"); *see, e.g., Chapel Investment*, 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016) ("There is a broad exemption [in the Exchange Act] for investors and traders not engaged in the regular business of providing dealer services to others").

Since the hearings before Congress contemplating the passage of the Exchange Act, the definition of dealer did **not** include a person "buying and selling securities for his own account," even if that person had no other business, unless the person is "engaging in a business of buying and selling securities to payy [sic.] them on to others." H'rg Excerpts, 73d Cong. (1934). The definition "does not cover a

man who is simply investing his own money," because "[t]hat is not a regular business" of dealing, which is "the business of making a profit by merchandising" securities. *Id*.

- **The Facts Cited by the District Court to Support a Finding of "Dealer" Status are Misplaced**

The District Court supported its finding that Investors were dealers because they profited from simply investing their own money: "MEG's entire business model was predicated on the quick sale of shares and Defendant Almagarby's stated goal was to 'turn [his] money around as fast as possible" and there were more than "962 sales of shares and more than $2.8 million in proceeds." [DE 112 at 7.] However, there is no connection between these facts and the factors that *the SEC itself* considers important indicators to determine when a trader is buying and selling too quickly, or at a stated frequency, for proceeds of a certain amount, would become a dealer, requiring registration.

Even so, Investors averaged less than 23 sales of shares per month – less than one sale per day. It is clear from the statutory text that dealer status does not turn merely on the frequency of trading, for engaging in an activity *frequently* does not mean one is engaged in that activity *as a business* or as a *regular business*. Playing tennis frequently does not make one a professional tennis player any more than frequently gardening makes one a professional landscaper.

- **The Volume of Transactions and Sum of Profits is Irrelevant**

The District Court erroneously relied on "the sheer volume of the number of deals and the large sums of profit" to give "credence to the proposition that [Investors] were engaged in the 'business' of buying and selling securities." [DE 112 at 7] (citing *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990)). But the "level of activity" referenced in *Ridenour* concerned the defendant's activities **as a dealer**. *Id*. at 517. He bargained with his clients; "attempted to obtain and keep a regular clientele for his 'private' bond deals," was quoting a market for municipal securities, buying from clients, marking up the bonds, selling them to other clients and pocketing the profits. *Id.*

For decades, the SEC has said volume was not enough: "[T]he nature of a bank's activities, rather than the volume of transactions or similar criteria, are of greater relevance in determining when a bank is a … securities dealer." *Adoption of Rule 15Ba2-1*, 1975 WL 163406, at *4. Former SEC Chair Mary Jo White echoed this position when agreeing that high frequency trading firms, which represent "well over a majority of [all] trading volume," were not dealers. Mary Jo White, "Enhancing Our Equity Market Structure," (June 5, 2014), https://www.sec.gov/news/speech/2014-spch060514mjw. There is no bright line distinguishing dealers from traders from the SEC or any legal authority based on

volume or profit sums.  However, there is a at least a genuine issue of fact whether Investors' volume or frequency of trading rendered them dealers or traders.

- **Recent Case Law Undermines the District Court's Decision**

Recent cases reject the expansive definition of dealer employed by the District Court for purposes of the **Exchange Act**.  In *In re Immune Pharms.,* No. 19-13273 *4, 2021 WL 5989337 (Bankr. D.N.J. Dec. 8, 2021), the court noted that a securities dealer was in "the regular business of providing dealer services to others … such as soliciting investor clients, handling investor clients' money and securities, [and] rendering investment advice to investors."  (internal citations omitted).  "Whereas an investor or trader may buy securities from issuers at ***substantial discounts*** and resell them into the public market for a potentially ***significant profit***, a dealer buys and sells securities from its customer ***and*** to its customer."  *Id.*  (emphasis added) (internal citation omitted).  Dealers "are distinguished from investors and traders because they have customers and derive their income from marketing securities for sale to customers or from being compensated for services provided as an intermediary or market-maker."  *Id.* (internal citations omitted).  The court determined one who "acquired [stock] at a discounted price when it converted a portion of [the convertible security] it acquired directly from [the company]" and "sold only into the public through a brokerage account … did not act as a dealer."

*Id.* Investors conduct was similar, yet the District Court inexplicably found Investors to be dealers.

Other courts support Investors' position. *See In re Scripts America*, 634 B.R. 863, 873 (Bank. D. Del. 2021) (one with no customers, whose only activities were buying securities from issuers at a discount, and then reselling them into the market for a profit, was not a dealer); *Discover Growth Fund*, 561 F. Supp. 3d 1035, 1041 (D. Nev. 2021) ("[w]hereas a dealer buys and sells securities from its customer and to its customer for a small, fixed commission, investors like Plaintiff buy securities directly from issuers like Defendant, often at a substantial discount, and then resell them into the public market for a variable but potentially large profit").

- **The Record Does Not Support a Finding of Undisputed Facts that Appellants Acted as Dealers**

The conclusion that Investors were **dealers** flies in the face of these recent decisions and the factors identified by the SEC itself! Investors did not: have a website; advertise or hold themselves out publicly to buy and sell securities; operate from outside home; provide investment advice; extend or arrange for the extension of credit in connection with securities transactions; run a book of repurchase or reverse repurchase agreements; use an interdealer broker for securities transactions; issue or originate securities; solicit investors to invest in securities; or handle money or securities on behalf of any issuers or note sellers.

31

The District Court never found that Investors engaged in the type of public securities business that would qualify as a regular business. Further, there is no evidence that Investors had customers from whom they purchased, or to whom they sold, any securities. [DE 75, 80, ¶¶ 33, 34.] In short, the District Court never found that Investors were engaged in the business of buying and selling securities as part of a regular basis. And there was insufficient evidence to make such a finding.

- **The District Court Mistakenly Applied Disputed Facts to Support its Conclusion that Appellants were Dealers**

The District Court also committed legal error in applying the facts to the *Big Apple* decision by misstating the undisputed facts – and then relying on the mistake. The District Court asserted as undisputed: "MEG purchased no less than approximately $1,115,000 of outstanding debt from the Issuers . . ." [DE 112 at 3] (citing PSMF ¶ 22). This statement was just wrong: there was no evidence that MEG purchased debt **from the issuers of the debt**.

In fact, ***the SEC*** asserted as undisputed that "MEG purchased . . . outstanding debt from the **debtholders of** issuers . . . ." PSMF ¶ 22 (emphasis added). The Court deleted "debtholders of" – a material alteration. In fact, it was undisputed that: ". . . Defendants never acquired any securities by purchasing securities from any of the Issuers, since the transaction, as alleged by Plaintiff, consisted of exchanging aged debt from debtholders for shares of common stock." [DE 83 ¶ 84].

32

For purposes of applying *Big Apple* to this case, the distinction between purchasing stock from an issuer for resale to the investing public versus purchasing aged debt **from a third-party creditor** for conversion into stock for resale to the investing public highlights why *Big Apple* is material. *Big Apple* found, in part, "[a]s further evidence of their dealer status, Big Apple and MJMM purchased CyberKey stocks at deep discounts pursuant to its contractual agreement with CyberKey and then sold those stocks for a profit." *Big Apple*, 783 F.3d at 710. *Big Apple* did not involve (as our case does) an investor purchasing aged debt securities **from a third party**, converting them into shares of stock for sale to the public.    However, the District Court's blatantly incorrect finding that MEG purchased securities **from issuers** improperly suggests our facts mesh with *Big Apple* (a Securities Act case).

The only case where a party purchased aged debt from a third-party creditor for conversion into common stock for sale through a registered broker-dealer (but without providing typical dealer services) has concluded that the investor was **not** acting as a dealer under the Exchange Act. *See In re Immune Pharms.*, 2021 WL 5989337, at *4; *In re Scripts America*, 634 B.R. 863 (Bank. D. Del. 2021) at *4-5. Indeed, other recent cases involving purchases of securities directly from issuers, "often at a substantial discount" for resale into the public market, have denied dealer status without proof of a regular business providing typical dealer services. *Discover Growth Fund*, 561 F. Supp. 3d 1035, 1041 (D. Nev. 2021); *see Scripts America*, 634

B.R. at 873 ("Ironridge's only activities were buying securities from issuers at a discount, and then reselling them into the market for a profit, so under the plain language of Section 5(B) it is not a dealer").

The indisputable evidence demonstrated that Investors bought and sold securities for their own profits and never provided any typical dealer services for any customers or issuers of the kind that the SEC has identified for decades. Nevertheless, the District Court erroneously concluded that Investors were dealers based on the fact that Almagarby formed a business entity with which he bought and sold securities. These facts are legally insufficient for reaching that conclusion under the Exchange Act, 15 U.S.C. § 78c(a)(5).

## ARGUMENT II

**WHERE SEC GUIDANCE FOR DECADES FAILED TO PROVIDE SUFFICIENT NOTICE THAT INVESTORS' CONDUCT WOULD MAKE INVESTORS A "DEALER" REQUIRED TO REGISTER UNDER SECTION 15(a), RATHER THAN A "TRADER" WHO WAS EXEMPT FROM THE REGISTRATION REQUIREMENT, THE DISTRICT COURT COMMITTED LEGAL ERROR IN FAILING TO FIND THAT THE SEC VIOLATED INVESTORS' SUBSTANTIVE DUE PROCESS RIGHTS.**

Standard of Review

See Standard in Argument I.

Argument

The District Court failed to address the argument that the SEC's enforcement action violated Investors' substantive due process rights.  [DE 74 at 17-18].  The Due Process Clause of the U.S. Constitution establishes the "fundamental principal in our legal system [] that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  Due process precludes "an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *PHH Corp. v. CFPB*, 839 F.3d 1, 49 (D.C. Cir. 2016) (quoting *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 3-4 (D.C. Cir. 1987), *reinstated in relevant part and rev'd in part on other grounds*, 881 F.3d 75 (D.C. Cir. 2018) (*en banc*); *see also, Upton v. SEC*, 75 F.3d 92, 98 (2nd Cir. 1996) (holding that the SEC

may not sanction a person pursuant to a "substantial change in its enforcement policy that was not reasonably communicated to the public.").

The SEC violated Investors' constitutional rights by bringing an enforcement action based on an interpretation of "dealer" that is inconsistent with Section 15(a) of the Exchange Act and ignored years of guidance **provided by SEC** Staff pronouncements, SEC No-Action Letters, and the SEC's own website.  It was thus impossible for Investors to determine with "ascertainable certainty" the standards of conduct to which the SEC and the District Court, "expect[ed] parties to conform." *Wisc. Res. Protection Council v. Flambeau Min. Co.*, 727 F.3d 700, 708 (7th Cir. 2013) (quoting *Howmet Corp. v. EPA*, 614 F.3d 544, 553-54 (D.C. Cir. 2010)).

The SEC has long provided guidance concerning the dealer-trader distinction. That guidance involves the fundamental question of whether a person is engaged in traditional dealer activities, such as underwriting, acting as a custodian for customer funds, or making markets.  The SEC has consistently publicized this message over the last 50 years[2]:

---

[2] **1975:**  *Adoption of Rule 15Ba2-1*, 1975 WL 163406, at *3; **1977:** *Burton Sec.*, 1977 WL 10680, at *1; **1987:** *Continental Grain Co.*, 1987 WL 108902, at *2; *Nat'l Council of Savings Institutions*, 1986 WL 67129, at *2; *Louis Dreyfus Corp.*, 1987 WL 108160, at *2; **1992:** *In the Matter of Gordan Wesley Sodorff,* 50 S.E.C 1249, 1992, WL 224082 (1992)  at *5 & n.27; **1993:** *Davenport Mgmt., Inc.*, 1993 WL 120436, at *12; **1998:** OTC Derivatives Dealers, 63 FR 59,362, 59,370 n.61 (Nov. 3, 1998) ("Release No. 34-40594"); **2002:** Release No. 34-46745, 67 FR 67,496, 67,499 & n.31; **2003:** Definition of Terms, 68 FR 8686, 8688 & n.22; **2007:** Compliance                          Guide                          (2007),

| Factors Listed In Securities Enforcement Commission Guidance | 1975 | 1977 | 1987 | 1992 | 1993 | 1998 | 2002 | 2003 | 2007 | 2008 | Almagarby |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **(1)** Handles other people's money or securities or carrying securities accounts | | ✓ | ✓ | ✓ | | | ✓ | | | ✓ | ✗ |
| **(2)** Solicit investors; or advertises or holds iteslf as a dealer, or as being willing to buy and sell securities on a coninuous basis | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✗ |
| **(3)** Quotes a market in any security | | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ |
| **(4)** Renders incidental investment advice | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | ✗ |
| **(5)** Extends or arranges the extension of credit in connection with others' securities transactions | | ✓ | ✓ | | ✓ | | ✓ | | | ✓ | ✗ |
| **(6)** Acts as an underwriter or participates in a selling group in any distribution of securities | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ |
| **(7)** Carries a dealer inventory in securities | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✗ |
| **(8)** Other (i.e., sends subscription agreements to investors; lends securities; issues or originates securities that it buys and sells; runs a matched book of repurchase agreements; or writes derivatives contracts that are securities) | | | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | ✗ |

There was no evidence that Investors engaged in the factors set forth in the guidance provided by the SEC itself!

Therefore, even if the statutory language encompassed Investors' conduct, summary judgment for SEC was improper because there was a lack of sufficient notice that such conduct required registration under Section 15(a). This case is not unlike *Fox*, where the FCC's enforcement of a statute violated a broadcaster's due process rights in light of the FCC's earlier guidance.

---

https://www.sec.gov/divisions/marketreg/bankdealerguide.htm; **2008:** Guide to Broker-Dealer Registration (2008), https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html

Investors reasonably relied upon the decades of guidance provided **by SEC itself** to determine their conduct did not trigger the registration requirements of Section 15(a).  Ignoring the due process argument, the District Court penalized Investors based upon SEC's abrupt change to its enforcement policy without properly communicating such a policy change to the public.  That is precisely what the court in *Upton* prohibits.  75 F.3d at 98.  By changing its position, the SEC deprived Investors of the due process right of sufficient notice of what the law requires.

At a minimum, the question of whether Investors had fair notice of the way in which the Exchange Act definition of "dealer" is applied in light of the guidance provided by the SEC should be a factual question for the jury.  *See, e.g., United States v. Harra*, 985 F.3d 196, 215-16 (3rd Cir. 2021) (holding that whether an individual had fair warning of government interpretation of regulation is a question for a jury).  Summary judgment was improper.

# ARGUMENT III

**WHERE MORE THAN FIVE YEARS PASSED FROM THE TIME THE INVESTORS FAILED TO REGISTER BEFORE ENGAGING IN BUYING OR SELLING SECURITIES FOR THEIR OWN ACCOUNT, AND THE CONTINUING VIOLATION DOCTRINE DID NOT APPLY, THE EXPIRED STATUTE OF LIMITATIONS PRECLUDED THE SEC FROM SEEKING DISGORGEMENT.**

Standard of Review

See Standard in Argument I.

Argument

"In *Kokesh v. SEC*, 581 U.S. ___, 137 S. Ct. 1635, 198 L. Ed. 2d 86 (2017), the court held that a disgorgement order in an SEC enforcement action imposes a 'penalty' for the purposes of 28 U.S.C. Section 2462, the applicable statute of limitations." *Liu v. SEC*, 140 S. Ct. 1936, 1940, 207 L. Ed. 2d 401 (2020).  Section 2462, 28 U.S.C., provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim ***first accrued*** .   .   .

(Emphasis added.)   *Kokesh* held that "any claim for disgorgement in an SEC enforcement action must be commenced within five years of the date the claim accrued."  137 S. Ct. at 1645.

Even though undisputedly Almagarby commenced the business of buying and selling securities for MEG by September 2012, DSMF ¶ 56, **(more than 5 years**

**before the SEC filed its complaint)**, the District Court did not consider when the claim for disgorgement accrued, let alone when it ***first accrued***. The District Court wrongly concluded that the complaint was timely filed under 28 U.S.C. §2462 based on the continuing violation doctrine, "[b]ecause some of [the] conduct occurred within the limitations period, the statute of limitations does not bar the SEC's disgorgement claim." [DE 112 at 5-6 (citing *U.S. v. Spectrum Brands, Inc.*, 924 F.3d 337, 350 (7th Cir. 2019)].

However, the continuing violation doctrine is inconsistent with the text of Section 2462, and there are no facts supporting its use. The 5-year limitations under Section 2462 may only be set aside "as otherwise provided by Act of Congress." 28 U.S.C. §2462. Even though Congress has expressed its intent "to protect the investor" when it passed the Exchange Act in 1934, *SEC v. Huff*, 758 F. Supp. 2d 1288, 1340 (S.D. Fla. 2010), *aff'd.* 455 F. App'x. 882 (11th Cir. 2012) (citation omitted), there is no express Congressional intent to set aside the limitations under Section 2462.

Courts have limited the doctrine's use to "where the appropriate facts exist...." *Id.* at 41. And there are no such facts here. Cases applying this doctrine involve conduct-based violations, not status-based violations like registration failures. For example, in *Spectrum Brands*, relied upon by the District Court, a manufacturer received customer complaints about a defective product. Spectrum

40

violated a statute that had a continuing obligation to report and continued manufacturing the defective product. *Spectrum*, 934 F.3d at 340-42. Therefore, the defendant could not rely on the expirations of limitations.

*Birkelbach v. SEC.*, 751 F.3d 472 (7th Cir. 2014), cited by the District Court, is also distinguishable because it dealt with a series of failures to supervise, such that the court could find the underlying violation as "continuing and divisible" with some claims within the limitations period, even if there were others outside of it. Our claim concerned a singular violation - the operation of a regular business for buying and selling securities which triggered the obligation to register, and "[t]here is [] nothing in the act of registration itself which makes failure to do so a continuing crime." *Toussie v. U.S.*, 90 S. Ct. 858, 864 (1970) (denying use of doctrine of continuing crimes for failure to register with Selective Service).

Moreover, the use of the continuing violation doctrine here would effectively delete the word "first" from the phrase "first accrued." "In common parlance a right accrues when it comes into existence . . . . Thus the 'standard rule' is that a claim accrues when the plaintiff has a complete and present cause of action." *Gabelli v. SEC*, 133 S. Ct. 1216, 1220 (2013) (internal citations omitted). It is well-settled that "an enforcement claim accrue[s] at the moment of violation." *3M Co. v. Browner*, 17 F.3d 1453, 1461 n.14 (D.C. Cir. 1994) (citing *Unexcelled Chemical Corp. v. U.S.*, 73 S.Ct. 580 (1953)). That accrual happens *once*. The Tenth Circuit stated:

41

> **The clock under § 2462 begins only once, when a claim first accrues**. If the limitations period under ¶ 2462 reset every day, the statutory term 'first' would have no operative force. In other words, the statute could just as easily state that the limitations period begins whenever "the claim accrues."

*Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 673-74 (10th Cir. 2016) (emphasis added).

Courts have denied the continuing violation doctrine where the violation was status-based, rather than conduct-based. See *U.S. v. Midwest Generation, LLC*, 720 F.3d 647 (7th Cir. 2013) (rejecting argument that every day plant operated without first obtaining a permit for construction to commence was a "fresh violation"; there was no "continuing duty"). The Tenth Circuit reached the same conclusion in *Sierra Club*, 816 F.3d at 671, where defendant engaged in unpermitted construction that continued within the limitations period. Limitations began to run as soon as the claim first accrued. *Sierra Club*, 816 F.3d at 671.

Exchange Act § 15(a) provides no affirmative obligation to file a report, as in *Spectrum*. It prohibits engaging in the business of buying and selling securities for one's own account as part of a regular business. It is thus the operation of the regular business that is buying and selling securities, not the buying and selling themselves, that is the violation. That violation happened once – more than 5 years before the SEC filed the Complaint based on 15(a). Because Investors were engaged in buying

and selling securities before November 17, 2012, the claims for disgorgement and

penalties were time barred.

## ARGUMENT IV

**WHERE THE DISTRICT COURT FAILED TO MAKE A FINDING THAT THE REMEDY OF DISGORGEMENT WAS APPROPRIATE OR NECESSARY FOR THE BENEFIT OF ANY INVESTORS (AND INSTEAD IMPROPERLY MEASURED DISGORGEMENT BY DEFENDANTS' PROFITS AND NOT INVESTOR LOSSES), THE DISTRICT COURT COMMITTED LEGAL ERROR IN ORDERING DISGORGEMENT.**

Standard of Review

See Standard in Argument I.

Argument

The District Court awarded disgorgement, as "measured by defendants' profits and not investor losses." [DE 138 at 6] (citing *SEC v. U.S. Pension Trust Corp.*, No. 07-22570-CIV-MARTINEZ, 2010 WL 3894082, at *23 (S.D. Fla. Sept. 10, 2010)). This disgorgement award must be reversed because it plainly contradicts the Supreme Court's decision in *Liu v. SEC*, 140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020), which held "that a disgorgement award that does not exceed a wrongdoer's net profits *and is awarded for victims is equitable relief* permissible under § 78u(d)(5)."

Here, the disgorgement award was solely based on Investors' net profits, without **any** evidence the award was "**appropriate or necessary for the benefit of victims**." 15 U.S.C. § 78u(d)(5). Without such finding, there was no jurisdiction to enter any equitable relief under Section 21, including disgorgement.

- **The Supreme Court Decision in *Liu v. SEC***

Section 21 of the Exchange Act, 15 U.S.C. § 78u(d)(5), provides: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary *for the benefit of investors*." 15 U.S.C. § 78u(d)(5) (emphasis added.)[3] On June 22, 2020, *Liu v. SEC*, 140 S. Ct. 1936, 1940, 207 L. Ed. 2d 401 (2020) considered "whether, and to what extent, the SEC may seek 'disgorgement' through its power to award 'equitable relief' under 15 U.S.C. § 78u(d)(5)."

*Liu* rejected the argument that disgorgement was a remedy whose primary function was to deprive wrongdoers of profits. It was true that "[e]quity courts ha[d] routinely deprived wrongdoers of their net profits from unlawful activity…," but Congress's grant of equitable jurisdiction was expressly limited by the latter part of Section 21(d)(5) by requiring that it be appropriate or necessary *for the benefit of investors*. *Liu*, 140 S. Ct. at 1942 (emphasis added). Disgorgement under Section

---

[3] This limitation in Section 21 was amended by Congress effective January 1, 2021, within six (6) months of the *Liu* decision, as part of the Defense Authorization Act for Fiscal Year 2021. PL 116-283, January 1, 2021, 134 Stat. 3388. Prior to the amendment, Congress limited the SEC's remedy to equitable relief "for the benefit of investors." The amendment added a subsection granting the SEC and courts express jurisdiction to award "disgorgement" without any condition that it be entered "for victims." 15 U.S.C. § 78u(d)(7).

21(d)(5), therefore, "must mean more than depriving a wrongdoer of his net profits alone…." *Id.* at 1948.

- **The Disgorgement Award Failed to Find it was Appropriate or Necessary for the Benefit of Investors**

The District Court exceeded the jurisdictional limit set forth by Section 21 of the Exchange Act as explained in *Liu*. The disgorgement award was based solely on Defendants' alleged "profits and not investor losses," and there was no finding that the award was appropriate or necessary for the benefit of investors, as required under *Liu*. [DE 138 at 6.]

*Liu* indicated that the SEC was obligated to demonstrate its award would be "for the benefit of investors" and "consistent with the limitations of §78u(d)(5)." *Liu*, 140 S. Ct. at 1948. The District Court ignored this critical precept, never explaining whether or how ***anyone*** was harmed by Investors' conduct. Without evidence of the existence of at least one investor-victim (whether identified specifically or as a class), however, the District Court could not conclude that its disgorgement award was "for the benefit of investors" and that it possessed jurisdiction to enter any equitable relief.

- **The District Court's Invitation to the SEC to Find Victims Post-Judgment Does Not Satisfy Section 21(d)(5)**

SEC never provided any methodology to determine who were victims or a methodology to calculate losses, if any, even while conceding that "***it is appropriate***

*to identify a class of victims directly impacted by the unlawful activity*." [DE 120 at 6 n.3] (emphasis added). Other than vague claims that the "counterparties" who bought shares of stock from Investors were "the most directly harmed investors," SEC never bothered to present any coherent class of victims. Meanwhile, the District Court denied that the existence of any investor-victims was even relevant to the disgorgement award.

With no finding of investor-victims, the District Court ordered that SEC hold any disgorgement payment as part of a fund "pending further order of the Court" with SEC proposing a plan to distribute funds subject to court approval. [DE 151 at 3-4.] Despite *Liu's* holding that disgorgement is **only permissible where it is for the benefit of investors**, the District Court ordered Investors to pay over $1 million in disgorgement and interest, *while giving the SEC unlimited time to search for a plan of distribution without any reference to identifying specific victims or even a theory of victimhood.*

There are no findings of any investor losses or what caused them. [DE 125 at 17-18.] *Liu* noted that while a wrongdoer should not profit from his own wrong, courts have "recognized the countervailing equitable principle that the wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.'" *Id.* at 1943. Any amount of disgorgement exceeding the "fair compensation to the person wronged" would become punitive, exceeding the court's

equitable jurisdiction under Section 21, where the purpose was to deprive the wrongdoer of ill-gotten gains. *Id.* at 1948.

- **Recent Cases Have Required Victim Identification**

At least three other courts post-*Liu* have authorized disgorgement *only after* the SEC identified victims. *See SEC v. Blackburn*, 15 F.4th d 676, 682 (5th Cir. 2021) (affirming disgorgement award where SEC "identified the victims and created a process for the return of disgorged funds"); *SEC v. Bevil*, 2020 WL 7048263, at *2 (D. Nev. Nov. 30, 2020) (denying disgorgement motion "[b]ecause of the [SEC's] failure to identify whether the disgorgement award [wa]s for the benefit of investors"); *SEC v. Janus Spectrum LLC*, 811 Fed. App'x. 432, 434 (9th Cir. 2020) (similarly remanding disgorgement award). Because Section 21(d)(5) requires the award be for the benefit of investors, it was improper to award disgorgement without identifying victims and measuring the harm.

## ARGUMENT V

**WHERE THERE WAS NO CAUSAL LINK BETWEEN ANY MERE FAILURE OF INVESTORS TO REGISTER WITH THE SEC AND ANY ILL-GOTTEN PROFITS, THE DISGORGEMENT AWARD WAS CONTRAY TO LAW.**

Standard of Review

See Standard in Argument I.

Argument

Disgorgement must be limited to "property causally related to the wrongdoing." *SEC v. Gane*, No. 03-61553-CIV-SEITZ, 2005 WL 90154, at *19 (S.D. Fla. Jan. 4, 2005). It cannot extend to profits "obtained without the aid of any wrongdoing." *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999); *see CFTC v. Southern Trust Metals*, 894 F.3d 1313, 1329 (11th Cir. 2018) (citation omitted). The District Court committed legal error by concluding that Investors' net profits were caused by their violation without explaining how. [DE 138 at 7.]

This Court has held disgorgement inappropriate for a registration violation (as here) because there is a lack of a causal link to any ill-gotten profits:

> The CFTC merely alleged Sidoti failed to register as a principal of Trinity. Sidoti's failure to register, by itself, is not causally related to Trinity's ill-gotten profits. . . . *we are not aware of any case in which a court has disgorged profits from a defendant whom it finds liable solely for failure to register as a principal*. A district court may not disgorge profits, unless there is record evidence the defendant is liable (either directly or indirectly) for fraud.

*Sidoti*, 178 F.3d at 1138 (emphasis added); *see Southern Trust Metals*, 894 F.3d at 1331 (vacating restitution because there was "no showing that the registration violations caused the losses"). SEC only charged Investors with a registration violation, not fraud. With no causal connection between the alleged violation and harm or ill-gotten profits, the disgorgement award must be reversed. *See SEC v. Wyly*, 56 F. Supp. 3d 260, 269 (S.D.N.Y. 2014) (denying disgorgement request absent "evidence…defendant's unlawful conduct…resulted in any market distortion, price impact, or profit tied to the violation").

SEC never demonstrated that "but for" the registration violation, Investors would not have generated the profits. *Wyly*, 56 F. Supp. 3d at 405; *SEC v. Gane*, 2005 WL 90154, at *19 (S.D. Fla. Jan. 4, 2005). The issue is akin to the unlicensed attorney considered by this Court in *Southern Trust*, 894 F.3d at 1330-31 (whether lawyer was unlicensed had no causal relationship to the fees generated). Accordingly, lack of registration here did not cause any profits earned.

At most, the District Court has conflated correlation with causation. *See id.*, 894. F.3d at 1330. However, this Court rejected substituting correlation with causation because

> [a]s a general matter, losing money is a foreseeable result of investing with an unregistered trader, but this is not because a trader's failure to register will itself inevitably cause a loss. More likely, any loss will result from some other factor, such as the trader's incompetence or dishonesty, which the failure to register might correlate with but not cause.

*Id.* There is no evidence that registration would have affected the transactions at all. *See Gane*, 2005 WL 90154, at \*19 (denying disgorgement where "there is no record evidence of any causal connection at all"). Investors' status as a "dealer" would not, and could not, affect the price at which they sold stocks. There is no connection between Investors' registration violation and their net profits, making the disgorgement award contrary to law.

## ARGUMENT VI

**EVEN IF INVESTORS WERE LIABLE SOLELY FOR A NON-SCIENTER-BASED, DEALER REGISTRATION VIOLATION, THE DISTRICT COURT COMMITTED LEGAL ERROR IN BASING INJUNCTIVE RELIEF, INCLUDING A PENNY STOCK BAR, ON THE INVESTOR'S YOUTH, THE MAINTENANCE OF TWO ACTIVE COMPANIES, GENERATION OF $2,600,000, IN MULTIPLE TRANSACTIONS OVER THREE YEARS, WHERE THERE WAS NO SHOWING THAT THERE WAS A REASONABLE LIKELIHOOD THAT THE WRONG WOULD BE REPEATED.**

Standard of Review

See Standard in Argument I.

Argument

In *Aaron v. SEC*, 446 U.S. 680, 700 (1980), the court determined that a district court shall grant an injunction whenever the SEC makes a proper showing that a person "is engaged or [is] about to engage in any acts or practices constituting a violation" of the federal securities law. The Eleventh Circuit has ruled that the SEC "is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of the federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004); s*ee also, Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979) ("To say that past misconduct gives rise to an inference of future misconduct is not enough"). The SEC has a high burden in establishing that a person should be permanently enjoined: "[an] injunction is a drastic remedy, not a mild prophylactic" and is almost always

reserved for those cases that are a "result of more than negligence." 446 U.S. at 703 (Burger, C.J., concurring).

Our case presents merely a technical violation - a failure to register – falling short of egregious conduct.  Indeed, simply registering as a dealer with the SEC would have satisfied Section 15(a) – the **only** statute Investors have been accused of violating. (DE 1 at 6-7.)  A violation of the federal securities laws is not enough. There must be "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."  *Steadman v. SEC*, 967 F.2d 636, 648 (D.C. Cir. 1992) (quoting *U.S. v. W.T. Grant Co*., 345 U.S. 629, 633 (1953)).  Here there is no such danger.

Relevant factors courts must consider when assessing the likelihood of recurring violations are "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations."  *Calvo*, 378 F.3d at 1216; *SEC v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004).

The District Court erred in entering an injunction without properly considering these factors.  Instead, the District Court entered an injunction *solely* based upon the following determination: (a) Almagarby is young; (b) MEG is listed

as an "active" business entity within the State of Florida; (c) two other businesses entities that Almagarby formed and that conducted similar business as MEG are still listed as active in the State of Florida; and (d) there were multiple transactions spanning a 3-year period that generated approximately $2.6 million in proceeds. [DE 138 at 4 and 5, and 151 at 1).

The District Court somehow determined that "absent an injunction, there is little to stop [Investors] from resuming their unlawful activity." (DE 138 at 4 and 5, citing 117 at 9). However, this determination was legally insufficient to impose an injunction because it was based solely on the theoretical possibility Investors **could** engage in a future violation, not on any finding of any **likelihood** of a future violation. Injunctions should be made of sterner stuff!

### 1. The *Calvo* Factors

#### A. The District Court Improperly Determined that Investors' Conduct was Egregious

The District Court found that the conduct was "egregious because it spanned over three years and thousands of transactions," [DE 138 at 4], facts insufficient to find "egregiousness." Moreover, there are no facts in the record which would support such a finding.

This Court has approved egregiousness findings where there was "a pattern of past and present questionable business practices" and "[b]latant and inexcusable violations" *SEC v. Carriba Air*, 681 F.2d 1318, 1322 (11th Cir. 1982); the defendant

was "a repeat violator," *SEC v. Hall*, 759 F. Appx. 877, 884 (11th Cir. 2019); and "the violations were blatant, brazen, and repeated," *CFTC v. Wilshire Inv. Management Corp.*, 531 F.3d 1339, 1347 (11th Cir. 2008).   Other courts found egregiousness where a violation was "flagrant and deliberate" as opposed to "merely technical in nature," *SEC v. Gunn*, 2010 WL 3359465, at *4 (N.D. Tex. Aug. 25, 2010) (quoting *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1228 (D.C. Cir. 1989); the violation also included a breach of fiduciary duty (*id.*) (citing *SEC v. Ginsberg*, 362 F.2d 1292, 1305 (11th Cir. 2004) ("It is . . . intentional, knowing conduct, as opposed to more minor, technical violations, for which injunctions are reserved") (repeated breach of fiduciary duty and deliberately tipping insider information); violation caused significant financial losses, (*id.*) (citing CFTC *v. Investors Freedom Club, Inc.*, 2005 WL 940897, at *2 (M.D. Fla. Apr. 4, 2005)); or the violation arose out of a complex or elaborate scheme to defraud.  (*id.*) (citing *SEC v. Friendly Power Company LLC*, 49 F. Supp. 2d 1363, 1372 (S.D. Fla. 1999)).

In *SEC v. Greene*, 2014 WL 11706448, *4 (S.D. Fla. Jan. 27, 2014), for example, the court found egregiousness as to a corrupt promoter and a stock purchase scheme.  S*ee also SEC v. Brennan*, 2013 WL 12091655, *3 (S.D. Fla. Dec. 9, 2013) (same) (criminal convictions of securities law demonstrated egregious nature of the actions); *SEC v. Weintraub*, 2012 WL 13012751, *2 (S.D. Fla. Jan. 10, 2012) (involving fraudulent offer letters to public companies and misrepresentations

55

and omissions to third parties); *SEC v. Keener*, 2020 WL 4736205, *6 (S.D. Fla. Aug. 14, 2020) (injunction may be proper where defendant previously barred by FINRA).

The inability of the District Court to explain how a registration violation would rise to the level of egregiousness is fatal to the entry of an injunction. For example, in *Steadman*, the court denied the SEC's motion for injunction because none of the violations "was flagrant or deliberate, and most were merely technical in nature," despite being a repeat offender. *Steadman*, 967 F.2d at 648. Our District Court made no finding that Investors' conduct was similarly egregious. Our case involved no fraud, let alone a complex scheme. The District Court never found that Almagarby engaged in this single violation fragrantly, blatantly or brazenly. SEC never even alleged, and the District Court never found, a breach of fiduciary duty or a violation that caused others to suffer significant financial loss. Our case only involved conduct that would be deemed perfectly appropriate had Investors simply registered as dealers.

### B. Investors' Violation was Isolated, with No Prior Violations

Courts consider two factors to determine whether actions are isolated or recurrent in nature: the length of time over which the violation(s) occurred, and whether the defendant is a first time or a repeat offender. *SEC v. Perez*, 2011 WL 5597331, at *3 (S.D. Fla. Nov. 17, 2011). Our District Court determined that

Investors' violations "spanned multiple transactions over a three-year period generating $2,601,383.09." (DE 138 at 4). However, **there was only one single violation—[Investors'] failure to register with the SEC** before buying and selling securities.

SEC maintained that Investors should have registered as dealers "before embarking on the conduct." (DE 125-1). As such, this was an isolated violation, rather than multiple registration violations under Section 15(a). **A singular act of failing to register as dealers comprises the totality of this case**. *See, e.g., In re David B. Havanich, Jr.*, SEC Release No. 935, 2016 WL 25786, at *11 (Jan. 4, 2016) ("The events at issue will be considered as one course of action – Respondents' operations as an unregistered broker-dealer from 2010 to 2012"). In regard to the second factor, the summary judgment order in our case was the **only instance** that Investors were found to have violated any civil or criminal law.

## C. It is Undisputed that Investors Never Acted with Scienter

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *SEC v. Adler*, 137 F.3d 1325, 1340 (11th Cir. 1998) (*quoting Aaron v. SEC*, 446 U.S. 680, 695-96 (1980)). The SEC did not allege, and the District Court did not find, that Investors acted with scienter. This is not a case involving misrepresentations or omissions, recklessness, a scheme to defraud or similar conduct. Even if scienter is not a prerequisite to injunctive relief, courts have

determined that scienter is "an important factor in this analysis," as SEC conceded (DE 120 at 3 (*citing Calvo*, 378 F.3d at 1216)), and "the respondent's state of mind is highly relevant in determining the remedy to impose." *Steadman*, 603 F.2d at 1140. *See also SEC v. Gentile* 939 F. 3d, 549, 559 (3d Cir. 2019), *cert. denied*, 206 L. Ed, 2d 823 (Apr. 20, 2020) (considers scienter factor in denying SEC request for injunctive relief).

To obtain injunctive relief, "it will almost always be necessary for the [SEC] to demonstrate that the defendant's past sins have been the result of more than negligence. Because the [SEC] must show some likelihood of a future violation, defendants whose past actions have been in good faith are not likely to be enjoined…That is as it should be." *Aaron*, 446 U.S. at 703 (Burger, C.J. concurring). The absence of scienter here strongly weighs against imposing an injunction.

## D. Investors Ceased Engaging in the Conduct at Issue in 2016

When Investors learned of the SEC's investigation around 2016, they immediately ceased the conduct at issue. (DE 125-2 at 2). District courts have exercised their equitable discretion and denied injunctive relief where substantial time had elapsed between the alleged securities law violations and the injunction claim. *See, e.g., SEC v. Voey*, No. 07-39, 2013 WL 3805127, at *3 (D.N.H. July 22, 2013) (denying SEC's request for an injunction where "the SEC here has not shown any realistic likelihood that [the defendant] will commit similar violations in the

future"); *SEC v. Jones*, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007) ("[S]everal years have passed since [d]efendants' alleged misconduct apparently without incident. This fact further undercuts the [SEC's] assertion that [d]efendants pose a continuing risk to the public"); *Proffit v. FDIC*, 200 F.3d 855, 862 (D.C. Cir. 2000).

Investors have assured against future violations and conducted themselves in a way showing they will not repeat these violations. While attending college, Almagarby is working in the home restoration business. (DE 125-2 at 2). This 8-10-hour workday demonstrates he lacks the time and inclination to engage in these types of transactions. *Id*. These factors weigh strongly against the imposition of an injunction. *See Steadman*, 967 F.2d at 648 (denying injunction where defendant ceased registration violation "after the SEC notified [defendant] that charges were pending").

### E. Investors Recognize the SEC's View of Their Conduct and the Gravity of the Enforcement Action and Have Not Engaged, and Will Not Engage, in Such Activity in the Future

While Investors deny they violated the Exchange Act, that doesn't mean they will repeat the conduct in question or not recognize the importance of the federal securities laws. As *Perez* court noted,

> the mere fact that a defendant denies the Commission's allegations, proceeds to trial, and does not admit fault after losing at trial does not, standing alone, suggest that the defendant is likely to commit another violation of the securities laws. What matters is the manner in which the defendant conducts himself during the course of presenting the vigorous defense to which he is entitled.

2011 WL 5597331 at *4.

*Perez* cited three factors suggesting a propensity for future violations, which all militate in favor of the denial of an injunction against Investors:  Investors' protestations of innocence were reasonable, given the novel nature of this case; Almagarby provided candid and consistent testimony (DE 80-1); and acknowledged the importance of the federal securities laws.  (DE 125-2 at 1).  *Id.*

### F. Almagarby's Occupation Does Not Afford Him with an Opportunity to Engage in the Violations Charged

Almagarby no longer is in the business of buying and selling securities, which weighs against a permanent injunction.  *SEC v. Grossman*, 1997 WL 231167, *5 (S.D.N.Y. May 6, 1997) (denying injunction where defendant pursued a doctorate and mathematics career, despite longtime refusal to admit wrongdoing).  He attends college and relies upon his family. (DE 125-2 at 2).  *Id*.  Almagarby's occupation does not afford him the opportunity for future violations.  *Id.*  For all these reasons, the District Court erred in entering an injunction.

<u>CONCLUSION</u>

Investors request that this court reverse the District Court's summary judgment which found that Investors were "dealers," who were required to register under the Exchange Act, and remand for entry of summary judgment ruling that Investors were "traders," who were exempt from registration under the Act. Investors also request that the disgorgement, injunctions and penalties awarded against Investors be reversed for this reason, or alternatively, for the other independent reasons outlined in the arguments.

## Certificate of Service

I HEREBY CERTIFY that on this 1st day of July, 2022, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served this day on all counsel of record or *pro se* parties identified on the service list below, either via transmission of notices of electronic filing generated by CM/ECF or in some other authorized manner for those counsel and/or parties who are not authorized to receive electronic notices of filing.

By:       /s/ Neil Rose
Florida Bar No.: 378755
neil@myappeal.com

**Service List**

Jeffrey L. Cox
Sallah Astarita & Cox, LLC
3010 North Military Trail
Suite 210
Boca Raton, FL 33431
561-989-9080
Fax: 561-989-9020
Email: jlc@sallahlaw.com
*Attorney for Defendants/Appellants*

Robert K. Gordon
US Securities & Exchange Commission
950 East Paces Ferry Road NE
Suite 900
Atlanta, GA 30326
404-842-7652
Fax: 404-842-7669
Email: gordonr@sec.gov
*Attorney for Plaintiff/Appellee*

Robert Charles Harris

Hunter Taubman Fischer & Li LLC
2 Alhambra Plaza
Suite 650
Coral Gables, FL 33134
305-629-1180
Fax: 305-629-8099
Email: rharris@htflawyers.com
*Attorney for Defendants/Appellants*

William Paul Hicks
United States Securities and Exchange
Commission
950 East Paces Ferry Road NE
Suite 900
Atlanta, GA 30326
404-842-7675
Email: hicksw@sec.gov
*Attorney for Plaintiff/Appellee*

Mark David Hunter
Hunter Taubman Fischer & Li LLC
2 Alhambra Plaza, Suite 650
Miami, FL 33134
305-629-1180
Fax: 305-629-8099
Email: mhunter@htflawyers.com
*Attorney for Defendants/Appellants*

Sharifa Giselle Hunter
2 Alhambra Plaza
Suite 650
Coral Gables, FL 33134
305-629-1180
Email: shunter@htflawyers.com
*Attorney for Defendants/Appellants*

Jenny Daphne Johnson-Sardella
Hunter Taubman Fischer LLC
2 Alhambra Plaza, Suite 650
Coral Gables, FL 33134

(305)629-8816
Email: jsardella@htflawyers.com
*Attorney for Defendants/Appellants*

Joshua Arnold Katz
Sallah Astarita & Cox, LLC
3010 N Military Trail
Suite 210
Boca Raton, FL 33431
561-989-9080
Fax: 989-9020
Email: jak@sallahlaw.com
*Attorney for Defendants/Appellants*

James D. Sallah
Sallah Astarita & Cox, LLC
3010 N Military Trail
Suite 210
Boca Raton, FL 33431
561 989-9080
Fax: 561-989-9020
Email: jds@sallahlaw.com
*Attorney for Defendants/Appellants*

Neil Rose, Esq.
4000 Hollywood Blvd., Suite 610 North Tower
Hollywood, FL  33021
(305) 439-5108
Email:  neil@myappeal.com
*Attorney for Defendants/Appellants*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B).  This brief contains 12,874 words.  This brief is submitted in Times New Roman 14-point font.

By:   /s/ Neil Rose
**Neil Rose, Esq.**