No. 21-13755

# United States Court of Appeals for the Eleventh Circuit

———————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee*,

v.

IBRAHIM ALMAGARBY and
MICROCAP EQUITY GROUP, LLC,

*Defendants-Appellants*.

———————————

On Appeal from the
United States District Court for the Southern District of Florida,
Case No. 17-cv-62255-MGC

═══════════════════════

**BRIEF OF THE SMALL PUBLIC COMPANY COALITION,
ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION LTD.,
AND NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS
AS *AMICI CURIAE* SUPPORTING DEFENDANTS-APPELLANTS
AND REVERSAL**

═══════════════════════

BARRY GOLDSMITH
M. JONATHAN SEIBALD
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y. 10166-0193
(212) 351-4000

HELGI C. WALKER
BRIAN A. RICHMAN
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500

*Counsel for* Amici Curiae

July 8, 2022

*SEC v. Ibrahim Almagarby et al.*, No. 21-13755

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT (CIP)

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, *Amici* state that the Certificate of Interested Persons contained in Defendants-Appellants' Brief is complete, other than the following additions:

1.    Alternative Investment Management Association Ltd.

2.    Goldsmith, Barry

3.    National Association of Private Fund Managers

4.    Richman, Brian A.

5.    Securities and Exchange Commission

6.    Seibald, M. Jonathan

7.    Small Public Company Coalition

8.    Walker, Helgi C.

*SEC v. Ibrahim Almagarby et al.*, No. 21-13755

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici* each states that it does not have a parent corporation and that no publicly held company owns 10 percent or more of its stock.  The Alternative Investment Management Association Ltd. ("AIMA") further states that it is a UK private company limited by guarantee.  It does not issue share capital and no publicly held company holds more than a 10% interest in AIMA.

Pursuant to Eleventh Circuit Rule 26.1-3(b), *Amici* certify that they are not aware of any publicly traded company or corporation that has an interest in the outcome of this case or appeal.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT (CIP)..............................C-1

TABLE OF CONTENTS ............................................................................i

TABLE OF CITATIONS ......................................................................... iii

INTEREST OF *AMICI CURIAE* ..............................................................1

STATEMENT OF ISSUE..........................................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT............................2

ARGUMENT ..............................................................................................6

I.     The Court Should Reject The Commission's Ahistorical, Hy-
       perliteral, And Overbroad Interpretation Of The Exchange
       Act. ..............................................................................................6

       A.     The Exchange Act Uses Well-Known, Widely
              Used Terms That Refer To The Methods Of
              Effectuating Customer Orders. ......................................7

       B.     The Context Reinforces The Customer-Order-
              Facilitation Interpretation. ..........................................13

       C.     The Statute's Structure Spells More Trouble For
              The Commission's Reading...........................................18

       D.     The Scope And History Of The Commission's
              Claimed Authority Counsel Against It. .......................23

       E.     The Commission's Reading Makes A Mess Of
              Other Statutory Limitations. .......................................28

       F.     Two Time-Honored Canons Of Judicial Restraint
              Foreclose The Commission's Theory............................30

i

## TABLE OF CONTENTS
### (continued)

II.   If Anything, *SEC v. Big Apple* Independently Bars The Commission's Attempted Overreach......................................................31

CONCLUSION .........................................................................34

CERTIFICATE OF COMPLIANCE ........................................36

CERTIFICATE OF SERVICE................................................37

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Air Wis. Airlines Corp. v. Hoeper*,
    571 U.S. 237 (2014) ........................................................................ 17

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
    141 S. Ct. 2485 (2021) ................................................................... 23

*Andrus v. Charlestone Stone Prods. Co.*,
    436 U.S. 604 (1978) ........................................................................ 13

*In re Appling*,
    848 F.3d 953 (11th Cir. 2017) ....................................................... 20

*Bullock v. BankChampaign, N.A.*,
    569 U.S. 267 (2013) ........................................................................ 20

*Chapel Invs. v. Cherubim Interests, Inc.*,
    177 F. Supp. 3d 981 (N.D. Tex. 2016) .......................................... 24

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012) ........................................................................ 23

*Clark v. Martinez*,
    543 U.S. 371 (2005) ........................................................................ 30

*Comm'r v. Kelley*,
    293 F.2d 904 (5th Cir. 1961) ......................................................... 15

*Cuozzo Speed Techs., LLC v. Lee*,
    579 U.S. 261 (2016) ........................................................................ 32

*DIRECTV, Inc. v. Brown*,
    371 F.3d 814 (11th Cir. 2004) ....................................................... 33

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*Donander Co. v. Comm'r*,
29 B.T.A. 312 (1933)................................................................16, 17

*Freeman v. Quicken Loans, Inc.*,
566 U.S. 624 (2012) ...............................................................19

*FTC v. Univ. Health, Inc.*,
938 F.2d 1206 (11th Cir. 1991).............................................34

*Garcia v. Vanguard Car Rental USA, Inc.*,
540 F.3d 1242 (11th Cir. 2008).............................................19

*Goldstein v. SEC*,
451 F.3d 873 (D.C. Cir. 2006)............................................3, 25

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)...............................................................20

*Harriman Nat'l Bank v. Comm'r*,
43 F.2d 950 (2d Cir. 1930) .....................................................17

*Inv. Tr. of Mut. Inv. Co. v. Comm'r*,
27 B.T.A. 1322 (1933)............................................................10

*Johnson v. United States*,
576 U.S. 591 (2015)...............................................................30

*Jones v. Harris Assocs. L.P.*,
559 U.S. 335 (2010)...............................................................21

*Knight v. Comm'r*,
552 U.S. 181 (2008)...............................................................15

*Lake Bldg. Prods., Inc. v. Sec'y of Labor*,
958 F.3d 501 (6th Cir. 2020)................................................29

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*Liu v. SEC,*
140 S. Ct. 1936 (2020)..........................................................20

*Murphy v. NCAA,*
138 S. Ct. 1461 (2018)..........................................................11

*Neder v. United States,*
527 U.S. 1 (1999)..................................................................16

*New Prime Inc. v. Oliveira,*
139 S. Ct. 532 (2019).........................................................7, 34

*Niz-Chavez v. Garland,*
141 S. Ct. 1474 (2021)..........................................................12

*NLRB v. SW Gen., Inc.,*
137 S. Ct. 929 (2017)............................................................15

*Roberts v. Sea-Land Servs., Inc.,*
566 U.S. 93 (2012)................................................................19

*Romag Fasteners, Inc. v. Fossil, Inc.,*
140 S. Ct. 1492 (2020)..........................................................18

*Romero v. Sec'y of Homeland Sec.,*
20 F.4th 1374 (11th Cir. 2021)............................................31

*SEC v. Big Apple Consulting USA, Inc.,*
783 F.3d 786 (11th Cir. 2015)..................................31, 32, 34

*Skilling v. United States,*
561 U.S. 358 (2010)..............................................................14

*State v. San Patricio Canning Co.,*
17 S.W.2d 160 (Tex. Civ. App. 1929)..............................28, 29

## TABLE OF CITATIONS
### (continued)

**Page(s)**

*State v. Yearby,*
    82 N.C. 561 (1880)..................................................................28

*Stokeling v. United States,*
    139 S. Ct. 544 (2019)..............................................................28

*Trump v. Thompson,*
    142 S. Ct. 680 (2022)..............................................................34

*United States v. Jones,*
    962 F.3d 1290 (11th Cir. 2020).............................................14

*Universal Health Servs., Inc. v. United States,*
    579 U.S. 176 (2016)................................................................16

*Util. Air Regulatory Grp. v. EPA,*
    573 U.S. 302 (2014)...........................................................7, 25

*Van Buren v. United States,*
    141 S. Ct. 1648 (2021).......................................................18, 24

*Vaughan v. Comm'r,*
    85 F.2d 497 (2d Cir. 1936) ....................................................17

*Weisbrod v. Lowitz,*
    282 Ill. App. 252 (1935)...........................................................8

*West Virginia v. EPA,*
    -- S. Ct. --, 2022 WL 2347278 (2022) ...............................6, 25

*Wilbur v. Corr. Servs. Corp.,*
    393 F.3d 1192 (11th Cir. 2004)..............................................34

*Wollschlaeger v. Governor,*
    848 F.3d 1293 (11th Cir. 2017)..............................................30

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*XY Planning Network, LLC v. SEC*,
  963 F.3d 244 (2d Cir. 2020) ................................................................ 6

*Yates v. United States*,
  574 U.S. 528 (2015) ............................................................................ 31

**Statutes**

15 U.S.C.
  § 77b(a)(12) ................................................................................ 32, 33
  § 78c(a)(4) ......................................................................................... 3
  § 78c(a)(4)(A) .............................................................................. 8, 18
  § 78c(a)(5) ......................................................................................... 3
  § 78c(a)(5)(A) ............................................................. 8, 14, 18, 33
  § 78c(a)(5)(B) ................................................................................. 16
  § 78ff(a) ........................................................................................... 31
  § 78fff-4(c) ...................................................................................... 21
  § 78o(a)(1) ...................................................................................... 31
  § 78o(c)(3)(A) ................................................................................ 21
  § 78o(e) ............................................................................................ 21

Act of Apr. 5, 1938, ch. 72, 52 Stat. 198 ................................................ 21

Act of June 25, 1938, ch. 677, 52 Stat. 1070 ......................................... 12

Act of May 27, 1936, ch. 464, 49 Stat. 1375 ......................................... 14

Investment Company Act of 1940, ch. 686, 54 Stat. 789 ....................... 11

Revenue Act of 1924, ch. 234, 43 Stat. 253 ........................................... 21

Securities Exchange Act of 1934, ch. 404, 48 Stat. 881 ............. 12, 14, 15,
                                                                  19, 20, 21

# TABLE OF CITATIONS
## (continued)

**Page(s)**

## Regulations

17 C.F.R.
  § 230.144 ................................................................. 27
  § 230.144(d)(3)(ii) .................................................. 26
  § 240.15c3-3(a)(1) .................................................. 22
  § 240.15c3-3(b)(1) .................................................. 22

FINRA Rule 160(b)(4) ................................................. 22

FINRA Rule 5310 ...................................................... 22

## Other Authorities

*Certain Broker-Dealers Deemed Not To Be Investment Advisers*, 70 Fed. Reg. 20,424 (Apr. 19, 2005) ..................................... 13

Comments of the Small Public Company Coalition, SEC File No. S7-24-20 (Mar. 22, 2021), https://bit.ly/3nBGJGy ................ 26, 27

W.O. Douglas & G.E. Bates, *Stock "Brokers" as Agents and Dealers*, 43 Yale L.J. 46 (1933) ............................................ 16

*Duker & Duker*, 1939 WL 36426 (SEC Dec. 19, 1939) .................................... 13

*Elray Res., Inc.*, 2016 WL 5571631 (SEC Sept. 30, 2016) ............................... 27

*Further Definition of "As a Part of a Regular Business" in the Definition of Dealer*, 87 Fed. Reg. 23,054 (Apr. 18, 2022) ............. 5, 30

*Gordon Wesley Sodorff, Jr.*, 1992 WL 224082 (SEC Sept. 2, 1992) ................................. 25

## TABLE OF CITATIONS
### (continued)

**Page(s)**

C.F. Hodge, *Wall Street* (1930)..............................................................9, 13

H.R. Doc. No. 76-279 (1939) ......................................................................11

H.R. Doc. No. 477 (1939) ...........................................................................11

H.R. Rep. No. 73-85 (1933)........................................................................32

H.R. Rep. No. 76-1775 (1940) ....................................................................11

H.R. Rep. No. 76-2639 (1940)....................................................................11

Letter re Planning Research Corp., SEC No-Action Letter,
    1980 WL 14999 (Dec. 8, 1980) ............................................................27

1 L. Loss et al., *Fundamentals of Securities Regulation* (7th
    ed. 2021 Cum. Supp.)............................................................................33

D. MacMillan, *Spotify Raises $1 Billion in Debt Financing*,
    Wall St. J. (Mar. 29, 2016), https://on.wsj.com/3y4FDYz...................24

C.H. Meyer, *Law of Stock Brokers and Stock Exchanges*
    (1933) .................................................................................................8, 9

H.M. Peirce, Comm'r, SEC, Statement on the Regulatory
    Flexibility Agenda (June 22, 2022), https://bit.ly/3AeRzK6 ...............5

*Registration Under the Advisers Act of Certain Hedge Fund
    Advisers*, 69 Fed. Reg. 72,054 (Dec. 10, 2004) ...................................25

*Revisions to Rule 144*, 72 Fed. Reg. 71,546 (Dec. 17, 2007)...................27

*Rule 144 Holding Period*, 86 Fed. Reg. 5063 (Jan. 19, 2021)...........26, 27

A. Scalia & B. Garner, *Reading* Law (2012)......................................12, 13

# TABLE OF CITATIONS
## (continued)

**Page(s)**

SEC, *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker* (1936).........................................................................7, 8, 10, 13

W. Strunk, *The Elements of Style* (1920)..................................................19

P.-W. Tam & T. Ewing, *Buying and Quickly Selling IPO Stock Is No Longer Bad*, Wall St. J. (Feb. 2, 2000), https://on.wsj.com/3y1YbbP..................................................24

Testimony of R.R. Lindsey, Director, Div. of Market Regulation, SEC, 1998 WL 781102 (Oct. 1, 1998).............................25

Twentieth Century Fund, *The Security Markets* (1935)...................14, 15

*Webster's New International Dictionary* (2d ed. 1934).....................14, 29

J.W. White, Director, Div. of Corp. Fin., SEC (Feb. 23, 2007), https://bit.ly/3IbQch3 ..........................................................................27

## INTEREST OF *AMICI CURIAE*[1]

The Securities and Exchange Commission claims to have discovered in a long-extant statute an unheralded regulatory power:  any company whose "business model" is based on the "purchase and sale of securities" is a "dealer" required to register with the Commission.  Doc. 79, at 8.[2]  That is a radical, transformative expansion in the Commission's authority.  *Amici* represent some of the world's largest, most sophisticated investors, who collectively (and, in many cases, individually) purchase and sell billions of dollars of securities each year, but are not, and have never been, securities "dealers."  *Amici* urge the Court to reject the Commission's overreach.

*Amici* speak for a broad array of financial professionals.  **The Alternative Investment Management Association Ltd.** is the global representative of the alternative investment industry.  AIMA's fund manager members collectively manage more than $2 trillion in hedge

---

[1]  The parties consented to this filing.  No party's counsel authored this brief in whole or part, and no one other than *Amici* or their members or counsel contributed money for the brief's preparation or submission.

[2]  Citations of "Doc. X, at Y" refer to district court docket X, page Y.  Page citations reference the CM/ECF page number at the top of the page.

fund and private credit assets. **The National Association of Private Fund Managers** represents the legal and economic interests of investment advisers to private funds—funds that serve a diverse set of investors, including pensions, endowments, and insurance companies. **The Small Public Company Coalition** is the voice of small, publicly-traded companies and the financial professionals who serve them.

## STATEMENT OF ISSUE

Whether the district court erred in holding that a "dealer" included any company whose "business model" was based on the "purchase and sale of securities."

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

This case implicates a statutory question of enormous importance—the meaning of "dealer" in the Securities Exchange Act of 1934. But that question is not properly presented here. Rather than analyzing the text, structure, and history of the statute—including the understanding of the text at the time it was adopted—appellants ground their defense in SEC guidance. In these circumstances, the Court should not decide the statutory meaning of "dealer"—another case squarely raising that issue is

about to be appealed. *See SEC v. Keener*, No. 20-cv-21254 (S.D. Fla.). If the Court does reach the issue, however, it should apply the usual tools of construction; the text's true meaning, based in part on the original usage of the statutory terms, is beyond clear.

This is (another) attempt by the Commission to effect an enormous and transformative expansion in its regulatory authority through "a manipulation of meaning" of well-known industry terms. *Goldstein v. SEC*, 451 F.3d 873, 882 (D.C. Cir. 2006). For more than a century, the terms "broker" and "dealer" have referred to the method in which a public securities business effectuates customer securities transactions. A "broker" acts as an agent, and trades "for the account of" the customer, whereas a "dealer" acts as a principal, and effectuates the customer's trade by taking the opposite side in the dealer's "own account." 15 U.S.C. § 78c(a)(4), (5). This is the universally recognized distinction between "brokers" and "dealers," and is how everyone (including the Commission) understood the text of the Exchange Act at the time it was enacted.

Today's Commission ignores this original understanding and claims to have discovered a new meaning. Writing off decades of its own interpretations as neither "dispositive" nor "binding," Doc. 79, at 10 n.3,

12, and focusing on just a few isolated words, the Commission insists that a dealer is *any* business that purchases and sells securities for its "own account," *id.* at 2. Literally. The Commission's position, repeated over and over again, in this and in other recent cases, is that any company whose "business model" is based on the "purchase and sale of securities … is a dealer," *id.* at 8, regardless of whether the company "render[s] any of the services that [have been] the hallmark of a dealer," such as effectuating customer orders. *Id.* at 9. "None of that," the Commission asserts, "is relevant" to the analysis. *Id.*

The Commission's position is untenable. It is untethered to the standard rules of construction, which seek to discern the *ordinary meaning* of a statute—not the hyperliteral, agency-power-maximizing meaning of a few isolated words. *Amici* represent a broad cross-section of businesses—from hedge funds to investment advisers—who collectively (and in many cases, individually) purchase and sell *billions* of dollars of securities each year, but are not, and have never been understood to be, securities "dealers."

4

The evident goal of the Commission's new enforcement cases is to establish a precedential hook for the "far-reaching changes" the Commission hopes to make to its "regulatory regime." Commissioner Peirce, Statement on the Regulatory Flexibility Agenda (June 22, 2022), https://bit.ly/3AeRzK6. On the heels of the agency's win below, the Commission put forth in a proposed rulemaking a "further definition" of the word "dealer" that purports to clarify that some of the world's most sophisticated, high-profile investors, including many of *Amici*'s members, have actually been "dealers" all along, presumably since the Exchange Act's enactment, without anyone having noticed—until now. *Further Definition of "As a Part of a Regular Business,"* 87 Fed. Reg. 23,054, 23,089 (Apr. 18, 2022).

The Commission's claim to authority is extraordinary. "[E]ven if" a firm "do[es] not … engage" in *any* of the activity that has ever been associated with "dealers" or identified in any Commission interpretation, including the pending "further definition," the firm "may still be … a dealer," and thus subject to SEC registration. 87 Fed. Reg. at 23,062 n.87. "The only definitional requirement," the Commission stresses, "is that a dealer engages in the business of buying and selling securities."

5

SEC's Opp'n 25, *SEC v. Carebourn Cap., L.P.*, No. 21-cv-2114 (D. Minn. Mar. 10, 2022), 2022 WL 1913692.

The Court should reject this vast regulatory overreach. Congress, in 1934, used well-known language that everyone at the time understood referred to the method of effectuating customer orders. It did not bestow upon the Commission an "unheralded power"—overlooked by everyone for nearly 100 years—to require the registration of virtually every business that participates in the securities markets. *West Virginia v. EPA*, -- S. Ct. --, 2022 WL 2347278, at *13 (2022).

## ARGUMENT

## I.    The Court Should Reject The Commission's Ahistorical, Hyperliteral, And Overbroad Interpretation Of The Exchange Act.

If the Court does not await a case in which the proper textual analysis is preserved and briefed, it should reject the Commission's overbroad reading. The text, structure, and history of the Exchange Act make unmistakably clear that a "dealer," like a "broker," is in the business of "effect[ing] securities transactions for customers." *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020). The Commission's radical new theory—that a "dealer" includes *any* business that buys and sells

6

securities—has no basis in the "original meaning of the statute," *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019), makes nonsense of the overall regulatory regime, and would expand the Commission's authority in ways that are not only absurd, but also impossible to square with nearly a century of settled practice.

### A. The Exchange Act Uses Well-Known, Widely Used Terms That Refer To The Methods Of Effectuating Customer Orders.

The Exchange Act's words must "be read in their context," *Util. Air Regulatory Grp. v. EPA* (*UARG*), 573 U.S. 302, 320 (2014), and given their ordinary meaning "at the time of the Act's adoption," *New Prime*, 139 S. Ct. at 539. These foundational principles resolve this case.

**1.** When Congress enacted the Exchange Act, "broker" and "dealer" had well-understood meanings in the financial context. The terms referred to the two alternative methods of effectuating customer securities transactions, which is why Congress regulated "brokers" and "dealers" together—to protect investor customers from the two business-types that served them. A "broker" would buy and sell securities "for" the customer, as an "agent," whereas a "dealer" would buy and sell securities "from" and "to" the customer, as a merchant, at arm's length. SEC, *Report on*

*the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at XIV (1936) ("*SEC Report 1936*").

In ordinary parlance, this distinction between brokers and dealers was expressed in terms of whose "account" facilitated the customer's order. A broker, acting as an agent, would be said to trade "for the account of the customer." *SEC Report 1936*, at XIV. As the standard trade confirmation of the day put it, "We have this day bought (or sold) *for your account* and risk." *Weisbrod v. Lowitz*, 282 Ill. App. 252, 255 (1935) (emphasis added). A dealer, in contrast, would be said to effectuate the customer's order by taking the opposite side in "his own account." *Id.* When a customer wanted to sell, for example, a dealer would effectuate the sale by "buy[ing] from [the] customer … for [the dealer's] own account." C.H. Meyer, *Law of Stock Brokers and Stock Exchanges* § 43-a, at 34 (1933).

When Congress adopted the "other's account" versus "own account" distinction in the Exchange Act—defining "broker" as "the business" of effecting transactions "for the account of others," 15 U.S.C. § 78c(a)(4)(A), and "dealer" as "the business" of "buying and selling" for one's "own account," *id.* § 78c(a)(5)(A)—Congress adopted the established, idiomatic meaning of these phrases: when juxtaposed against one another, trading

8

for the "account of others" and one's "own account" referred to the account used to facilitate customer orders.

The evidence of this contemporaneous, widely-understood meaning is overwhelming. Prominent treatises of the time are replete with references to the "account of others" and "own account" that could only be read as distinguishing the method by which brokers and dealers effectuate customer orders. Charles Hodge's *Wall Street* (1930) treatise differentiates brokers and dealers as follows: "A dealer sells to and buys from a client whereas a broker buys and sells for the account of a client." *Id.* at 361. Meyer's *Law of Stockbrokers* (1933), *supra*, treatise similarly explains that a "broker" is the "agent" of "his customer"; he trades for the "*account* and risk" of the customer. *Id.* at 32, 34 (emphasis added). What "distinguishe[s]" the "*dealer* … from a *broker*" is that the dealer "sells to his customers … securities which he has purchased *for his own account* elsewhere," or "buys from his customer securities *for his own account* with a view to disposing them elsewhere." *Id.* at 32-33 (emphases added). In each instance, "account" distinguishes the way in which the broker or dealer effectuates customer orders.

The Commission itself spoke this way. In a report by James Landis, the SEC's founding father, and then-Commissioner (future-Justice) William O. Douglas, the Commission explained that the "characteristic activities of a dealer" are that he "sells securities to his customer which he has purchased … elsewhere or buys securities from his customer with a view of disposing of them elsewhere." *SEC Report 1936*, at XIV. "In any such transaction," the dealer "acts *for his own account* and not as agent for the customer." *Id.* (emphasis added). A "broker," "[o]n the other hand," "is the agent of his customer"; in the Commission's words, the broker's transaction "is solely *for the account* of the customer." *Id.* (emphasis added).

**2.** Powerful confirmation of the text's original meaning comes from the investment-company and investment-adviser worlds. In 1934, as today, these firms had (in the words of today's Commission) a "business model" that was based on the "purchase and sale of securities." Doc. 79, at 8. That's what they did. *E.g.*, *Inv. Tr. of Mut. Inv. Co. v. Comm'r*, 27 B.T.A. 1322, 1322 (1933) ("it makes purchases and sales of securities"). Yet, tellingly, it did not occur to *anybody* that these firms might be "deal-

ers." *E.g.*, H.R. Rep. No. 76-2639, at 10 (1940) ("great majority of investment companies have never come within the purview of" the Act). Contemporaneous Commission reports recognized that investment companies were not governed by rules that applied to "'brokers and dealers' only," H.R. Doc. No. 76-279, at 1523 n.434 (1939), and that "[f]ederal regulation" of investment advisers did "not exist" under the Exchange Act, H.R. Doc. No. 477, at 31 (1939). These statements would have "be[en] incorrect" had dealer meant what today's Commission claims. *Murphy v. NCAA*, 138 S. Ct. 1461, 1484 (2018).

Congress's understanding is equally informative. Just six years after enacting the Exchange Act, Congress passed the Investment Company Act and the Investment Advisers Act, because these firms were not subject to the Exchange Act. *See* H.R. Rep. No. 76-2639, at 10; H.R. Rep. No. 76-1775, at 21 (1940). Section 1 of the Investment Company Act itself, for example, recognized that "investment companies" were distinct from "brokers" and "dealers," *see* ch. 686, § 1(b)(2), 54 Stat. 789, 790, and raised concerns regarding fair-dealing, recordkeeping, and other matters, *see id.* § 1(b)(3)-(5), 54 Stat. at 790, that the Exchange Act would *already* have addressed had investment companies been "brokers" or "dealers,"

11

*see* Securities Exchange Act of 1934, ch. 404, §§ 17(a) (recordkeeping), 18(a) (misleading statements), 48 Stat. 881, 897-98; Act of June 25, 1938, ch. 677, sec. 1, § 15A(b)(7), 52 Stat. 1070, 1071 (fair-and-equitable principles of trade). Congress's nearly-contemporaneous understanding of the Exchange Act's language disproves the Commission's newly-discovered meaning.

**3.** The Commission confuses the *ordinary meaning* of the text "(the textualist's touchstone)" with the "hyperliteral meaning" of a few isolated words. A. Scalia & B. Garner, *Reading* Law 356 (2012).

"[O]rdinary meaning" is not "literal" meaning. *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1484 (2021). A law that punishes whoever "draws blood in the streets" would literally condemn a surgeon who opens the vein of a person who has fallen in the street due to illness. Scalia & Garner, *supra*, at 357. But no sensible person would interpret the statute that way because the phrase "drawing blood in the streets," in its ordinary, "conventional meaning," refers to a violent attack that pierces the skin, not a medical procedure. *Id.*

The Commission would hang the surgeon. While it insists that buying and selling for one's "own account" means *hyperliterally* buying and

12

selling for one's self, the Commission has no response to the fact that in 1934, the common method of distinguishing brokers and dealers was identifying which "account" facilitated customer trades. Only by taking an "overly literal reading" of a few isolated words, "without any regard for [their] context or history," can the Commission press its case. *Andrus v. Charlestone Stone Prods. Co.*, 436 U.S. 604, 616 (1978).

### B.   The Context Reinforces The Customer-Order-Facilitation Interpretation.

**1.**   In 1934, everyone understood that "brokers" and "dealers" served investors by "executing trades as part of an overall package of services provided to customers." *Certain Broker-Dealers Deemed Not To Be Investment Advisers*, 70 Fed. Reg. 20,424 20,428 n.38 (Apr. 19, 2005). The "intimate relationship between customers and brokers and dealers" was recognized by virtually everyone. *Duker & Duker*, 1939 WL 36426, at *3 n.6 (SEC Dec. 19, 1939); *see SEC Report 1936*, at XIV ("dealer sells securities to his customer"); Hodge, *supra*, at 361 ("dealer sells to and buys from a client"). This focus on facilitating customer orders is "important" context in construing the statutory definitions, Scalia & Garner, *supra*, at 228, because Congress presumptively defines terms to match

13

their ordinary meaning, *United States v. Jones*, 962 F.3d 1290, 1298 (11th Cir. 2020).

**2.** The statutory phrase "the business of buying and selling securities" reinforces the customer-centered reading. 15 U.S.C. § 78c(a)(5)(A). The definite article "the" ("*the* business") demonstrates that Congress had a *specific* "business" in mind, *id.*, "when it enacted the statute," *Skilling v. United States*, 561 U.S. 358, 404 (2010) (construing "the"); *see Webster's New International Dictionary* 2617 (2d ed. 1934) ("the" "[l]imit[s] to a concrete application").

The conjunctive phrase "buying *and* selling" reveals what that business was. The Exchange Act originally required registration only in the over-the-counter markets. *See* § 15, 48 Stat. at 895; Act of May 27, 1936, ch. 464, sec. 3, § 15(a), 49 Stat. 1375, 1377. There, dealers "ordinarily" had one way to execute customer orders—say a "buy" order. Twentieth Century Fund, *The Security Markets* 266 (1935). The dealer would buy the stock for its "own account" (usually from another dealer), then, from its "own account," sell to the customer. *Id.* The dealer would thus trade "twice"; to facilitate one order, it would "both buy[] and sell[] for [its] own

14

account." *Id.  That* is "the" business of "buying *and* selling" Congress addressed.

Had Congress intended to reach *any* business that bought and sold, Congress could "have chosen clearer language." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017).  An obvious possibility would have been to replace "any person engaged in *the* business of buying and selling securities" with any person who "transacts *a* business in securities."  That formulation appears throughout the original Act, §§ 8, 11(d), 14(b), 17(a), 30(b), 48 Stat. at 888-904, and, by relying on the indefinite article "a," invites the broader construction the Commission prefers, *see Comm'r v. Kelley*, 293 F.2d 904, 911-12 (5th Cir. 1961) (contrasting definite and indefinite articles).  "The fact that [Congress] did not adopt this readily available and apparent alternative" "strongly" suggests that Congress had the more specific, customer-order-facilitation meaning in mind. *Knight v. Comm'r*, 552 U.S. 181, 188 (2008).

**3.**  The legal-backdrop supports this reading.

Take the common law.  "[W]here Congress uses terms that have accumulated settled meaning" under the common law, courts typically infer "that Congress means to incorporate the established meaning of

15

these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999).  Even where a statute "abrogates the common law in certain respects," courts "presume that Congress retained all other elements of [the common law] that are consistent with the statutory text."  *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 187 n.2 (2016); *see Neder*, 527 U.S. at 23-25.

That rule resolves this case.  At common law, the concepts of "broker" and "dealer" presupposed the facilitation of customer orders.  *See* W.O. Douglas & G.E. Bates, *Stock "Brokers" as Agents and Dealers*, 43 Yale L.J. 46, 60-61 (1933) ("distinguish[ing]" brokers and dealers by looking to the "confirmation" sent the "customer," whether "the customer is … charged any commission," and how stock is "transfer[ed] … to the customer").  Given this backdrop, it is inconceivable that Congress used those terms to refer to anything else.

Other bodies of law point the same way.  The Exchange Act clarifies that "dealer" does not include any person who buys or sells "but not as a part of a regular business."  15 U.S.C. § 78c(a)(5)(B).  That exclusionary phrase is not unique to the Act; Congress plucked it, nearly verbatim, from Internal Revenue regulations.  *See Donander Co. v. Comm'r*, 29 B.T.A. 312, 313 (1933).  In doing so, Congress "adopt[ed] the cluster of

16

ideas" that were attached to the "body of learning from which [the phrase] [was] taken." *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014).

That body of learning unquestionably excluded from dealer status firms that did not buy and sell to facilitate customer orders. As one court put it in 1933, "regardless of the number of purchases and sales," the term "dealer" "ha[d] application [only] to a merchant who h[eld] himself out to sell to customers." *Donander*, 29 B.T.A. at 314-15. Accordingly, a firm that traded "for sale to customers" was a "dealer." *Vaughan v. Comm'r*, 85 F.2d 497, 499 (2d Cir. 1936); *see Harriman Nat'l Bank v. Comm'r*, 43 F.2d 950, 952 (2d Cir. 1930) (dealer "purchased securities to fill specific orders" and "h[eld] them for customers"). But a firm that traded for its own "speculation," without customers, was not. *Vaughan*, 85 F.2d at 499. If Congress intended to extend "dealer" beyond the customer-order-facilitation context, it wouldn't have borrowed language from *this* body of law.

### C.    The Statute's Structure Spells More Trouble For The Commission's Reading.

A "wider look at the statute's structure" further undermines the Commission's position. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020).

**1.** Consider the "interplay between" broker and dealer. *Van Buren v. United States*, 141 S. Ct. 1648, 1658 (2021). All agree that the definition of "broker"—effecting transactions for the "account of others," 15 U.S.C. § 78c(a)(4)(A)—refers *only* to trading "on behalf of … customers." SEC's Opp'n 18, *Carebourn*, 2022 WL 1913692. All also agree that the definition of "dealer"—buying and selling for one's "own account," 15 U.S.C. § 78c(a)(5)(A)—*includes* transactions that facilitate customer orders. SEC Opp'n 24, *Carebourn*, 2022 WL 1913692.

The Court should stop there. Reading both definitions as referring to methods of effectuating customer orders "makes sense of the statutory structure" by "treat[ing]" both definitions "consistently." *Van Buren*, 141 S. Ct. at 1658.

The Commission's contrary approach "creates 'inconsistencies.'" *Van Buren*, 141 S. Ct. at 1659 (cleaned up). Under the Commission's

18

reading, the first definition ("broker") refers to *one* method of effectuating customer orders, and the second definition ("dealer") refers to the *other* method of effectuating customer orders *and also any other type of trading*. This reading fails to place both definitions "into an harmonious whole." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012).

Underscoring the Commission's error is the *noscitur a sociis* canon—the commonsense principle that words are known by the company they keep. *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1247 (11th Cir. 2008). In multiple instances, the original Exchange Act "links the words" broker and dealer. Scalia & Garner, *supra*, at 198. It places both definitions in back-to-back sentences. 48 Stat. at 883. It defines both words in parallel terms, implying a related meaning. *See* W. Strunk, *The Elements of Style* 26 (1920). And on numerous occasions, it joins the terms as "broker or dealer" (or something similar). §§ 3(a)(3), 5, 7(c), 7(c)(2), 7(d), 8, 8(a), 9(a)(3), 9(a)(4), 9(a)(5), 11(d), 11(e), 12(a), 14(b), 15, 17(a), 17(b), 30(a), 48 Stat. at 883-904.

The *noscitur* canon teaches that where words are linked like this, the words are read in light of their "common 'core of meaning.'" *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012). That meaning is clear:

19

"both terms refer to different forms of generally similar conduct," *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274 (2013)—different methods of effectuating customer orders.

**2.**  Congress's use of "broker," "dealer," and "own account" in other parts of the Act confirms this meaning.

When Congress uses the same words in different parts of a statute, the words "bear the same meaning throughout." *In re Appling*, 848 F.3d 953, 958 (11th Cir. 2017).  Consider Section 11, which presupposes a business that combines "the functions of dealer and broker" to facilitate customer orders.  48 Stat. at 892.  Section 11 provides that a combined broker-dealer must "disclose[] to [his] customer in writing at or before the completion of the transaction whether he is acting as a dealer for his own account, as a broker for [the] customer, or as a broker for some other person." *Id.*  These references to "broker," "dealer" and "own account" can only be referring to the manner of effectuating customer orders.  *Id.*  If that's what those terms mean in Section 11, they have the same meaning elsewhere.  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995).

**3.**  The Commission's contrary position creates other structural problems:  it "render[s] meaningless" the word account.  *Liu v. SEC*, 140

S. Ct. 1936, 1948 (2020). A "broker" effects transactions "for the account of others"; a "dealer" "for his own account." 48 Stat. at 883. Under the Commission's theory, Congress could've said "for others" and "for himself." *Cf.* Revenue Act of 1924, ch. 234, § 701(1), 43 Stat. 253, 326; Act of Apr. 5, 1938, ch. 72, § 863, 52 Stat. 198, 198. Only the customer-order-facilitation interpretation gives effect to "account"; the word calls to mind the widely-understood meaning of "account of others" and "own account," detailed above (at 8-10).

**4.** The Commission's structural problems continue: the agency's position has no "relationship to the other protections that the Act affords." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 348 (2010).

The broker-dealer regulatory regime is premised on the protection of customer orders and accounts. The Commission cannot explain why Congress would have forced individuals such as Mr. Almagarby to (among other pointless tasks) send "notice[s] to [their] customers" (which they do not have), 15 U.S.C. § 78o(e); meet "financial responsibility requirements" to keep "custody … of customers' securities" (which they do not hold), *id.* § 78o(c)(3)(A); and join a fund to insure "each of [their] customers" accounts (which do not exist), *id.* § 78fff-4(c).

The Commission's theory absurdly results in *less* regulatory protections.  Consider Rule 15c3-3, which requires broker-dealers to maintain "physical possession or control" of customer securities.    17 C.F.R. § 240.15c3-3(b)(1).  Or take FINRA Rule 5310, which mandates "reasonable diligence" in "ascertain[ing] the best market" for customer orders.  Neither rule applies to individuals like Mr. Almagarby, because they don't effectuate customer orders.  Individuals like Mr. Almagarby do, however, place their own orders, for their own trading.  But because they are not actually "dealers," and do not have direct market access, they rely on real broker-dealers to effectuate their orders.  Doc. 73-1, at 4 ¶¶ 14-15.  There's the rub:  if they're "dealers" themselves, the customer-protection rules don't protect them.  *See* 17 C.F.R. § 240.15c3-3(a)(1); FINRA Rule 160(b)(4).  Their brokers can lose their securities and trade at unreasonable prices.  Congress did not have such a nonsensical scheme in mind.

22

### D.    The Scope And History Of The Commission's Claimed Authority Counsel Against It.

**1.**  The "sheer scope of the [Commission's] claimed authority" "counsel[s] against the [Commission's] interpretation." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021).

The Commission's theory is absurd.  If having a "business model" that is based on the "purchase and sale of securities" is "conclusive proof" that a company is a "dealer," Doc. 79, at 8, it could have enormous implications for the registration status of other market participants, including hedge funds, investment companies, investment advisers, family offices, venture capital funds, private equity funds, and the like.  The law does not lightly presume "entire industr[ies]" negligent.  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012).

The Commission has no credible answer.  Below, the Commission asserted random facts about Mr. Almagarby, claiming he was unlike ""hedge funds' and 'family offices'" because he "repeatedly acquired large amounts of newly-issued shares directly from the issuer rather than through the secondary market and introduced and dispersed those shares to the investing public."  Doc. 88, at 8.  That is non-responsive.

23

Myriad (non-dealer) businesses acquire and sell newly-issued shares—say in convertible-debt arrangements,[3] IPOs,[4] and exchanges.[5]

More importantly, the Commission "does not identify any textual basis" for the newly-issued, non-newly-issued distinction. *Van Buren*, 141 S. Ct. at 1655. Nor could it: the Commission's theory has nothing to do with share vintage. *See* Doc. 88, at 3 ("[B]ecause Defendants clearly engaged in purchasing and selling securities … none of the factors cited by Defendants need be established."). All the Commission asks is whether a firm bought and sold as part of a "regular business." *See id.* (emphasizing that "'regular business'" does not "mean[] something other than a regular business"). The Commission cannot explain *why* its reading of the statute could not apply to every financial firm in the country.

**2.** The novelty of the Commission's claimed authority provides more reason for pause. For decades, the Commission has maintained

---

[3] *Spotify Raises $1 Billion in Debt Financing*, Wall St. J. (Mar. 29, 2016), https://on.wsj.com/3y4FDYz.

[4] *Buying and Quickly Selling IPO Stock Is No Longer Bad*, Wall St. J. (Feb. 2, 2000), https://on.wsj.com/3y1YbbP.

[5] *Chapel Invs. v. Cherubim Interests*, 177 F. Supp. 3d 981, 986-88 (N.D. Tex. 2016).

that a "dealer" is a "public securities business" that provides "services to investors."  Testimony of Director Lindsey, Div. of Market Regulation, 1998 WL 781102, at *2 n.2 (Oct. 1, 1998).  It "solicit[s] investors and handle[s] their money and securities." *Gordon Wesley Sodorff, Jr.*, 1992 WL 224082, at *5 (SEC Sept. 2, 1992).  The Commission's claimed "discover[y]" of an expansive new meaning merits "skepticism." *UARG*, 573 U.S. at 324.

The Commission's near-century-long silence—the total "want of assertion of power" in circumstances where the agency would "presumably" have been "alert to exercise it"—is almost dispositive proof that the newly-asserted power does not exist. *West Virginia*, 2022 WL 2347278, at *13.  The treatment of investment companies and advisers, discussed above (at 10-12), is one example; the 2004 Hedge Fund Rule is another.  At that time, the Commission searched (unsuccessfully) for a "hook on which to hang" the registration of hedge funds. *Goldstein*, 451 F.3d at 882.  If the Commission really had the power to require dealer-registration of any company whose business model was based on the "purchase and sale of securities," Doc. 79, at 8, it is remarkable that no one suggested that hedge funds might *themselves* be dealers.  *Cf. Registration*

*Under the Advisers Act*, 69 Fed. Reg. 72,054, 72,091 n.17 (Dec. 10, 2004) (focusing instead on broker-dealers that service hedge funds).

The Commission's treatment of convertible securities is similarly revealing.  According to the Commission, Mr. Almagarby acted as a dealer by acquiring convertible debt, converting that debt into discounted stock (pursuant to SEC Rule 144, Doc. 73, at 30), and selling that stock into the market.  Doc. 73, at 29.  The Commission in other pending cases states this is "sufficient" proof of being a dealer.  SEC's Opp'n 16, *Carebourn*, 2022 WL 1913692.  The Commission cannot reconcile that theory with the regulatory history.

Rule 144(d)(3)(ii) allows companies holding convertible debt to do *exactly* what Mr. Almagarby did:  "after the Rule 144 holding period is satisfied," holders can "convert [their securities] into … common stock[] at a … discount to the market price" and "quickly" resell "into the public market."  *Rule 144 Holding Period*, 86 Fed. Reg. 5063, 5066 (Jan. 19, 2021).  There is a thriving convertible-securities industry that relies on this rule, and none of the investors have been thought of as "dealers" before.  *See generally* Comments of the Small Public Company Coalition,

26

SEC File No. S7-24-20 (Mar. 22, 2021), https://bit.ly/3nBGJGy ("SPCC Comments").

The Commission has known about this for decades.  The Commission approved the conversion-resale process (with a non-dealer) in 1980, *see* Letter re Planning Research Corp., SEC No-Action Letter, 1980 WL 14999, at *2 (Dec. 8, 1980); codified that position in 2007, *see Revisions to Rule 144*, 72 Fed. Reg. 71,546, 71,555 & n.143 (Dec. 17, 2007); and is currently studying amendments, *see* 86 Fed. Reg. at 5066—all under a rule that dealers can't use, *see* 17 C.F.R. § 230.144 prelim. note ("other than" dealers).  In the meantime, *thousands* of convertible-securities transactions—all with non-dealers—have been disclosed in corporate filings filed with the Commission.  *See* SPCC Comments 14-15.  The Commission undertook a special "screening process" for those filings in 2007, Director White, Div. of Corp. Fin. (Feb. 23, 2007), https://bit.ly/3IbQch3, and cracked down on late-filing issuers in 2016, *see Elray Res., Inc.*, 2016 WL 5571631, at *2 (Sept. 30, 2016)—never suggesting that the firms holding and converting the securities were all supposedly "dealers." Count *Amici* skeptical.

### E.    The Commission's Reading Makes A Mess Of Other Statutory Limitations.

The Commission's theory is inconsistent with the meaning of the conjunctive phrase—"buying *and* selling securities"—in other ways.

**1.**  By the early twentieth century, the states had developed a robust body of law regulating different types of "dealers."  Textually, courts held that when legislatures "coupl[ed] the two acts of buying and selling," they intended to "render the law more explicit," such that a "dealer" would include only businesses that "buy and sell *the same article and in the same condition*."  *State v. Yearby*, 82 N.C. 561, 562 (1880).  Thus, for example, a shrimp canner was not a dealer in shrimp.  *State v. San Patricio Canning Co.*, 17 S.W.2d 160, 162 (Tex. Civ. App. 1929).  He bought (raw) shrimp and sold (canned) shrimp, but did not "buy[] and sell[] shrimp" in the statutory sense, because the shrimp were not in the same "form and condition."  *Id.*

The Commission's theory is incompatible with this meaning.  When Congress adopted the phrase "buying and selling," it brought the established meaning with it.  *Stokeling v. United States*, 139 S. Ct. 544, 551

(2019). Mr. Almagarby's activity does not fall within that meaning because he does not buy and sell the same securities in the same form. Just as the shrimp canner bought raw shrimp and "converted [that shrimp] into" canned shrimp, *San Patricio*, 17 S.W.2d at 162, Mr. Almagarby "obtain[s] convertible debentures" and "convert[s] the debentures into shares," before "sell[ing]," Doc. 73-1, at 3-4. He doesn't "buy[] and sell[]" in the statutory sense.

**2.** The Commission's theory has another problem: Mr. Almagarby's buys and sells lack a temporal connection. The conjunctive "and" implies a linkage in "time." *Webster's*, *supra*, at 98; *see Lake Bldg. Prods., Inc. v. Sec'y of Labor*, 958 F.3d 501, 505 (6th Cir. 2020) ("and" implies "certain temporal proximity"). But Mr. Almagarby's purchases and sales were separated by up to a six-month gap, Doc. 73-2, at 24:4-13—more proof the agency's conception of "dealer" is wrong.

29

**F.    Two Time-Honored Canons Of Judicial Restraint Foreclose The Commission's Theory.**

**1.**    The Commission's theory fails on constitutional-avoidance grounds, *see Clark v. Martinez*, 543 U.S. 371, 381-82 (2005); it's "so standardless," and invites so much "arbitrary enforcement," that vagueness concerns arise, *Johnson v. United States*, 576 U.S. 591, 595 (2015).

If a dealer is any company whose "business model" is based on the "purchase and sale of securities," Doc. 79, at 8, the only thing standing between nearly every financial firm and an enforcement action is the "benevolence" of government lawyers, *Wollschlaeger v. Governor*, 848 F.3d 1293, 1322 (11th Cir. 2017).  The Commission basically admits it cannot articulate what a "dealer" is.  In the pending "dealer" rulemaking, the Commission lists several specific activities that may be indicative of a "dealer" (none of which have any connection to the statutory text), and then throws up its hands:  "a person not meeting the standards in the Proposed Rules may still be a dealer ….  Whether or not a person is a 'dealer' is based on the facts and circumstances, where various factors are 'neither exclusive, nor function as a checklist.'"  87 Fed. Reg. at 23,059 n.51.  "I know it when I see it" is not a real standard.

**2.** The rule of lenity also forecloses the Commission's interpretation. When the Court is faced with a statute—like this one, *see* 15 U.S.C. §§ 78o(a)(1), 78ff(a)—"that has both criminal and noncriminal applications," "the rule of lenity" applies, even in civil cases. *Romero v. Sec'y of Homeland Sec.*, 20 F.4th 1374, 1383 (11th Cir. 2021).

The rule mandates that when choosing "between two readings of" a criminal statute, the Court should choose the reading that "criminalizes a narrower range of conduct." *Romero*, 20 F.4th at 1383-84. That principle applies here. Because the "traditional tools of statutory construction" fail to "clear[ly] and definit[ively]" sustain the Commission's expansive interpretation, the Court must choose the reading that subjects fewer market participants to potential prosecution. *Yates v. United States*, 574 U.S. 528, 547-48 (2015).

## II. If Anything, *SEC v. Big Apple* Independently Bars The Commission's Attempted Overreach.

The Commission also relied on *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015), but that disproves the Commission's theory.

31

The Commission claims that *Big Apple* adopted the agency's conception of "dealer"—any company whose "business model" is based on the "purchase and sale of securities."  Doc. 79, at 8.  The problem is *Big Apple* "interpret[ed] a different statute"—the *Securities* Act—and does not "magically" dictate the meaning of "different language in the different statute"—the *Exchange* Act—before the Court today.  *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 277 (2016).

**A.**  As applied to the *Securities* Act, the Commission's reading of *Big Apple* disproves the agency's interpretation of the *Exchange* Act.

In the Securities Act, Congress collapsed a number of business types into the definition of "dealer," as a matter of administrative convenience, for the "sole" purpose of subjecting them to the "same" regulations.  H.R. Rep. No. 73-85, at 14 (1933).  Thus, Congress defined "dealer" as any company, not only engaged in "dealing," but also acting as a "broker" or "otherwise" involved in "trading," even for "part of [its] time."  15 U.S.C. § 77b(a)(12).  As is obvious from the text, and as was widely understood at the time, the Securities Act's definition extends beyond "merely the ordinary dealer."  H.R. Rep. No. 73-85, at 14.

32

When Congress enacted the Exchange Act, one year later, it corrected this "overeconomy of language" and returned the "dealer" definition to its ordinary meaning in "the English language." 1 L. Loss et al., *Fundamentals of Securities Regulation* § 3.A.4 (7th ed. 2021 Cum. Supp.). Congress struck "broker" and "trading," swapped the disjunctive for the conjunctive, added "own account," and made other material changes, plainly narrowing the definition's reach:

> The term "dealer" means any person ~~who~~ engage**d** ~~either for all or part of his time, directly or indirectly, as agent, broker, or principal,~~ in the business of ~~offering,~~ buying**, and** selling~~, or otherwise dealing or trading in~~ … securities ~~issued by another person~~ for such person's own account ….

*Compare* 15 U.S.C. § 77b(a)(12), *with id.* § 78c(a)(5)(A).

Congress's actions cannot be squared with the Commission's position. "Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning." *DIRECTV, Inc. v. Brown*, 371 F.3d 814, 817 (11th Cir. 2004). Accordingly, if the text of the *Securities* Act means that a "dealer" is any "business model" based on the "purchase and sale of securities," Doc. 79, at 8, the narrower text of the *Exchange* Act must have a narrower meaning.

33

**B.** The Commission retreats to a *Big-Apple* footnote, which stated that the "dealer" definitions under the Securities Act and Exchange Act were "very similar." 783 F.3d at 809 n.11. But the panel's (citation-free) assertion is wrong, has been superseded by Supreme Court authority, and is dicta. The panel's textual analysis of the Securities Act consisted in its entirety of looking up a single word ("business") in a copy of *Black's Law Dictionary* published seventy years after the statute's adoption. *New Prime* rejected that exact interpretive approach. 139 S. Ct. at 539. The panel, moreover, "had no occasion" to interpret the Exchange Act, *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022), because appellants failed to raise Exchange-Act arguments, thus "abandon[ing]" them, 783 F.3d at 806. The panel's footnoted commentary on an unbriefed, abandoned issue is not binding, and cannot save the Commission's case. *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1204 n.7 (11th Cir. 2004); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1216 n.20 (11th Cir. 1991).

## CONCLUSION

The decision below should be reversed.

Respectfully submitted,

Dated:  July 8, 2022                    /s/ *Helgi C. Walker*

BARRY GOLDSMITH                         HELGI C. WALKER
M. JONATHAN SEIBALD                     BRIAN A. RICHMAN
GIBSON, DUNN & CRUTCHER LLP             GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue                         1050 Connecticut Avenue, N.W.
New York, N.Y. 10166-0193               Washington, D.C. 20036-5306
(212) 351-4000                          (202) 955-8500

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

**1.    Type Volume**

__X__          This document complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 6,500 words.

**2.    Type face and Type-Style**

__X__          This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point New Century Schoolbook font.

Dated:  July 8, 2022                          /s/ *Helgi C. Walker*

                                                          Helgi C. Walker
                                                          *Counsel for* Amici Curiae

36

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of July, 2022, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

Dated: July 8, 2022

/s/ *Helgi C. Walker*

Helgi C. Walker
*Counsel for* Amicus Curiae