No. 21-13755

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

IBRAHIM ALMAGARBY AND MICROCAP EQUITY GROUP, LLC,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Southern District of Florida,
Hon. Marcia G. Cooke, Senior U.S. District Judge
Patrick M. Hunt, U.S. Magistrate Judge
Case No. 17-cv-62255-MGC

**BRIEF OF TRADING AND MARKETS PROJECT, INC.
AS AMICUS CURIAE SUPPORTING
DEFENDANTS-APPELLANTS AND REVERSAL**

Anthony S. Barkow
Charles D. Riely
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1662
abarkow@jenner.com
criely@jenner.com

Gabriel K. Gillett
   *Counsel of Record*
Kelsey L. Stimple
Jenner & Block LLP
353 North Clark Street
Chicago, IL 60654
(312) 840-7220
ggillett@jenner.com

*Counsel for Amicus Curiae*

No. 21-13755, *SEC v. Almagarby et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2(b), amicus curiae here certify that, to the best of its knowledge, the Certificate of Interested Persons contained in the briefs filed by Plaintiff-Appellant, Defendant-Appellee, and the Small Public Company Coalition, Alternative Investment Management Association Ltd., and National Association of Private Fund Managers (together "Industry Amici") is complete except for the following:

- Barkow, Anthony S. – Counsel for amicus curiae

- Gillett, Gabriel K. – Counsel for amicus curiae

- Jenner & Block LLP – Counsel for amicus curiae

- Riely, Charles D. – Counsel for amicus curiae

- Stimple, Kelsey L. – Counsel for amicus curiae

- Trading and Markets Project, Inc. – Amicus curiae

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, amicus curiae hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

No. 21-13755, *SEC v. Almagarby et al.*

Amicus curiae further certifies that it is not aware of any publicly traded company or corporation that has an interest in the outcome of this case or appeal.

*/s/ Gabriel K. Gillett*
Gabriel K. Gillett

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
    CORPORATE DISCLOSURE STATEMENT .................... C-1

TABLE OF CITATIONS ............................................................. iii

INTEREST OF AMICUS CURIAE .................................................. 1

STATEMENT OF THE ISSUE ........................................................ 3

INTRODUCTION AND SUMMARY OF ARGUMENT ................. 3

ARGUMENT ................................................................................... 7

I.    Registered Investment Advisers And Funds Operate And
      Are Regulated Differently From Dealers .............................. 7

      A.    Registered Investment Advisers And Funds Seek To
            Deliver Returns For Investors. ..................................... 7

      B.    Registered Investment Advisers And Funds Are
            Subject To Oversight By The SEC And Others. .......... 10

      C.    Registered Investment Advisers And Funds Are
            Different From Dealers And Are
            Regulated Differently .................................................. 11

II.   This Court Should Hold, Consistent With The Text,
      History, And Structure Of The Exchange Act, That A
      "Dealer" Executes Customer Orders "As Part Of A
      Regular Business." ............................................................ 13

      A.    The District Court Ignored That The Statutory
            "Regular Business" Exemption Shows That
            Traders And Entities Without Customers Are
            Not "Dealers." ............................................................ 14

      B.    The District Court Wrongly Followed *Big Apple* ......... 20

i

III.  The SEC Has Chosen The Wrong Forum For Advancing
      An Expansive And Unprecedented View Of Who Is
      A "Dealer." ............................................................................ 23

      A.   Supreme Court Precedent Supports Scrutinizing
           The SEC's Newfound Position. .................................... 23

      B.   The SEC Cannot Use This Case As A Backdoor To Revise
           Rule 144. It Must Go To Congress Or Issue A Rule
           That Can Withstand Judicial Review .......................... 25

IV.   At A Minimum, This Court Should Determine Dealer
      Status Based On The SEC's Own Factors And Guidance .... 29

V.    This Court Should Limit If Not Bar Disgorgement
      And  Retrospective Remedies ................................................ 31

CONCLUSION ................................................................................ 33

CERTIFICATE OF COMPLIANCE .............................................. 34

CERTIFICATE OF SERVICE ........................................................ 35

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Alvarez v. United States,*
862 F.3d 1297 (11th Cir. 2017) ........................................................... 32

*Axon Enter., Inc. v. FTC,*
143 S.Ct. 890 (2023) ........................................................................ 23

*Bittner v. United States,*
143 S.Ct. 713 (2023) ........................................................................ 31

*Calder v. Bull,*
3 U.S. (3 Dall.) 386 (1798) ............................................................... 31

*CFTC v. S. Tr. Metals, Inc.,*
894 F.3d 1313 (11th Cir. 2018) ........................................................... 32

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ........................................................................ 31

*Digital Realty Tr., Inc. v. Somers,*
138 S.Ct. 767 (2018) ........................................................................ 27

*DIRECTV, Inc. v. Brown,*
371 F.3d 814 (11th Cir. 2004) ........................................................... 21

*Dirks v. SEC,*
463 U.S. 646 (1983) ........................................................................ 23

*Gabelli v. SEC,*
568 U.S. 442 (2013) ........................................................................ 23

*Goldstein v. SEC,*
451 F.3d 873 (D.C. Cir. 2006) ......................................................... 7, 24

*Jarkesy v. SEC,*
34 F.4th 446 (5th Cir. 2022), *cert. granted* (U.S. June 30,
2023) (No. 22-859) ......................................................................... 23

iii

*Kisor v. Wilkie*,
   139 S.Ct. 2400 (2019)........................................................................28

*\*Kokesh v. SEC*,
   581 U.S. 455 (2017)..........................................................................23

*\*Liu v. SEC*,
   140 S.Ct. 1936 (2020)........................................................................23

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007)..........................................................................28

*Lucia v. SEC*,
   138 S.Ct. 2044 (2018)........................................................................23

*Pauley v. BethEnergy Mines, Inc.*,
   501 U.S. 680 (1991)..........................................................................28

*Sackett v. EPA*,
   143 S.Ct. 1322 (2023)........................................................................19

*Savage Servs. Corp. v. United States*,
   25 F.4th 925 (11th Cir. 2022) ...........................................................18

*Schafer v. Helvering*,
   299 U.S. 171 (1936)..........................................................................15

*Sec. Allied Corp. v. Comm'r*,
   95 F.2d 384 (2d Cir. 1938) ...............................................................15

*SEC v. Big Apple Consulting USA, Inc.*,
   783 F.3d 786 (11th Cir. 2015)............................................ 4, 20, 22, 23

*SEC v. Federated Alliance Grp., Inc.*,
   1996 WL 484036 (W.D.N.Y. Aug. 21, 1996) .......................................24

*SEC v. Hallam*,
   42 F.4th 316 (5th Cir. 2022) .............................................................32

*Slack Techs., LLC v. Pirani*,
   143 S.Ct. 1433 (2023)..................................................................22, 26

*Sprint Corp. v. FCC*,
    315 F.3d 369 (D.C. Cir. 2003) ........................................................ 25

*United States v. Hall*,
    64 F.4th 1200 (11th Cir. 2023) .................................................... 23

\*W. Va. v. EPA,
    142 S.Ct. 2587 (2022) ........................................ 24, 26, 27

*Wilson v. Comm'r*,
    76 F.2d 476 (10th Cir. 1935) ...................................................... 15

\*Wis. Cent. Ltd. v. United States,
    138 S.Ct. 2067 (2018) ............................................... 16, 21

*XY Plan. Network, LLC v. SEC*,
    963 F.3d 244 (2d Cir. 2020) ..................................... 11, 12

## Statutes, Rules and Regulations

5 U.S.C. § 706(2)(A) ..................................................................... 26

15 U.S.C. § 77b(a)(12) ................................................................. 21

15 U.S.C. § 78c(a)(5) ................................................................ 2, 3

\*15 U.S.C. § 78c(a)(5)(A) ........................................... 3, 12, 17

\*15 U.S.C. § 78c(a)(5)(B) ............................................ 3, 14, 21

15 U.S.C. § 78c(f) ........................................................................ 26

15 U.S.C. § 78fff-4(c) ................................................................. 13

15 U.S.C. § 78u(d)(5) .................................................................. 32

15 U.S.C. § 78w(a)(2) ................................................................. 26

15 U.S.C. § 80a-1(b)(2) .............................................................. 12

15 U.S.C. § 80a-3 ........................................................................ 10

15 U.S.C. § 80a-3(a) .................................................................... 13

15 U.S.C. § 80b-1 *et seq.* ............................................................. 10

17 C.F.R. § 230.144(d)(1)(i) ......................................................... 25

17 C.F.R. § 230.500 *et seq.*......................................................... 10

17 C.F.R. § 240.15c3-1.................................................................. 13

17 C.F.R. § 240.15c3-3.................................................................. 13

17 C.F.R. § 240.15c3-5.................................................................. 13

17 C.F.R. § 245.101 ...................................................................... 10

Fed. R. App. P. 29 ........................................................................... 1

Pub. L. No. 106-102, §§ 202, 216, 219, 113 Stat 1338 (Nov. 12, 1999)...................................................................................... 18

*Regulation Best Interest: The Broker-Dealer Standard of Conduct*, 84 Fed. Reg. 33,318 (July 12, 2019) ............................ 11, 12

*\*Revisions to Rules 144 and 145*, 72 Fed. Reg. 71,546 (Dec. 17, 2007) ...................................................................................... 25

## Other Authorities

AIMA, FAQs (visited July 11, 2023) ............................................... 7

*Comm. on Interstate and Foreign Com., The Exchange Act of 1934: Hearings on H.R. 7852 and H.R. 8720*, 73rd Cong. (1934) (statement of Rep. Corcoran).................................................. 16

Cong. Rsch. Serv., *U.S. Retirement Assets: Amount in Pensions and IRAs* (2022) ............................................................... 8

*ECM Highlights: FY22*, dealogic (Dec. 19, 2022) .................................. 9

FINRA, *Investment Advisers* (visited July 11, 2023)........................... 7, 8

*Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, SEC Release No. 34-94524, 87 Fed. Reg. 23,054 (proposed Apr. 18, 2022) ............................................................... 26, 27

Elizabeth Howcroft, Reuters, *RPT-Convertible Bond Issues Surge in Coronavirus-Hit Market* (July 6, 2020) ................................. 8

Investment Co. Inst., Mutual Funds Are Key to Building Wealth for Majority of US Households (Oct. 31, 2022)........................ 8

Craig Lewis, *The SEC's Proposed Rules for Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer* (Dec. 2022) .................. 27

MFA Comment Letter, File No. S7-12-22 (Apr. 6, 2023) ........................ 27

SEC, Annual Staff Report Relating to the Use of Form PF Data (Dec. 9, 2022)................................................................... 10

SEC, *Guide to Broker-Dealer Registration* (rev. Dec. 12, 2016) (visiting July 11, 2023) .............................................................. 29

SEC, *Information for Newly-Registered Investment Advisers* (rev. Mar. 31, 2017).................................................................. 10

SEC, Investor Bulletin: Investing in an IPO (visited July 11, 2023)................................................................................... 30

SEC, *Private Fund Adviser Overview* (Oct. 21, 2016) ........................... 10

SEC, Private Fund (visited July 11, 2023) ............................................ 12

SEC's Notice of Supplemental Authority, *SEC v. LG Capital Funding, LLC*, No. 22-cv-3353 (E.D.N.Y. July 7, 2023), ECF No. 35.................................................................. 27

*SEC v. Keener*, No. 22-14237 (11th Cir.), ECF Nos. 26, 34, 36, 38 ...................................................................................... 14

Tim Stobierski, Harv. Bus. Sch. Online, *What is Arbitrage?* (July 20, 2021)....................................................................... 8

The Economist, *Why Convertible Bonds Are the Asset Class for the Times* (July 10, 2021) ................................................................. 9

## INTEREST OF AMICUS CURIAE[1]

Trading and Markets Project, Inc. ("TMP") is a non-partisan non-profit organization dedicated to enhancing capital markets and ensuring the stability and competitiveness of the financial system. TMP advocates on behalf of entities and individuals focused on securities regulation and the securities markets—including private fund managers, registered investment advisers, investment companies, and others. TMP members include, among others, financial market participants, and former officials from the Securities and Exchange Commission ("SEC") and the legislative, executive, and judicial branches of government.

TMP and its members have a strong interest in how courts and the SEC interpret the Securities Exchange Act of 1934 ("Exchange Act") and how those interpretations impact capital markets and market participants. TMP and its members also have a strong interest in ensuring the securities laws are applied consistently, predictably, and fairly.

---

[1] Amicus has simultaneously moved for leave to file this brief. Defendants consent to the motion; Plaintiff will not oppose the motion and takes no position.

No party or party's counsel authored this brief in whole or in part or contributed money intended to fund preparing or submitting the brief. No person other than amicus or its members or counsel contributed money intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29.

This case involves the meaning of the term "dealer" under the Exchange Act, 15 U.S.C. § 78c(a)(5). Many market participants—including investment advisers and managers of private funds and other investment vehicles—have long understood that they do not qualify as "dealers" based on the statutory definition, the historical context when the definition was codified in 1934, and the guidance provided over the years from the SEC. But in this case, at the SEC's urging, the District Court adopted an unprecedented interpretation of the term "dealer." According to the District Court, a "dealer" includes *any* person that buys and sells securities as a business, regardless of whether the other elements of the statute are satisfied, the activity historically has been understood as dealing, or the criteria the SEC and others have long relied on to determine who is a dealer are present. *See* Dkt. 39 ("SEC Br.") at 3, 14-19.

The District Court's interpretation is wrong and should be rejected. If adopted by this Court, it would cause serious harm to capital markets and market participants of all stripes—including investment advisers, private and public funds, insurers, individuals, and others—by imposing unnecessary regulation that would not benefit investors or regulators

and would create a risk that companies could face substantial penalties for conduct they understood in good faith was legal when it occurred.

## STATEMENT OF THE ISSUE

Whether the District Court erred in holding that any firm "engaged in the business of buying and selling securities" is a "dealer" under 15 U.S.C. § 78c(a)(5).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Exchange Act defines "dealer" as "any person engaged in the business of buying and selling securities … for such person's own account," 15 U.S.C. § 78c(a)(5)(A), and includes an express exemption for persons buying and selling securities "not as a part of a regular business," *id.* § 78c(a)(5)(B). That language historically has been understood as limiting "dealer" status to a narrow category of entities that buy and sell securities to execute customer orders.

Here, the District Court reinterpreted the meaning of "dealer" in a way that contradicts nearly a century of precedent and practice. Following the SEC's suggestion, the District Court relied on a case arising under a *different* statute, with a *different* definition of dealer, as holding that "where a company's business model is based entirely on the purchase and

sale of securities, that fact constitutes **conclusive** proof that the company is a dealer" under the Exchange Act. Dist.Ct.Dkt. 112 ("Order") at 7 (Aug. 17, 2020) (citing *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015)); *see* Dist.Ct.Dkt. 18 ("SEC MTD Opp.") at 6-9; Dist.Ct.Dkt. 73 ("SEC MSJ") at 14-15.

TMP agrees with Defendants and the Small Public Company Coalition, Alternative Investment Management Association, and National Association of Private Fund Managers ("Industry Amici") that the District Court erred. TMP writes to highlight additional reasons why the District Court's novel reading contravenes the Exchange Act's text, conflicts with the long-settled understanding of that Act, contradicts the SEC's own guidance, and risks the imposition of improper remedies.

First, the practical reality is that dealers operate and are regulated differently from many other market participants that buy and sell securities. Dealers buy from and sell to customers and are compensated based on commissions or the bid-ask spread. But market participants like private funds do not have customers; they have investors. And like investment advisers, they profit through returns on investments not capturing commissions or bid-ask spreads.

Second, the District Court ignored that the "dealer" definition was never intended to ensnare all market participants that buy and sell securities. Congress meant the definition to be limited to those who transact in their own account with or for customers as part of a "regular business"—which in 1934 meant earning profits through commissions and fees not returns through investing. But Congress did not intend to cover market participants like investment advisers and private funds that trade for investment purposes, even though Congress clearly understood that such participants were operating in business in a generic sense.

Third, the SEC is in the wrong forum to assert its unprecedented view about what it means to be a dealer under the Exchange Act and restructure its regulatory regime. Defendants solicited microcap issuers for convertible-securities transactions then sold the converted securities in compliance with the SEC's rules. If the SEC believes those rules are insufficient, it should change them through proper notice-and-comment rulemaking. If the SEC believes the statutory "dealer" definition is too narrow, it should ask Congress to amend it. If the SEC believes fraud is occurring, it should invoke its antifraud authority. But it cannot use this case to advance a new interpretation of what it means to be a "dealer"

under the Exchange Act that conflicts with statutory text, historical context, and settled understandings.

Fourth, at a minimum, this Court should reject the District Court's broad and categorical holding that any business buying or selling securities can be a "dealer." Instead, this Court should hold that dealer status is determined by whether someone transacts as "part of a regular business" for executing customer orders, or by reference to the specific factors and guidance the SEC and market participants have traditionally relied upon. Doing so will mitigate the risk that any professional adviser or investor could be deemed a dealer. In turn, that will save a broad array of market participants—including mutual funds, private funds and pension funds, insurers, family offices, foundations, and individuals—from registering as a dealer, complying with ill-fitting regulation that is neither relevant to their businesses nor helpful to regulators or markets, and facing serious sanctions for conduct no one thought was dealing at the time.

Fifth, the SEC cannot seek disgorgement of profits that were not tied to any past failure to register as a dealer or that did not harm investors. Penalizing market participants for conduct that was considered lawful at the time is unfair and improper.

## ARGUMENT

## I. Registered Investment Advisers And Funds Operate And Are Regulated Differently From Dealers.

### A. Registered Investment Advisers And Funds Seek To Deliver Returns For Investors.

Investors today have a range of investments and investment vehicles available to achieve their financial goals. Many rely on the expertise of investment advisers, who are "paid for providing advice about securities to their clients." FINRA, *Investment Advisers*, https://tinyurl.com/2vch7fx8 (visited July 11, 2023).

Private investment funds are one type of vehicle that can provide competitive, diversified, uncorrelated risk-adjusted returns, as well as downside protection and flexibility. *See* AIMA, FAQs, https://tinyurl.com/34vwwur9 (visited July 11, 2023); *Goldstein v. SEC*, 451 F.3d 873, 876 (D.C. Cir. 2006). They are "usually structured as limited partnerships" to achieve "maximum separation of ownership and management," where "the general partner manages the fund (or several funds) for a fixed fee and a percentage of the [fund's] gross profits" and "[t]he limited partners are passive investors and generally take no part in management activities." *Goldstein*, 451 F.3d at 876; AIMA, FAQs, *supra.* In

7

managing the fund, the general partner typically hires an adviser that may have discretion to trade for the fund's own account. FINRA, *supra.*

Investors may also utilize other investment vehicles, including private equity funds, investment companies, pension funds, and family offices. Collectively, their impact is substantial. In 2021, U.S. pension plans held over $27 trillion in assets. *See* Cong. Rsch. Serv., *U.S. Retirement Assets: Amount in Pensions and IRAs* (2022). In 2022, 115.3 million investors and 52.3% of U.S. households owned mutual funds. Investment Co. Inst., Mutual Funds Are Key to Building Wealth for Majority of US Households (Oct. 31, 2022).

Among instruments available to investors are convertible notes or bonds, which typically have periodic interest payments but also include "the option to convert [the security] into shares of the underlying company at a later date, often at a discounted rate." *See* Tim Stobierski, Harv. Bus. Sch. Online, *What is Arbitrage?* (July 20, 2021). Convertible bonds are attractive to companies looking to reduce their cost of capital and provide those with low or no credit ratings with access to funding when they may lack other options. *See* Elizabeth Howcroft, Reuters, *RPT-Convertible Bond Issues Surge in Coronavirus-Hit Market* (July 6, 2020). For

investors, convertible bonds offer upside potential if the company's common stock appreciates and afford "a degree of indexation to rising consumer prices." The Economist, *Why Convertible Bonds Are the Asset Class for the Times* (July 10, 2021). They are thus "well-suited to fast-changing conditions." *Id.* Since 2021, over $270 billion in convertible bonds have been issued. *See ECM Highlights: FY22*, dealogic (Dec. 19, 2022).

Advisers, funds, and investors ultimately seek returns on investment rather than profit from market-making. Investment opportunities may come from an SEC-registered broker or dealer engaged by an issuer looking for investors. Opportunities may come from a fund or adviser contacting a registered broker or dealer, seeking investments meeting particular criteria. Typically, investments are made through or with the assistance of a broker or dealer intermediary, not through a structure that positions the issuer as the customer. Typically the adviser, fund, or investor does not hold itself out as predominantly being in the business of matching buyers and sellers or financing companies by underwriting new securities offerings.

## B.    Registered Investment Advisers And Funds Are Subject To Oversight By The SEC And Others.

Investment advisers with assets under management over $150 million must register with the SEC—and are thus subject to SEC oversight and regulation. SEC, *Private Fund Adviser Overview* (Oct. 21, 2016), https://tinyurl.com/2s3udjsd. For example, advisers must file reports with the SEC and are examined for compliance by staff. SEC, *Information for Newly-Registered Investment Advisers* (rev. Mar. 31, 2017), https://tinyurl.com/y5dwcs7m (describing compliance and disclosure obligations); *see generally* Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*

Private funds that hire registered investment advisers are also within the SEC's purview. Such advisers must disclose detailed information about the private funds they manage, including "fund size, use of borrowings and derivatives, strategy, and types of investors." SEC, Annual Staff Report Relating to the Use of Form PF Data (Dec. 9, 2022), https://tinyurl.com/2p8vpwzr. Private funds are also subject to securities laws when raising money. *See* 17 C.F.R. § 230.500 *et seq.* Mutual funds, pension funds, and other entities are also subject to SEC scrutiny. *See, e.g.*, 15 U.S.C. § 80a-3; 17 C.F.R. § 245.101.

### C.    Registered Investment Advisers And Funds Are Different From Dealers And Are Regulated Differently.

Registered investment advisers and the private funds they manage are very different from dealers. They are subject to different regulatory frameworks, "have different types of relationships with investors, offer different services, and have different compensation models when providing investment recommendations or investment advisory services to customers." *Regulation Best Interest: The Broker-Dealer Standard of Conduct*, 84 Fed. Reg. 33,318, 33,319 (July 12, 2019).

Dealers typically hold themselves out as willing to make two-way markets by buying and selling securities. They typically advertise and solicit buyers and sellers, or issuers, each of whom would be a dealer's customer or counterparty. Dealers also hold inventory (often acquired in bulk) to pair together those who wish to buy and sell a particular security at different times. "A broker-dealer's recommendations may include recommending transactions where the broker-dealer is buying securities from or selling securities to retail customers on a principal basis or recommending proprietary products." *Id*; *see also XY Plan. Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020) ("[B]roker-dealers often provide

advice and make recommendations about securities transactions and investment strategies.”). “Investment advisers, on the other hand, typically provide ongoing, regular advice and services in the context of broad investment portfolio management.” *Regulation Best Interest: The Broker-Dealer Standard of Conduct*, 84 Fed. Reg. at 33,319.

Dealers “effect securities transactions for customers, for which they typically charge a commission or other transaction-based fee.” *XY Plan.*, 963 F.3d at 248 (citing 15 U.S.C. § 78c(a)(5)(A)). Private funds, on the other hand, are “created to pool money from multiple investors …. to make investments on behalf of the fund.” SEC, Private Fund, https://tinyurl.com/2p8kxmmp (visited July 11, 2023). Funds, unlike dealers, do not have clients or customers. A fund is the adviser’s client and has investors who are the fund’s equity owners and benefit from its returns. A fund’s investors do not transact as a counterparty of the fund. And a fund is not in a customer relationship with the companies in which it invests.

Because they raise different types of public policy concerns, registered investment advisers and funds are regulated differently from dealers. Dealers are governed by the Exchange Act, not the Investment Advisers Act or the Investment Company Act. *See* 15 U.S.C. § 80a-1(b)(2)

12

(distinguishing investment advisers from dealers); *id.* § 80a-3(a) (defining investment companies). Among other things, dealers must: maintain minimum net capital levels to satisfy customer claims (17 C.F.R. § 240.15c3-1); possess or control certain margin securities carried for a customer's accounts (17 C.F.R. § 240.15c3-3); join a fund to insure customer accounts (*see* 15 U.S.C. § 78fff-4(c)); and implement safeguards to control risks associated with direct access to securities markets (17 C.F.R. § 240.15c3-5). These rules are designed to protect broker-dealers' customers. But these rules have no utility as applied to traders or funds, which have no customers. And these rules may harm fund investors by imposing unnecessary costs to comply with ill-fitting requirements without a corresponding benefit to investors, markets, or regulators.

## II. This Court Should Hold, Consistent With The Text, History, And Structure Of The Exchange Act, That A "Dealer" Executes Customer Orders As "Part Of A Regular Business."

At the SEC's urging, the decision below broadly construed the term "dealer" in the Exchange Act as anyone "engaged in the 'business'" of "buying and selling securities." Order at 7; *see* SEC MTD Opp. at 6-9, SEC MSJ at 14-15. Defendants and Industry Amici persuasively explain that the District Court's interpretation of "dealer" flouts multiple rules of

statutory interpretation, ignores the historical evidence that Congress viewed dealers as customer-facing, and contradicts the SEC's own statements and actions over the years. *See* Dkt. 25 ("Defs.' Br.") at 21-34; Dkt. 35 ("Industry Br.") at 6-29; *see also* appellant's and amici briefs filed in *SEC v. Keener*, No. 22-14237 (11th Cir.), ECF Nos. 26, 34, 36, 38. In the interest of efficiency, TMP incorporates those arguments by reference but does not repeat them.

TMP offers two additional arguments for why the SEC's expansive and blinkered interpretation, which fails to acknowledge the customer-focused nature of being a dealer, improperly eschews bedrock principles of statutory construction and should be rejected.

### A.  The District Court Ignored That The Statutory "Regular Business" Exemption Shows That Traders And Entities Without Customers Are Not "Dealers."

The Exchange Act exempts activity "not as a part of a regular business" from the definition of dealer. 15 U.S.C. § 78c(a)(5)(B). The District Court did not address this language or explain how it guides who qualifies as a dealer. *See* Order at 6-8. But this language—when read in proper context, and once the SEC's reasoning is applied consistently and fol-

lowed to its natural conclusion—further reinforces that traders and in-vestors (who do not have customers) cannot be characterized as dealers.

When the Exchange Act was adopted in 1934, "many" tax-related court rulings interpreted the phrase "not in the course of an established business," which appeared in the regulatory definition of "dealers in se-curities," to mean that traders who did not have an established place of business to serve customers could not be dealers—regardless of the fre-quency of their trading and whether the trading was for an entity. *Schafer v. Helvering*, 299 U.S. 171, 173-74, 173 n.1 (1936) ("The meaning of 'dealer in securities'. … is limited to one who, as a merchant, buys and sells securities to customers."); *see Sec. Allied Corp. v. Comm'r*, 95 F.2d 384, 386 (2d Cir. 1938) (company not a dealer when "[i]t had no place of business to which customers could come to buy"); *Wilson v. Comm'r*, 76 F.2d 476, 478 (10th Cir. 1935) (similar).

Congress had these settled interpretations in mind when it para-phrased that language in the Exchange Act's "regular business" exemp-tion. *See* Industry Br. 11-15. The legislative history reflects that the Ex-change Act "excludes from the definitions of a broker and dealer a man who just buys securities for his own account and is not in the business of

15

making a profit by *merchandising* them, like an ordinary dealer." *Comm. on Interstate and Foreign Com., The Exchange Act of 1934: Hearings on H.R. 7852 and H.R. 8720*, 73rd Cong. 687 (1934) (statement of Rep. Corcoran) (emphasis added), https://tinyurl.com/2mbsmcur.

As with the definition of "dealer" itself, the historical context is critical to understanding the "trader" exception because statutory terms "should be 'interpreted as taking their ordinary ... meaning ... at the time Congress enacted the statute.'" *Wis. Cent. Ltd. v. United States*, 138 S.Ct. 2067, 2074 (2018). In modern times, a professional business that seeks to earn investment profits, which involves purchases and sales of securities, might seem like a "regular business." But that is not what Congress thought in 1934—the key time period. In the wake of the 1929 market crash, investors were seen as speculators that did not operate a "regular business" for purposes of the Exchange Act definition, whereas dealers operated a "regular business" that earned profits through commissions, fees, or the spread when executing customer orders.

The SEC acknowledges that mere traders cannot be characterized as dealers, no matter how frequent their trading activity, and that the historical context is important to this understanding. Dkt. 51-2 ("SEC

Sur-Reply") at 4-6. But the SEC simultaneously asks this Court to ignore historical context and adopt a broad, hyper-literal reading of the definition in § 78c(a)(5)(A) to broaden who qualifies as a dealer. The SEC cannot have it both ways.

Defendants and Industry Amici correctly argue that history and context counsel for interpreting "dealer" to only reach an entity that executes customer orders or transacts for its own investment purpose not on behalf of customers. *See* Defs.' Br. 17, 25-28, 30-31; Industry Br. 6-22. The District Court neither drew this distinction nor accounted for the statute's historical context and meaning. Instead, it erroneously focused on the volume of Defendants' trades and other facts unrelated to how Congress understood the term "regular business" when codifying that exemption in 1934. Order at 7-8. That misplaced focus is another reason to reject the SEC's interpretation.

The District Court's error is further illustrated by Congress's 1999 re-enactment of the definition of "dealer." At that time, Congress amended the bank exemption from the Exchange Act's definition of dealer and simultaneously amended the corresponding definitions in the Investment Company Act and the Investment Advisers Act to track the

new Exchange Act definition. Pub. L. No. 106-102, §§ 202, 216, 219, 113 Stat 1338 (Nov. 12, 1999). But Congress did not change the substantive language of the Exchange Act's definition or the "regular business" exemption. *See id.* And Congress neither disturbed settled precedent that dealers buy and sell securities to execute customer orders, nor adopted a position like the SEC now advances. *See id.* So that change undermines the SEC's position rather than supports it. *See Savage Servs. Corp. v. United States*, 25 F.4th 925, 945 (11th Cir. 2022) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

The SEC's incomplete approach to statutory interpretation fails to recognize the *customer*-focused meaning of "broker" and "dealer." Contrary to the original limited meaning, the SEC's new near-limitless reading could make a dealer out of many if not all investment advisers, funds, and other market participants—potentially subjecting *thousands* of entities and individuals to rules like costly capital requirements and customer protection regulations that make no sense for businesses that lack customers. That result cannot be squared with the historical context in

which Congress enacted the Exchange Act in 1934. It is therefore not a proper way to interpret the meaning of "dealer" under the Exchange Act today. *See Sackett v. EPA*, 143 S.Ct. 1322, 1338 (2023) ("The meaning of a word 'may only become evident when placed in context.'").

Tacitly recognizing that "dealer" status requires evidence of executing customer orders—not merely trading securities for one's own account—the SEC contends Defendants "had as customers" the "issuers from whom" they purchased convertible securities. SEC Sur-Reply 4 (citing SEC Br. 6-8, 22 & n.5, 37). To support that assertion, the SEC notes that Defendants "negotiated deals" with multiple issuers "'finders' identified," converted the resulting debt into stock, then sold the stock at a profit. SEC Br. 6-9. But those facts do not show the issuers were Defendants' *customers* in the way that dealers historically had customers. Defendants were neither intermediaries pairing issuers selling with investors buying, nor compensated through commissions or based on a spread. Defendants appear to have made investments on favorable terms, accepted the risk that investments might fail, then profited on investments that did not. That is trading, not dealing.

19

Market realities further refute the SEC's suggestion that issuers are Defendants' "customers" merely because they transact on opposite sides. Traders frequently purchase newly issued securities (including convertible securities) from issuers as part of a broader trading strategy—which makes that activity fit squarely within the "regular business" exemption and insufficient to trigger "dealer" status. Indeed, the SEC does not appear to dispute that many of Defendants' transactions represented Defendants' own trading activity. So the SEC has not shown Defendants were in the "regular business" of executing customer orders— which is necessary to establish "dealer" liability.

## B.    The District Court Wrongly Followed *Big Apple*.

The District Court relied on *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015). Order at 7. Industry Amici note (at 32-33) that *Big Apple* is not controlling because it interpreted "dealer" under Securities Act § 5, not Exchange Act § 15—the operative provision here.

That distinction is critical. In 1933, Congress enacted the Securities Act, which does not address the registration of dealers and has no exemption limiting the definition of "dealer"—it explicitly includes "trading"

20

and lumps together both brokers and dealers in a single, catch-all defini-tion. *See* 15 U.S.C. § 77b(a)(12). By contrast, when Congress addressed the registration of dealers in 1934, it crafted a more nuanced definition—defining "broker" and "dealer" separately, using language that in context referred to customers, eliminating reference to "trading," and exempting investors, speculators, and other traders transacting "not as a part of a regular business", 15 U.S.C. § 78c(a)(5)(B). Disregarding those important textual differences and equating the different definitions of "dealer" un-der the Securities Act and the Exchange Act ignores that "[w]here the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a differ-ent meaning." *DIRECTV, Inc. v. Brown*, 371 F.3d 814, 817 (11th Cir. 2004); *see Wis. Cent.*, 138 S.Ct. at 2071 ("We usually 'presume differences in language'" between related statutes "convey differences in meaning.").

There are also important structural reasons why the definition of "dealer" in the Exchange Act is narrower than the corresponding defini-tion in the Securities Act. As a general matter, the Securities Act is con-cerned with the registration and oversight of securities and securities of-

ferings, rather than secondary trading through brokers, dealers or exchanges, which are the purview of the Exchange Act. *See Slack Techs., LLC v. Pirani*, 143 S.Ct. 1433, 1437-38 (2023). "Dealers" under the Securities Act (analyzed in *Big Apple*) are merely obligated to ensure the securities they are selling into the market for the first time are registered with the SEC or exempt from registration, *see id.*; distributing unregistered shares into the market is ordinarily illegal, and the Securities Act's broad definition of "dealer" ensures that basic requirement cannot be evaded. By contrast, "dealer" status under the Exchange Act requires SEC registration and triggers a range of ongoing regulatory burdens (including customer-protection rules, *see supra* at I.C), which Congress intended to impose only on those who serve customers. Applying these rules to entities that lack customers would thus increase burdens without providing any corresponding benefit.

Although *Big Apple* stated in a footnote that the "dealer" definition in the Securities Act and the Exchange Act are "similar," that was *dicta*; the defendant had "abandoned" a challenge to its "dealer" status under the Exchange Act and the parties did not brief the issue. 783 F.3d at 806,

809 n.11. And, of course, *Big Apple* did not hold that the statutory exemption (which appears only in the Exchange Act) should be rendered meaningless. *See United States v. Hall*, 64 F.4th 1200, 1204 (11th Cir. 2023) (statutes must be interpreted to give effect to all provisions).

## III. The SEC Has Chosen The Wrong Forum For Advancing An Expansive And Unprecedented View Of Who Is A "Dealer."

### A. Supreme Court Precedent Supports Scrutinizing The SEC's Newfound Position.

The Supreme Court has long advised that, "[w]ithout legal limitations, market participants [would be] forced to rely on the reasonableness of the SEC's litigation strategy, but that can be hazardous." *Dirks v. SEC*, 463 U.S. 646, 664 n.24 (1983). Indeed, the Supreme Court has repeatedly recognized—in unanimous or near-unanimous opinions—the importance of closely scrutinizing SEC actions and blocking SEC overreach.[2]

This Court should likewise closely review the SEC's actions and theories here. Administrative agencies like the SEC cannot "assert[]

---

[2] *See, e.g*, *Axon Enter., Inc. v. FTC*, 143 S.Ct. 890, 900 (2023) (unanimously affirming decision allowing challenges to SEC in-house proceedings before they conclude); *Lucia v. SEC*, 138 S.Ct. 2044, 2053-54 (2018) (7-2, invalidating SEC in-house adjudications); *Liu v. SEC*, 140 S.Ct. 1936, 1946 (2020) (8-1, limiting SEC's disgorgement power); *Kokesh v. SEC*, 581 U.S. 455, 465-67 (2017) (unanimously rejecting SEC's view that statute of limitations did not apply to disgorgement); *accord Gabelli v. SEC*, 568 U.S. 442, 454 (2013) (unanimously rejecting discovery rule in SEC actions). *cf. Jarkesy v. SEC*, 34 F.4th 446, 465-66 (5th Cir. 2022) (holding SEC in-house proceeding violated jury trial right), *cert. granted* (U.S. June 30, 2023) (No. 22-859).

highly consequential power beyond what Congress could reasonably be understood to have granted" based on "a merely plausible textual basis"—especially when the agency's "newly uncovered" regulatory authority has "conveniently enabled it" to pursue a theory that was previously unsupported. *W. Va. v. EPA*, 142 S.Ct. 2587, 2609, 2614 (2022).

Yet that is what the SEC is attempting to do. Nearly ninety years after the Exchange Act's passage—and after years of not requiring investment advisers, funds, and other investment vehicles to register as dealers—the SEC now sees "dealer" in a new light. Its long-running failure to advance the position it now asserts is strong proof that the position lacks merit. *Cf. id.* at 2610-14; *see also SEC v. Federated Alliance Grp., Inc.*, 1996 WL 484036, at *5 (W.D.N.Y. Aug. 21, 1996) (rejecting SEC's "excessively broad definition of a dealer" that "would embrace as a dealer every securities trader who makes money through buying and selling of securities"); *Goldstein*, 451 F.3d at 878-83 (rejecting SEC's attempt to redefine the term "client" in the Investment Advisers Act when the SEC could not "justify departing from its own prior interpretation" to impose new registration requirements).

24

**B.    The SEC Cannot Use This Case As A Backdoor To Revise Rule 144. It Must Go To Congress Or Issue A Rule That Can Withstand Judicial Review.**

Convertible transactions are not new. For years the SEC has blessed the issuance of convertible debt to investors, who then converted the debt into stock at a discount and resold it at an advantageous time.

Here, the SEC claims that when Defendants engaged in such transactions they were acting as *underwriters* distributing securities into the market without registering as a dealer under the Exchange Act. SEC Br. 15-17. But that was possible because of how the SEC has chosen to write and amend its own Rule 144, which includes a safe-harbor from underwriter liability that applies when securities are held for six months. *See* 17 C.F.R. § 230.144(d)(1)(i); *Revisions to Rules 144 and 145*, 72 Fed. Reg. 71,546, 71,561-62 (Dec. 17, 2007) (adopting six-month safe-harbor after concluding the prior twelve-month safe-harbor made it too difficult for small issuers to raise capital). If the SEC now believes Rule 144 is insufficient, it should pursue notice-and-comment rulemaking. *See Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003).

If instead the SEC believes that the statutory definition of "dealer" is insufficient, it should ask Congress—which is uniquely situated to amend the securities laws—to change the meaning of "dealer" or to expand the SEC's reach. *Slack Techs.*, 143 S.Ct. at 1442; *see W. Va.*, 142 S.Ct. at 2609, 2613. And if the SEC believes fraud is underfoot, or that an issuer's choice to finance itself using convertible bonds is problematic, it can wield existing antifraud authority.

Rather than utilizing these options, and with enforcement actions pending, the SEC has simultaneously chosen to pursue through rulemaking its new vision of what it means to be a "dealer." *See Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, SEC Release No. 34-94524, 87 Fed. Reg. 23,054 (proposed Apr. 18, 2022). That effort could be appropriate *if* the SEC were clarifying ambiguities in the statutory language, within the scope of its authority and in compliance with applicable rules—such as properly balancing costs and benefits and accounting for stakeholder perspectives. *See W. Va*, 142 S.Ct. at 2608-09; 5 U.S.C. § 706(2)(A); 15 U.S.C. §§ 78c(f) (requiring SEC to consider "whether the action will promote efficiency, competition, and capital formation"), 78w(a)(2) (similar).

26

But there are many reasons the SEC's putative regulatory efforts fail those requirements. For one, the SEC has endorsed the view that the "statutory language" is "clear" (*SEC v. LG Capital Funding, LLC*, No. 22-cv-3353 (E.D.N.Y. July 7, 2023), ECF No. 35), which "precludes the Commission from more expansively interpreting that term," *Digital Realty Tr., Inc. v. Somers*, 138 S.Ct. 767, 782 (2018) (rejecting SEC rule). In addition, the newfound authority the SEC asserts after 90+ years, and the "economic and political significance of that assertion," strongly suggest the SEC lacks authority to interpret "dealer" to suddenly cover wide swaths of the financial industry. *See W. Va.*, 142 S.Ct. at 2608-09. Plus, the record before the SEC reflects that the proposed rule will impose many costs but yield few (if any) benefits. *See, e.g.*, MFA Comment Letter, File No. S7-12-22 (Apr. 6, 2023), https://tinyurl.com/2e8dtwk4; *see* Craig Lewis, *The SEC's Proposed Rules for Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer* (Dec. 2022), https://tinyurl.com/38w2s4hj (former SEC Chief Economist and Director of the Division of Economic and Risk Analysis highlighting flaws in proposed rule and harm it may cause). That

casts a cloud over the SEC's choice to pursue its broad and new interpretation of what it means to be a "dealer" in the courts and not Congress.

Whether the SEC advances its view through legislation or proper rulemaking, the result would be better than ad hoc enforcement actions based on an unprecedented reinterpretation of nearly century-old language. On the front end, decisionmakers "can conduct factual investigations, can consult with affected parties, [and] can consider how their experts have handled similar issues over the long course of administering a regulatory program." *Kisor v. Wilkie*, 139 S.Ct. 2400, 2413 (2019); *see Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 167-68 (2007). On the back end, the process should provide clarity about how to follow the rule and is subject to judicial review. *See Kisor*, 139 S.Ct. at 2413; *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696-97 (1991).

But cherry-picked enforcement actions create a risk that markets and market participants will be whipsawed by the SEC's arbitrary discretion, subjected to a patchwork of inconsistent interpretations of federal law, and beset with uncertainty and unpredictability. Congress prefers that interpretive issues related to complex regulatory schemes not be resolved "piecemeal by litigation." *Kisor*, 139 S.Ct. at 2413-14.

28

Whatever the vehicle, the SEC may not misconstrue the text, history, and settled understanding of the Exchange Act or exceed its own authority. It may not force a square peg into a round hole by redefining "dealer" to capture activity that does not satisfy the statutory definition. And it may not use this case to advance a newly devised interpretation of the term "dealer" that transforms market participants relying in good-faith on settled understandings of the law into lawbreakers.

## IV.  At A Minimum, This Court Should Determine Dealer Status Based On The SEC's Own Factors And Guidance.

This Court has many strong reasons to reverse the judgment below and reject the SEC's broad view of what it means to be a "dealer" under the Exchange Act. If this Court disagrees and affirms, it should at a minimum anchor its decision in the factor-based guidance the SEC has long relied on to distinguish "dealers" from traders, advisers and funds. *See, e.g.*, SEC, *Guide to Broker-Dealer Registration* (rev. Dec. 12, 2016), https://tinyurl.com/4kym57cy (visiting July 11, 2023). Doing so, and declining to endorse the District Court's overbroad reasoning, would mitigate some of the major consequences that could flow from the decision below.

Several of those SEC-identified factors distinguish the activities of registered investment advisers and funds from what has been understood to be dealer activity. For example:

1.  Registered investment advisers and funds typically do not "employ[] and pay[] 'finders' who were in the business of soliciting referral companies." Order at 2, 7. Nor do they advertise or hold themselves out as dealers. While they may attend conferences and express a general interest in investments, those facts alone do not trigger "dealer" status.

2.  Although buying and selling convertible notes is a component of the business model used by some registered investment advisers and funds, their "entire business model" is not typically "predicated on the quick sale of shares" after converting them into shares of the issuer. Order at 2, 7.[3] Nor do they aim to provide liquidity to the market by pairing buyers and sellers.

3.  Registered investment advisers and funds do not typically focus on underwriting securities of issuers they have solicited as customers, as opposed to investing through intermediaries. Investment advisers' clients are the funds they advise, and the funds have investors but do not have clients or customers at all. *See supra* at I.C.

4.  Registered investment advisers and funds do not serve as intermediaries between issuers and investors, do not have customers, and do not operate in the business of buying and selling securities to or from their customers. *See* Order at 2, 7. They most often trade through registered broker-dealer intermediaries. *See supra* at I.C.

5.  Registered investment advisers and funds are already subject to SEC oversight and investment advisers are required to,

---

[3] Selling securities at the at the earliest opportunity is not inherently problematic: "flipping, alone, is not prohibited under the federal securities laws." SEC, Investor Bulletin: Investing in an IPO 5, https://tinyurl.com/y6neb23x (visited July 11, 2023).

among other things, disclose detailed information about funds they manage. *See supra* at I.B.

Any decision to affirm the judgment below should thus be grounded in the specific facts of this case and the factors the SEC has itself relied on—not categorically label *any* business buying and selling securities as a "dealer"—to avoid chaos from upending long-settled expectations.

## V.    This Court Should Limit If Not Bar Disgorgement And Retrospective Remedies.

If this Court does not reject the SEC's novel and unorthodox theory, it should limit the available remedies in two ways.

First, this Court should permit only prospective remedies. Market participants that relied on settled understandings that dealer registration was not required should not be punished for failing to predict the SEC's change in position. *See Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) ("It is against all reason and justice" to "punish[] a citizen" for an act "which, when done, was in violation of no existing law."); *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157-58 (2012) (agency "inaction" in the face of "industry[] practice" creates an "acute" risk of "unfair surprise"); *Bittner v. United States*, 143 S.Ct. 713, 724 (2023) (noting rule of lenity requires "statutes imposing penalties" to be "'construed strictly' against the government").

31

Second, as Defendants correctly argue, disgorgement is improper here because there is no causal link between the profits that Defendants earned and the failure to register as a dealer. *See* Defs.' Br. 44-51. Disgorgement aims to reclaim "a reasonable approximation of profits causally connected to the violation" and to return ill-gotten gains to victims. *SEC v. Hallam*, 42 F.4th 316, 329-331 & n.32 (5th Cir. 2022).

Here, the supposed failure to register as a dealer did not generate any gains or cause harm. *Alvarez v. United States*, 862 F.3d 1297, 1302 (11th Cir. 2017) (registration failure "had no effect" on investors); *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1330 (11th Cir. 2018) (similar). Notably, the SEC cites no evidence that the regulatory violation defrauded investors, boosted Defendants' profits, or facilitated transactions that would not have happened otherwise. *See* SEC Br. 44-45; Disgorgement for failure to register is thus punitive, not equitable relief "for the benefit of investors," 15 U.S.C. § 78u(d)(5), and the SEC should be barred from seeking disgorgement based on past failure to register as a dealer.

## CONCLUSION

For the foregoing reasons, Amicus urges this Court to reverse and issue a narrow opinion supporting strong and competitive capital markets.

Dated: July 13, 2023                    Respectfully submitted,

                                        */s/ Gabriel K. Gillett*

Anthony S. Barkow                       Gabriel K. Gillett
Charles D. Riely                            *Counsel of Record*
Jenner & Block LLP                      Kelsey L. Stimple
1155 Avenue of the Americas             Jenner & Block LLP
New York, NY 10036                      353 North Clark Street
(212) 891-1662                          Chicago, IL 60654
abarkow@jenner.com                      (312) 840-7220
criely@jenner.com                       ggillett@jenner.com

*Counsel for Amicus Curiae*

33

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(4)(G) and Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies with the type-volume limitation because this brief contains 6,488 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Century Schoolbook font for the main text and 12-point Century Schoolbook font for footnotes.

*/s/ Gabriel K. Gillett*
Gabriel K. Gillett

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/ Gabriel K. Gillett*
Gabriel K. Gillett