# PARKCERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

*SEC v. Almagarby*, No. 21-13755

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Appellants and Amici the Small Public Company Coalition, Alternative Investment Management Association Ltd., National Association of Private Fund Managers, and Trading and Markets Project, Inc., state that the following individuals and entities have an interest in the outcome of this appeal:

- Almagarby, Ibrahim
- Alternative Investment Management Association Ltd.
- Barkow, Anthony S.
- Berkovitz, Dan M.
- Cooke, Hon. Marcia G., District Judge
- Conley, Michael A.
- Cox, Jeffrey L.
- Freda, Dominick V.
- Gibson, Dunn & Crutcher LLP
- Gillett, Gabriel K.
- Goldsmith, Barry
- Gordon, Robert K.
- Harris, Robert C.
- Hicks, William P.
- Hunt, Hon. Patrick M., Magistrate Judge

- Hunter Taubman Fischer & Li LLC
- Hunter, Mark David
- Hunter, Sharifa G.
- Jenner & Block LLP
- Johnson-Sardella, Jenny D. Johnson
- Lisitza, David D.
- Katz, Joshua A.
- Microcap Equity Group, LLC
- National Association of Private Fund Managers
- Ramkumar, Archith
- Richman, Brian A.
- Riely, Charles D.
- Rose, Neil
- Sallah Astarita & Cox, LLC
- Sallah, James D.
- Securities and Exchange Commission
- Seibald, M. Jonathan
- Small Public Company Coalition
- Stimple, Kelsey L.
- Trading and Markets Project, Inc.
- Walker, Helgi C.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellants and Amici each state that it does not have a parent corporation and that no publicly held company owns 10 percent or more of its stock. The Alternative Investment Management Association Ltd. ("AIMA") further states that it is a UK private company limited by guarantee. It does not issue share capital and no publicly held company holds more than a 10% interest in AIMA.

Pursuant to Eleventh Circuit Rule 26.1-3(b), Appellants and Amici certify that they are not aware of any publicly traded company or corporation that has an interest in the outcome of this case or appeal. Appellants and Amici respectfully direct the Court to the Certificate of Interested Persons contained in Appellee's Brief, which identifies publicly traded companies that, according to Appellee, have an interest in the outcome of this case.

<em>/s/Joshua A. Katz</em><br>
Joshua A. Katz

SALLAH ASTARITA COX
LLC

3010 North Military Trail, Suite 210 | Boca Raton, Florida 33431
Phone: (561) 989-9080 | Fax: (561) 989-9020 | www.sallahlaw.com

ATTORNEYS AT LAW    Florida | New York | New Jersey

February 5, 2024

<u>VIA ECF</u>

David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

Re:   *SEC v. Almagarby*, No. 21-13755
      Rule 28(j) Letter from Appellants and Industry Amici

Dear Mr. Smith:

In *CFTC v. EOX Holdings, L.L.C.*, the court held that Defendants "lacked fair notice of the [agency's] unprecedented interpretation of [a] thirty-nine-year-old" rule "at the time they were engaging in the challenged conduct." 90 F.4th 439, 441-43 (5th Cir. Jan. 8, 2024). This Court should similarly vacate the judgment and hold that Defendants lacked fair notice of the SEC's novel interpretation of the ninety-year-old "dealer" definition. *See* Dkt. 25 at 35-38 (raising fair notice argument).

Parallels abound between *EOX* and this case.

In *EOX,* the CFTC argued the rule's "plain language" gave Defendants "fair notice" they were violating the rule. 90 F.4th at 444. Here, the SEC also claims support from the Exchange Act's "plain text." Dkt. 39 at 30-31. But the text, context, structure, and history of the "dealer" definition squarely demonstrate that Defendants are not dealers because they did not intermediate transactions for others. *See* Dkt. 25 at 27-28, Dkt. 35 at 7-13, Dkt. 70 at 13-20.

In *EOX*, the CFTC took a "novel" position it "had never publicly stated" before the litigation, and over decades "had taken 'no steps to advise the public that it believed the practice [at issue] was questionable.'" 90 F.4th at 441, 445-46. Here, too, the SEC's decades of public statements and guidance have never interpreted "dealer" as the SEC does now, and the SEC has repeatedly advised that "dealer" would *not* cover conduct like Defendants'. *See* Dkt. 25 at 36-37, Dkt. 35 at 24-27.

In *EOX*, the court found "thoroughly unpersuasive" the CFTC's claim that its (mis)interpretation of the rule was justified because it had "reasons for wishing to regulate" defendants. 90 F.4th at 448. This Court should reject that same argument from the SEC. *See* Dkt. 39 at 39-41. The SEC cannot "justify departing from its own prior interpretation" of the dealer definition through a "manipulation of meaning." *Goldstein v. SEC*, 451 F.3d 873, 878-83 (D.C. Cir. 2006). Nor can the SEC rely on "'newly uncovered'" regulatory authority to "'assert[] a highly consequential power beyond what Congress could reasonably be understood to have granted.'" Dkt. 70 at 23-24 (citation omitted).

Respectfully submitted,

By: /s/*Joshua A. Katz*

Gabriel K. Gillett
Kelsey L. Stimple
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
312-222-9350
ggillett@jenner.com

Anthony S. Barkow
Charles D. Riely
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1662

*Counsel for Trading & Markets Project, Inc.*

Helgi C. Walker
Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500

James D. Sallah
Joshua A. Katz
Jeffrey L. Cox
SALLAH ASTARITA & COX, LLC
3010 N. Military Trail, Suite 210
Boca Raton, FL 33431
Tel: 561-989-9080

Neil Rose
4000 Hollywood Blvd.,
Suite 610 North
Hollywood, Florida 33021
Tel: (305) 439-5108

Mark David Hunter
Jenny Johnson-Sardella
Sharifa G. Hunter
HUNTER TAUBMAN FISCHER
& LI LLC
2 Alhambra Plaza, Suite 650
Coral Gables, Florida 33134
Tel: 305-629-1180

*Counsel for Appellants Ibrahim Almagarby and Microcap Equity Group*

| | |
|---|---|
| Barry Goldsmith | (212) 351-4000 |
| M. Jonathan Seibald | |
| GIBSON, DUNN & CRUTCHER LLP | |
| 200 Park Avenue | |
| New York, N.Y. 10166-0193 | |
| (212) 351-4000 | |

*Counsel for Small Public Company Coalition, Alternative Investment Management Association, Ltd., and National Association of Private Fund Managers*

2024 WL 78512
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

COMMODITY FUTURES TRADING
COMMISSION, Plaintiff—Appellee,
v.
EOX HOLDINGS, L.L.C.; Andrew
Gizienski, Defendants—Appellants.

No. 22-20622
|
FILED January 8, 2024

**Synopsis**
**Background:** Commodity Futures Trading Commission (CFTC) filed civil-enforcement action in which it alleged that defendants, which were a company that was an "introducing broker" and an individual who was an "affiliated person," engaged in improper insider trading in the market for electrical energy futures block trades. After transfer, the United States District Court for the Southern District of Texas, Sim T. Lake III, J., 2022 WL 16556032, entered judgment on a jury verdict that defendants violated CFTC rules by, among other things, taking the other side of orders, and the Court also entered an injunction. Defendants appealed.

The Court of Appeals, Jones, Circuit Judge, held that as a matter of first impression, the CFTC-enforced rule that generally prohibits "taking the other side of an order" applies only to broker and affiliated persons who become a counterparty with a financial interest and the possibility of profit and loss.

Penalty judgment reversed, injunction vacated in part, and case remanded.

**Procedural Posture(s):** On Appeal; Judgment; Motion for Judgment Notwithstanding the Verdict (JNOV); Motion for New Trial; Motion for Stay.

Appeal from the United States District Court for the Southern District of Texas, USDC No. 4:19-CV-2901, Sim T. Lake, III, U.S. District Judge

**Attorneys and Law Firms**

Raagnee Beri (argued), Anne Whitford Stukes, Deputy General Counsel, U.S. Commodity Futures Trading Commission, Office of General Counsel, Washington, DC, Joseph Konizeski, U.S. Commodity Futures Trading Commission, Division of Enforcement, Chicago, IL, for Plaintiff—Appellee.

Constantine John Gekas (argued), Gekas Law Limited, Chicago, IL, Joe F. Wright, Prospect, KY, for Defendant—Appellant EOX Holdings, L.L.C.

Constantine John Gekas (argued), Gekas Law Limited, Chicago, IL, for Defendant—Appellant Andrew Gizienski.

Before Jones, Stewart, and Duncan, Circuit Judges.

**Opinion**

Edith H. Jones, Circuit Judge:

**\*1** EOX Holdings, LLC, and Andrew Gizienski ("Defendants") appeal from adverse judgments in a novel civil liability suit filed by the Commodity Futures Trading Commission ("CFTC") pursuant to 17 C.F.R. § 155.4(b)(2)(i), a regulation that prevents commodities traders from "taking the other side of orders" without clients' consent. We hold that the Defendants lacked fair notice of the CFTC's unprecedented interpretation of this thirty-nine-year-old Rule. The judgment is REVERSED in part, the injunction VACATED in relevant part, and the case REMANDED.

I.

The background of this case is the noisy, fast-moving, high-stakes world of electrical energy futures block trades. An energy future is an agreement to buy or sell energy for delivery or cash settlement in the future at a specified price. Those who trade in electric energy block futures include high-net-worth individuals as well as utilities and commercial or institutional producers or consumers of electricity seeking to "hedge," that is, minimize losses from price changes. A trader looking for a suitable block trade reaches out to a broker like Gizienski with a bid or offer for a contract at a desired price, quantity, and duration. The broker then "blasts" the details to other traders, asking if anyone wants to take the offer.

Gizienski came to EOX in 2010 as the head of the Northeast Power Desk. He worked at the Houston office alongside five other brokers, seated at a conference room table, with a "squawk box" connected directly to traders by thirty-six high-speed lines. Two television monitors provided real-time audio and video of brokers' desks in the other EOX offices around the country. As described in testimony at trial, the trading environment for electric energy futures block trades is controlled chaos, as block brokers communicate throughout the trading day with each other and with traders via "squawk box," telephone, or internal instant messaging system.

In 2013, one of Gizienski's clients, Jason Vaccaro, granted Gizienski a power of attorney allowing Gizienski to act on his behalf and to enter into block trade transactions at Gizienski's discretion. The block trades at issue in this appeal arose from this discretionary account. EOX had a formal policy against its brokers' handling such discretionary accounts. That policy had to be waived for Vaccaro. The Chief Executive Officer of EOX instructed his Houston branch manager to seek approval for the discretionary account from ICE Futures U.S., the online exchange on which the futures were traded.[1] EOX obtained the necessary approval from ICE's Head of Power and from the compliance departments of FCStone and Bank of America Merrill Lynch, two brokerage firms, which, as registered futures commission merchants, are legally authorized to clear trades and to hold and account for customer funds.

After obtaining these authorizations, Gizienski could make specific trades, determining the quantity, price, and timing of the trades without first informing Vaccaro. Gizienski traded on Vaccaro's behalf in that manner from August 2013 until May 2014, when Vaccaro directed him to stop. Neither EOX nor Gizienski disclosed to other EOX customers that Gizienski was exercising trading discretion on Vaccaro's behalf in the same markets where Gizienski served as broker for those customers.

 *2  The CFTC filed this civil enforcement action against the Defendants in a four-count complaint in the Southern District of New York in 2018. It accompanied its complaint with a press release accusing the Defendants of insider trading. As Gizienski later testified at trial, this negative publicity severely damaged his career and put him out of work for over two years. The case was transferred to the Southern District of Texas in 2019 and tried to a jury for seven days in 2022. Traders who appeared as witnesses testified that they had suffered no damage as a result of Gizienski's conduct. The CFTC dropped its claims for restitution and disgorgement. At the end of the evidence, the Defendants moved for judgment as a matter of law. The district court denied the motion from the bench and the case went to the jury.

The jury found for the Defendants on Count I, flatly rejecting CFTC's insider trading claim under Rule 180.1 of the Commodity Exchange Act. But the jury found for the CFTC on Count II, the sole count at issue in this appeal, which accused the Defendants of

> violat[ing] Rule 155.4 (1) by knowingly taking the other side of customer orders revealed to EOX or any of its affiliated persons without the customers' prior consent one-hundred and twenty-two (122) times; and (2) by disclosing to Jason Vaccaro the orders of other customers held by EOX or any of its affiliated persons, when such disclosures were not necessary to the effective execution of the customer orders six (6) times.

Specifically, the jury found that Gizienski "took the other side of orders" on 65 of the 122 challenged transactions, in violation of Rule 155.4(b)(2)(i). The jury also found the Defendants liable on Count II for disclosing customer information, but the Defendants do not challenge this part of the verdict. For "taking the other side of orders," the jury assessed a penalty, for regulatory violations only, of $6.5 million.[2] As this district court stated at the final hearing, "[t]here was no evidence at trial that any of Mr. Gizienski's clients suffered a loss because of his conduct."[3] The final judgment included an injunction, which the Defendants now challenge. The Defendants' combined motions under Federal Rules of Civil Procedure 50 and 59 for a new trial or judgment as a matter of law were denied. This appeal followed.

### II.

The Defendants make four principal arguments on appeal. First, they argue that the district court construed Rule 155.4(b)(2)(i) erroneously in its jury instruction. Specifically, the CFTC had not given them fair notice at the time they were

engaging in the conduct that the CFTC newly claims to have violated the Rule. Second, even accepting the jury charge, the jury verdict lacked sufficient evidence. Third, the district court erred in various trial management decisions. [4] Last, the injunction was overbroad.

**\*3** As stated above, we hold that the Defendants did not have fair notice of the construction of Rule 155.4(b)(2)(i) at the time they were engaging in the challenged conduct. The penalty judgment and relevant portion of the injunction cannot be sustained. Because of this disposition, we need not address the Defendants' other arguments.

This case was the first enforcement action brought by the CFTC for "taking the other side" under this thirty-nine-year-old Rule. The interpretation of Rule 155.4(b)(2)(i) is therefore a matter of first impression. We review the district court's construction of the Rule de novo. 9C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2558 (3d ed.) ("[F]ederal appellate courts evaluate the correctness of jury instructions regarding their statement of the law de novo." (footnote omitted)); *cf.* *United States v. Hamilton*, 46 F.4th 389, 393 (5th Cir. 2022) ("When a jury-instruction challenge 'hinges on a question of statutory construction,' our review is *de novo*." (quoting *United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013))).

Rule 155.4(b)(2)(i) states:

> No introducing broker or any of its affiliated persons shall:
>
> ...
>
> Knowingly take, directly or indirectly, the other side of any order of another person revealed to the introducing broker or any of its affiliated persons by reason of their relationship to such other person, except with such other persons's [sic] prior consent and in conformity with contract market rules approved by or certified to the [CFTC].

17 C.F.R. § 155.4(b)(2)(i). [5] During the trial proceedings, the parties offered opposing definitions of "taking the other side of an order." The Defendants argued that "taking the other side of an order" means "becoming a counterparty with a financial interest and the possibility of profit and loss." The CFTC argued that "taking the other side of an order" means "mak[ing] the decision to trade opposite the order and execut[ing] the trade opposite the order." The Defendants' definition thus excluded brokers like Gizienski who exercise discretion over the accounts they trade, while the CFTC's definition included such brokers. In the jury instructions, the district court accepted the CFTC's construction of the Rule, defining "taking the other side of an order" as follows:

> An individual takes the other side of an order if he makes the decision to trade opposite the order and executes the trade opposite the order. It was not necessary for Mr. Gizienski to own or have a financial interest in the account he was trading from in order to take the other side of a customer order.

The Defendants argue that they did not have fair notice of the CFTC's construction of the rule at the time of the conduct at issue because the CFTC altered its prosecution policies after "thirty-nine years of regulatory silence" about the meaning of Rule 155.4(b)(2)(i). The CFTC responds that it has "consistently interpreted Rule 155.4(b)(2)(i) according to its plain language," and that this "controlling plain language" provided "fair notice" to the public.

In ruling for the CFTC on a motion to dismiss, the district court noted that "[n]othing in the language of Regulation 155.4(b)(2) limits its application to principals with an ownership or financial interest in a particular account, and none of the cases cited by the defendants either cite Regulation 155.4 or describe the CFTC's view of that regulation's scope." The district court was correct that the text of Rule 155.4(b)(2)(i) does not *limit* its application to principals. But nothing *extends* its application beyond principals either. On its face, then, the text of Rule 155.4(b)(2)(i) is at best ambiguous. It did not give fair notice to the Defendants absent further guidance from the CFTC, and for nearly four decades, no such guidance came.

**\*4** The fair notice doctrine is a "basic principle of administrative law." *SNR Wireless LicenseCo, LLC v. Fed. Commc'ns Comm'n*, 868 F.3d 1021, 1043 (D.C. Cir. 2017). As this court stated in an oft-cited case, "[i]f a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976). The agency "must provide

a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Id.* "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017) (quoting *Gen. Elec. Co. v. Env't Prot. Ass'n*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995)). [6]

Three cases support the conclusion that there was no fair notice here. In *Upton v. Securities & Exchange Commission*, cited by the Defendants, the Second Circuit considered how to construe a rule regulating broker-dealers. 75 F.3d 92, 93 (2d Cir. 1996). The rule required broker-dealers to keep a separate bank account for customers, to calculate the amount to be deposited in that account every week "as of the close of the last business day of the week," and to deposit that amount "no later than 1 hour after the opening of banking business on the second following business day." *Id.* (quoting 17 C.F.R. § 240.15c3-3(e)(3)). Upton's firm complied with the "technical[ ] require[ments]" of the rule but evaded its impact by "pa[ying] down loans collateralized by customer securities just before the weekly ... computation and replac[ing] them with unsecured loans; on the next business day, [it] reinstated the customer-secured loans." *Id.* at 97, 93. The Commission found Upton liable for violating the regulation, but the Second Circuit vacated the order. *Id.* at 98. The court noted that the Commission "was aware that brokerage firms were evading the substance of Rule 15c3-3(e)," but "took no steps to advise the public that it believed the practice was questionable" at the time Upton was engaged in the practice except for "one consent order carrying little, if any, precedential weight." *Id.* (quotation marks omitted). Therefore, the court held, "Upton was not on reasonable notice that [the firm's] conduct might violate the Rule." *Id.*

**\*5** Similarly, in *Employer Solutions Staffing Group II, LLC v. Office of the Chief Administrative Hearing Officer*, this court vacated an administrative law judge's order for lack of fair notice. 833 F.3d 480, 491 (5th Cir. 2016). The Immigration and Nationality Act requires a "person or entity" wishing to hire an employee to " 'attest ... on a form [established by the appropriate agency] by regulation, that it has verified that the individual is not an unauthorized alien by examining' employee documents." *Id.* at 485 (quoting 8 U.S.C. § 1324a(b)(1)(A)). The petitioner in the case, a temporary staffing agency, divided this process into two parts whereby one corporate representative in El Paso, Texas, examined original documents in the presence of the hired employee, then "another corporate representative in Edina, Minnesota, inspected photocopies of the documents and completed" the I-9 Form. *Id.* at 491. The form stated only that it was "[t]o be completed and signed by employer." *Id.* at 488. The agency, however, argued that "the same ... representative who examines an employee's original documents must also meet with the employee and sign the ... I-9 Form's ... attestation." *Id.* at 485. The court rejected the agency's interpretation because the petitioner "lacked fair notice" of that construction. *Id.* at 489. The court noted that "neither Congress nor [the Department of Homeland Security] had ever declared a bar to corporate attestation prior to this enforcement action." *Id.* Consequently, "the most reasonable interpretation permits corporate attestation," and the petitioner "did not violate the law." *Id.* at 491.

In contrast, fair notice was afforded in *Consol Pennsylvania Coal Co. v. Federal Mine Safety & Health Review Commission*, 941 F.3d 95, 112-13 (3d Cir. 2019), cited by the CFTC. The regulation at issue imposed obligations on mine operators "once the operator knows or should know that an accident has occurred involving ... [a]n injury of an individual at the mine which has a reasonable potential to cause death." *Id.* at 104. An individual at the mine "was crushed between two multi-ton pieces of mining equipment." *Id.* at 100. He said he was in a lot of pain and could not move his legs. *Id.* The company argued that because "the Commission's legal standard fails to provide fair notice of how it will be applied," "Consol lacked fair notice that the specific factual scenario at issue ... would constitute" a violation. *Id.* at 113. The court disagreed, holding that there had been fair notice, because "we think it extraordinarily clear that the injuries in this case reflected a reasonable potential for death." *Id.*

Here, as in *Upton*, the CFTC had *never* publicly stated that to "take the other side of trades" includes the broker's trading for a discretionary account without himself having a financial interest in that account. *See* 75 F.3d at 98. Indeed, the cases cited by the agency provide no evidence of such a gloss to that phrase, even though Rule 155.4(b)(2)(i) has been in existence since 1984 and has applied to electric energy futures block trades since 2012. As in *Employer Solutions*, this enforcement action is the first time the CFTC has advanced this interpretation of the Rule. *See* 833 F.3d at 489. And unlike *Consol Pennsylvania Coal*, where it was "extraordinarily clear" to the court that having one's legs crushed in a piece of mining equipment "has a reasonable potential to cause death," it would not have been clear to the Defendants that

the phrase "taking both sides of an order" applied to their conduct. *See* 941 F.3d at 113. Importantly, the Defendants sought and obtained prior approval from ICE, which has authority to impose rules on its traders, and whose rules do not prohibit Gizienski's activity. *See* ICE FUTURES U.S., INC., TRADING RULES 4.07(a)(i). They further obtained approval from FCStone and Bank of America Merrill Lynch, all with no indication that Gizienski's conduct might be in violation of the law. The CFTC had issued no guidance that might have put the Defendants on notice that they were violating Rule 155.4(b)(2)(i). Over the course of nearly four decades, the CFTC had taken "no steps to advise the public that it believed the practice was questionable." *See Upton*, 75 F.3d at 98.

The CFTC asserts that its interpretation of Rule 155.4(b)(2)(i) tracks language in the Federal Register about the prevention of "bucketing." *See* Rules Relating to Intermediaries of Commodity Interest Transactions, 66 Fed. Reg. 53,510, 53,513-14 (Oct. 23, 2001) ("Rules 155.1, 155.3 and 155.4 have helped the Commission to deter such practices as 'front-running,' 'trading ahead,' 'bucketing,' and improper disclosure of customer orders."). [7] If anything, this language undermines the CFTC's position. The CFTC's own online glossary defines "bucketing" as "[d]irectly or indirectly taking the opposite side of a customer's order into *a broker's own account or into an account in which a broker has an interest*, without open and competitive execution of the order on an exchange." CFTC, FUTURES GLOSSARY: A GUIDE TO THE LANGUAGE OF THE FUTURES INDUSTRY (emphasis added). [8] But Gizienski did not own or have an interest in the account at issue here. It is unclear how the reference to "bucketing" could have put him on notice that his conduct violated Rule 155.4(b)(1)(2)(i).

**\*6** The parties cite two previous enforcement actions alleging "bucketing," but both involve brokers who, unlike Gizienski, had an ownership interest in the relevant accounts. In *CFTC v. Topworth International, Ltd.*, a receiver found that the defendant corporation had possibly engaged in metals-futures "bucketed trades" where it did not actually execute its customers' orders, instead "tak[ing] into its own account the opposite side of a given trade." 205 F.3d 1107, 1110 (9th Cir. 1999), *as amended* (Mar. 23, 2000). The receiver therefore decided to distribute the defendant's remaining funds pro rata to investors, a plan that the Ninth Circuit upheld over the objections of an individual investor. *Id.* at 1116. *Topworth* suggests that "bucketing" requires an ownership interest in the underlying account. It does not analyze whether it is ever possible to take the opposite side of a given trade without taking it "into [one's] own account." *Id.* at 1110.

Similarly, in *Purdy v. CFTC*, this court defined "bucketing" in the context of "precious metal leverage contracts" as

> [the] method of doing business wherein orders of customers for the purchase or sale of commodities for future delivery, instead of being executed by bonafide purchases and sales with other traders, are simply matched and offset in the soliciting firm's own office and the firm itself takes the opposite side of the customers' orders.

968 F.2d 510, 520 (5th Cir. 1992) (quoting 80 Cong. Rec. 8088 (May 27, 1936) (remarks of Senator Pope)) (upholding the findings made by an administrative law judge and affirmed by the CFTC that "bucketing" violations did not exist). Like *Topworth*, *Purdy* also suggests that "bucketing" requires an ownership interest in the underlying account.

Neither case addresses the facts before this court, but by negative implication both *Purdy* and *Topworth* suggest that a broker engages in "bucketing" or in "taking the other side" of an order only if he has an ownership interest in the account. Gizienski undisputedly did not have any such interest. Therefore, without further guidance from the CFTC, the language in the Federal Register about "bucketing" could not have put the Defendants on fair notice that the agency might attempt to construe Rule 155.4(b)(2)(i) to prohibit Gizienski's conduct.

The trial testimony likewise suggests that the phrase "taking the other side of orders" was at best ambiguous. For example, one witness stated, without defining the term, that it was not common for brokers to "trade on the opposite side of customer orders." When asked why he did not trade on the opposite side of customer orders, he implied it was because he was not rich enough to do so:

> Well, first of all, the products are very big and expensive. Like hundreds of thousands, millions of dollars in each

transaction. And so I couldn't afford it. Also, you just don't. You don't do it as a broker. You don't trade. You know, you're supposed to be just in the middle, a middleman. And you're trying to align a buyer and a seller into a willing transaction where everyone is happy.

This comment might imply that anyone trading on the opposite side of customer orders would have to be very rich in order to do so. But on the other hand, it might imply that such trades would require decisionmaking power over a discretionary account owned by another. The comment is not dispositive either way, but it seems to lend support to the Defendants' interpretation of the phrase.

Similarly, the repeated statements by witnesses that no one at EOX had discretionary authority over customer accounts may show that such authority was rare at that firm or perhaps in the industry as a whole, but they shed no light on the definition of "taking the other side of trades." In fact, the rarity of such a situation may explain why the phrase was never defined specifically to prohibit discretionary trading in addition to trading for one's own account.

**\*7**  In conclusion, we find the CFTC's construction of the Rule to be thoroughly unpersuasive. Maybe, as the CFTC stated at oral argument, the agency has reasons for wishing to regulate such conduct. But if so, "it is the regulation as written which must bear the blame." *Diamond Roofing Co.*, 528 F.2d at 650. We therefore hold that the Rule applies only to brokers and affiliated persons who "becom[e] a counterparty with a financial interest and the possibility of profit and loss," and not to those who merely "make the decision to trade opposite the order and execute the trade opposite the order." As noted above, "a regulation cannot be construed to mean what an agency intended but did not adequately express." *Id.* at 649.

### III.

The district court's fashioning of injunctive relief is reviewed for abuse of discretion. *Thomas v. Hughes*, 27 F.4th 995, 1011 (5th Cir. 2022).

The portion of the injunction challenged by the Defendants states:

Pursuant to Section 6c of the Commodity Future Trading Act (the "Act"), 7 U.S.C. § 13a-1, EOX and Gizienski are permanently restrained, enjoined, and prohibited from directly or indirectly:

> a. Disclosing the orders of other customers held by them or any affiliated persons, unless such disclosure is necessary to the effective execution of such order or is made at the request of an authorized representative of the CFTC, the contract market on which such order is to be executed, or a futures association registered with the CFTC pursuant to section 17 of the Act, in violation of Regulation 155.4(b)(1), 17 C.F.R. § 155.4(b)(1) (2021); and

> b. Knowingly taking, directly or indirectly, the other side of any order of another person revealed to them or any affiliated persons by reason of their relationship to such other person, except with such other person's prior consent and in conformity with contract market rules approved by or certified to the CFTC, in violation of Regulation 155.4(b)(2), 17 C.F.R. § 155.4(b)(2) (2021).

The Defendants argue that an injunction must "describe in reasonable detail ... the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(C). General injunctions which in essence order a defendant to obey the law, they say, are prohibited. *Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017). The injunction in this case is invalid, according to the Defendants, because it "merely tracked the statutory language and was not limited to the violations found by the Jury." The Defendants argue that the CFTC could seek contempt sanctions against them without filing a new enforcement action alleging different violations of these provisions, "for the purpose, for example, of denying [them] their right to a jury trial."

But an injunction not to disobey a specific law is not overbroad, as the CFTC correctly argues. *See id.* at 784-85.

Because the Defendants lacked fair notice of the CFTC's construction of Rule 155.4(b)(1)(2)(i), we VACATE Paragraph 4(b) of the injunction. But the Defendants' overbreadth challenge fails as applied to Paragraph 4(a). [9]

### IV.

In conclusion, we REVERSE the penalty judgment because Rule 155.4(b)(2)(i), as written, does not apply to the Defendants' actions; we VACATE Paragraph 4(b) of the injunction; and we REMAND for entry of judgment in accordance herewith.

**All Citations**

--- F.4th ----, 2024 WL 78512

## Footnotes

1      ICE is a private "self-regulatory organization" which itself possesses some regulatory authority and imposes various rules on its traders.

2      In addition to the $6.5 million penalty for taking the other side of orders, the jury also imposed a penalty of $500,000 "for Mr. Gizienski's disclosure of a customer's material, nonpublic order information," where the jury found that Gizienski had made such disclosures five times. On Counts III and IV, the jury also imposed on EOX penalties of $350,000 and $140,000 respectively.

3      The Defendants do not contest liability found by the jury under Count III ("EOX failed to create and/or keep pre-trade communications relating to seven trades made in 2014 from the account that Mr. Gizienski managed for Jason Vaccaro.") and Count IV ("EOX violated Rule 166.3," which requires EOX "to both (1) establish adequate policies or procedures for the detection and deterrence of possible wrongdoing by its employees; and (2) follow those policies.").

4      The Defendants argue that the district court erred by (1) giving the parties inadequate notice of the jury instruction, (2) excluding evidence regarding "eligible contract participants," (3) submitting to the jury a verdict form that lacked the Defendants' "Special Interrogatories," and (4) enforcing a ten-hour time limit on each party's trial presentation.

5      It is undisputed that EOX is an "introducing broker" and Gizienski is its "affiliated person" in the meaning of Rule 155.4(b)(2)(i).

6      When, as here, a regulation is ambiguous, an agency may seek judicial deference to the agency's interpretation under *Auer v. Robbins*, 519 U.S. 452, 117 S. Ct. 905, 137 L.Ed.2d 79 (1997). Here, the agency did not avail itself of *Auer* deference because of its view that the regulation plainly supports liability. We disagree. And in any event, "*Auer* deference is sometimes appropriate and sometimes not." *Kisor v. Wilkie*, 588 U.S. ——, 139 S. Ct. 2400, 2408, 204 L.Ed.2d 841 (2019). In particular, "*Auer* deference does not apply if the petitioner 'lacked fair notice' of the agency's interpretation of the regulation that the agency is advancing in the enforcement action." *ExxonMobil Pipeline Co.*, 867 F.3d at 573 (quoting *Employer Sols. Staffing Grp. II, LLC v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 487-88 (5th Cir. 1976)); *see also Kisor*, 139 S. Ct. at 2417-18 (Courts "may not" afford *Auer* deference to agency interpretations that impose liability without "fair warning[.]" (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156, 132 S. Ct. 2156, 183 L.Ed.2d 153 (2012))); *Christopher*, 567 U.S. at 156 n.15, 132 S. Ct. 2156 ("In penalty cases, courts will not accord substantial deference to an agency's interpretation of an ambiguous rule in circumstances where the rule did not place the individual or firm on notice that the conduct at issue constituted a violation of a rule." (quoting 1 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 6.11, at 543 (5th ed. 2010))). Because the "failure to give fair notice—on its own—justifies setting aside the imposed fine," "further analysis" of the appropriate level of deference is "unnecessary." *Employer Sols.*, 833 F.3d at 489 n.7.

| | |
|---|---|
| 7 | As the CFTC notes, the Rule also prohibits improper disclosure of customer information, but the Defendants do not challenge that part of the verdict. |
| 8 | Available online at: https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm. |
| 9 | The CFTC argues that the Defendants waived this argument in any event because they failed to raise it in the motion for judgment as a matter of law. The Defendants reply that they properly preserved their objection. Since neither party cites sources for its interpretation of the law here, this court assumes without deciding that the issue was not waived. |